1  JAMES E. GIBBONS (*pro hac vice application pending*)
   Cal. State Bar No. 130631
2  STEVEN J. RENICK (*pro hac vice application pending*)
   Cal. State Bar No. 101255
3  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
4  15th Floor at 801 Tower
   801 South Figueroa Street
5  Los Angeles, CA 90017
   Telephone: (213) 624-6900
6
   ROBERT W. COHEN (*pro hac vice application pending*)
7  Cal. State Bar No. 150310
   MARIKO TAENAKA (*pro hac vice application pending*)
8  Cal. State Bar No. 273895
   **LAW OFFICES OF ROBERT W. COHEN, A.P.C.**
9  1875 Century Park East, Suite 1770
   Los Angeles, CA 90067
10 Telephone: (310) 282-7586

11 JAMES R. OLSON
   State Bar No. 116
12 PETER M. ANGULO
   State Bar No. 3672
13 **OLSON, CANNON, GORMLEY,**
   **ANGULO & STOBERSKI**
14 9950 W. Cheyenne Ave.
   Las Vegas, NV 89129
15 Telephone: (702) 384-4012

16 Attorneys for Plaintiffs

17                    UNITED STATES DISTRICT COURT

18                        DISTRICT OF NEVADA

19
   SHIGE TAKIGUCHI, FUMI NONAKA, YOZO          )  Case No.:
20 SHIKI, KAORUKO KOIZUMI, AND TATSURO         )
   SAKAI, Individually and On Behalf of All Others )  **COMPLAINT AND DEMAND FOR**
21 Similarity Situated,                         )  **JURY TRIAL**
                                                )
22                    Plaintiffs,               )  **CLASS ACTION**
                                                )
23 vs.                                          )
                                                )
24 MRI INTERNATIONAL, INC., EDWIN J.            )
   FUJINAGA, JUNZO SUZUKI, PAUL MUSASHI         )
25 SUZUKI, LVT, INC., dba STERLING ESCROW,      )
   and DOES 1-500,                              )
26                                              )
                    Defendants.                 )
27                                              )
   _____ )
28

Plaintiffs SHIGE TAKIGUCHI, FUMI NONAKA, ITSUAKI TAKITA, KAORUKO KOIZUMI, AND TASTUROU SAKAI, on behalf of themselves and those similarly situated, sue defendants MRI INTERNATIONAL, INC. ("MRI"), EDWIN J. FUJINAGA, JUNZO SUZUKI, PAUL MUSASHI SUZUKI and LVT, INC., dba STERLING ESCROW ("STERLING ESCROW").

## NATURE OF ACTION

1.     This is an action to recover damages and ancillary equitable relief due to defendants' long-standing operation of a "Ponzi scheme." Under the scheme, MRI purported to operate – and assured investors that it did operate – a legitimate business in dealing in "Medical Account Receivables," or "MARS." MARS are account receivables that U.S. medical providers hold against insurance companies. MRI assured investors, including plaintiffs, that its business was legitimate, that it would use investors' monies to deal in MARS, and that plaintiffs' investments were secure because they were managed by an independent escrow agent, were monitored by U.S. regulators, and were even guaranteed under U.S. law.

2.     In fact, MRI used the investors' money to pay off earlier investors and fund its principals' lavish lifestyles; misled investors about U.S. regulatory and legal oversight and guarantees; and lied to Japanese regulators who investigated the scam. MRI has now stopped paying on its matured obligations to investors and its Las Vegas headquarters are empty. Japanese regulators have stripped MRI of its license to engage in financial transactions in Japan.

## THE PARTIES

3.     MRI is a Nevada corporation founded in July 6, 1998, and headquartered in Las Vegas, Nevada. MRI also has a branch office in Tokyo, Japan. In June 2008, MRI was registered as a Type II Financial Instruments Business under Japanese finance laws by the Kanto Local finance Bureau, a local office of the Financial Services Agency that is directly supervised by the Prime Minister's Cabinet Office. MRI was never authorized under any Nevada or U.S. law to deal in securities.

4.     Edwin J. Fujinaga is an individual living in Nevada. He is MRI's President and Chief Executive Officer.

5.     Junzo Suzuki is an individual living in Tokyo, Japan and Hawaii. He is the registered representative of MRI's Tokyo office, and supervised the operations of MRI in Tokyo.

6.     Paul Musashi Suzuki is an individual living in Tokyo, Japan and Hawaii. He assisted in supervising MRI's Tokyo's operations.

7.     Sterling Escrow is a Nevada corporation incorporated under the name LVT, Inc. It was established in 1988 and is a licensed escrow company under the laws of Nevada (License Number 904).

## JURISDICTION AND VENUE

8.     The Court's jurisdiction is predicated on 28 U.S.C. § 1331 because this action arises under the federal Securities Acts of 1933 and 1934, 15 U.S.C. § 77 *et seq.* and 15 U.S.C. § 78J.

9.     The Defendants are subject to this Court's jurisdiction. The corporate defendants at all relevant times have engaged in continuous and systematic business in the State of Nevada, and have designated agents for service of process in this State, and/or have committed tortious acts in this State. The individual defendants have at all relevant times been engaged in continuous and systematic business in Nevada, and/or have committed tortious acts in this State.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) and (b), because a substantial number of the acts and transactions that gave rise to Plaintiffs' claims occurred within this District.

## CLASS ACTION ALLEGATIONS

11..    This action is brought by plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23.

12.    Plaintiffs seek relief on behalf of themselves and a class of all persons who were MRI investors and who were injured as a result of Defendants' illegal Ponzi scheme and actions (the "Class"). Excluded from the Class are the Defendants, their employees, their family members, and affiliates of Defendants.

13.    The members of the Class number approximately 8,700, and so joinder of all class members in a single action is impracticable. Questions of law and/or fact common to the class

predominate, including but not limited to:

        a.   Whether Defendants were operating an unlawful Ponzi scheme;

        b.   Whether Defendants failed to segregate monies, as promised, between accounts;

        c.   Whether Defendants failed to keep investors' monies in secure escrow accounts;

        d.   Whether Defendants mislead plaintiffs and the class by advising them that MRI and Plaintiffs' investments were regulated by U.S. law;

        e.   Whether Defendants omitted to inform Plaintiffs and the Class Members that they were entering into a Ponzi scheme;

        f.   Whether and to what extent the conduct has caused injury to the Plaintiff and the Class Members.

14.   These and other questions of law and/or fact are common to the Class, and predominate over any question affecting only individual class members.

15.   The Plaintiffs' claims are typical of the claims of the Class, because Plaintiffs were persuaded to invest in MRI through MRI's standard sales representations, and the Plaintiffs lost money as a result of investing what was in reality a Ponzi scheme.

16.   The Plaintiffs will fairly and adequately represent the interests of the Class, because Plaintiffs' claims are typical of those of the Class, and Plaintiffs' interests are fully aligned with those of the Class. The Plaintiffs have retained counsel who are experienced and skilled in complex class action litigation.

17.   Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged in this action, because class treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

18.    The Plaintiffs know of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### MRI'S MISREPRESENTATIONS – THE PONZI SCHEME

19.    MRI typically placed advertisements in Japanese newspapers and magazines to attract potential investors. Plaintiffs who were interested in the investment contacted MRI for additional information and were mailed pamphlets. The pamphlets touted MRI as a thriving company dealing in MARS, and assured potential investors that MRI was a safe, profitable investment where the investors' funds would be managed by an independent third party, closely regulated by U.S. financial authorities, and, in fact, guaranteed under U.S. law. The pamphlets made the following promises:

- the investors' money would be managed not by MRI, but by an independent escrow company, obligated by U.S. law to deposit a set percentage of its funds with the state government each month, which, in turn, would be used to indemnify the investors in the event of a default;

- the investors' money would be placed in a bank "lockbox" account, which only the largest and safest banks could establish, and which only the most trustworthy of customers could obtain; the funds in the lockbox would then be used solely to buy MARS that were of greater value than the amount MRI paid for them;

- the "lockbox" account would be independently-managed and, if the bank were to fail, the state government would guarantee the funds in the account, with the investors having the first right of priority to recover the funds, and

- each U.S. state guarantees MARS up to a legal limit, and MRI purchases MARS only up to this guaranteed limit.

20.    MRI also represented that, because it was the first to introduce "the escrow system" in MARS investments, the Nevada state government closely monitored the escrow company, and required that Sterling Escrow deposit a set percentage of the balance that the held in trust each month with the state to create a contingency fund. MRI described this as the "Trust Fund System."

1    This way, MRI claimed, even if a loss occurred at the escrow company, the state would indemnify

2    the loss though the money deposited by Sterling Escrow in the Trust Fund System.

3        21.    The Financial Products sold by MRI were distilled into a "Contract for Transaction

4    in Financial Product." The contracts were classified into two types, known as "Select A" contract or

5    "Class A" contract. Both the "Select A" Contract and the "Class A" Contract offered investment

6    units of $10,000, $50,000 and $100,000 in U.S. Dollars in the Dollar-denominated Plans, or 1.5

7    Million Yen, 7.5 Million Yen, and 15 Million Yen in the Yen-denominated Plans. Investors were

8    also given options in their investment terms of two years, three years, and five years. Lastly,

9    investors had the option of receiving profit distributions annually (Option A) or at maturity of the

10   investment (Option B).

11       22.    Under the contract, the funds invested by Plaintiffs and the Class were to be used

12   solely to acquire MARS. MRI would use the funds to purchase the MARS at a discounted rate from

13   medical service providers, and then upon recovering payment of the MARS, distribute a portion of

14   the profits to the investor under the contracted interest rate. At the end of the investment term,

15   investors would be reimbursed for their principal invested and any interest they were guaranteed.

16   The contracts, however, were replete with misrepresentations, including the fact that investors'

17   money was to be managed by an independent third-party escrow company, Sterling Escrow, and that

18   the state government guaranteed the collection of MARS.

19       23.    Once Plaintiffs signed up, they were instructed to wire their funds to a Wells Fargo

20   Bank account in the United States. The wire transfers were made to bank accounts in the name of

21   "STERLING ESCROW TRUSTEE for MRI Series" followed by the year the investment was made

22   and the type of investment being made (for example "STERLING ESCROW TRUSTEE for MRI

23   Series 2005 Class A Account.") Over the course of 14 years, the named Plaintiffs sent a total of

24   $77,500,000 Yen ($7.75 million) in cash to Sterling Escrow for investment with MRI.

25       24.    On a quarterly basis, MRI provided a statement with interest calculations to each

26   investor, assuring Plaintiffs that their investment was profiting.

27

28

25.     To bolster its credibility, MRI regularly communicated with its investors, initially through a simple monthly newsletter, but in October 2008, MRI began publishing a magazine called "VIMO" which contained interviews of celebrities and features on luxury brand items, such as high end watches and yachts.  Additionally, when "MRI's MARS Investment," was featured in well known Japanese financial magazines, such as "President" and "Nikkei Business," MRI made sure to send investors the excerpts.  In addition, MRI regularly held seminars in Japan, and hosted complimentary vacations to Las Vegas, calling it the "Las Vegas Gold Tour," for customers who invested large amounts of money, where they were given tours of MRI's U.S. headquarters and MRI's affiliated companies.

26.     Two months prior to maturity, MRI mailed investors documents entitled "Notice of Maturity," which listed details, such as the customer's date of maturity, account designated for redemption, and the total amount of principal.  The document also stated prominently that, if redemption were sought at maturity, special privileges would be lost and no additional investments could be made.  This – combined with the false sense of safety and stability in MRI reinforced by seminars, Las Vegas tours, interest calculation sheets and glossy company newsletters – prompted many investors to simply reinvest the principal and interest rather than redeeming it at maturity.

27.     The time for repayment for many of Plaintiffs' investments have now passed, but MRI has failed to repay Plaintiffs' principal.

28.     Many of the investors have contacted MRI's Tokyo branch, and have been told that while MRI acknowledges that plaintiffs' investments have reached maturity, MRI lacks sufficient funds to repay the principal.

29.     MRI's headquarters in Las Vegas, Nevada, are now shuttered, and calls to the office number are not returned.  Sterling Escrow's offices in Las Vegas are now vacant.

30.     By its own admission, as of December 2012 MRI was entrusted with $136.5 Billion Yen ($1.36 Billion) from approximately 8,700 investors in Japan.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## ACTIONS TAKEN AGAINST MRI BY JAPAN'S FINANCIAL SERVICES AGENCY

31.     On April 26, 2013, Japan's Financial Services Agency (Kanto Local Finance Bureau) revoked MRI's license, based on its fraudulent practices and its attempt to mislead the FSA during the agency's investigation into MRI. In announcing its action, the FSA stated that MRI had violated Article 52(1)(ix) of the Financial Instruments and Exchange Act because "a wrongful act or extremely unjust act has been conducted with regard to Financial Instruments Business, and [ ] these circumstances are especially serious." The FSA also concluded that MRI had provided "false information concerning the conclusion of a Contract for Financial Instruments Transaction or solicitation thereof." Specifically, the FSA found:

- "[MRI] explained to many individual customers that investments would be separately managed through trust accounts and other accounts, opened in the name of a third-party institution. It was found, however, that nearly all of the funds, which were deposited in the trust account for Fund A as investments by customers for the purpose of acquiring Fund Equities were remitted to the trust account for Fund B. In addition, it was found that funds were remitted from Fund B trust account to bank accounts opened in the Company's name as well as to customers of Fund A and Fund B, and thus the Company's own assets and the assets of Fund A and Fund B were commingled from at the latest 2011."

- "[F]unds invested by customers for the purpose of acquiring Fund Equities were not used in the Business but were used to pay dividends and redemptions to other customers."

- "[T]he payment of dividends and redemptions to customers were delayed. Despite such situation regarding the trust accounts which manage the deposits and withdrawals of funds invested by customers, the Company continued solicitation for acquisition of Fund Equities."

- "Although [MRI] notified customers that investments would be used exclusively for the business involving the purchase and collection of MARS in the Company's website, customer brochures, Documents Delivered prior to Conclusion of Contracts, and contracts, as noted in (1) above, from at the least 2011, funds invested by customers were used to pay dividends and redemptions to other customers."

- "Although [MRI] notified . . . [customers] that it would pay customers dividends out of the profits realized on the Business, as mentioned in (1) above, the Company used funds invested by customers to pay distributions to other customers from at the least 2011."

- "Preparing business reports with false statements and submitting such reports to the director-general of the Kanto Local Finance Bureau."

- "[MRI] replied that it had performed an internal assessment of the trust accounts jointly with a third-party institution in response to an order for production of reports issued by the SESC to the Company's president, etc. in the course of this inspection. However, the fact that such an internal assessment had been performed by the Company jointly with a third-party institution was not found."

- "[A]n extremely improper situation continues with respect to the protection of investors, such as the situation where the Company has already prepared brochures and other solicitation materials for 2013 and planned to make solicitation for acquisition to many new customers, and that this situation urgently requires correcting."

32.     In short, the regulators found that investors' funds were not segregated and managed in an independent escrow account, but were kept by MRI and commingled. Moreover, payments to existing investors were not derived from the sale of MARS, but were derived from new investors' contributions. Further, even though it had already begun to have difficulty meeting its obligations to

investors, MRI nonetheless continued to solicit investments from new investors to keep its scheme

going.

## COUNT I

## VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934,

## 15 U.S.C. § 78J  AND RULE 10B-5, 17 C.F.R. 240.10B-5

## (AGAINST ALL DEFENDANTS)

33.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 32 as if fully

set forth herein.

34.    All Defendants are sued either as primary participants in the wrongful and illegal

conduct alleged herein or as controlling persons as alleged herein.

35.    Defendants, individually and in concert, directly and indirectly, by use of interstate

commerce, and of the mails in connection with the purchase or sale of securities described herein,

have with knowing intent to deceive, manipulate, or defraud, and/or with severe recklessness, done

the following:

       a    employed a device, scheme and artifice to defraud;

       b.    made untrue statements of material facts and omitted material facts necessary

            to make the statements made, in the light of the circumstances under which

            they were made, not misleading; and

       c.    engaged in acts, practices and courses of business which have operated as a

            fraud upon the purchasers of such securities.

36.    Specifically, defendants violated Section 10(b) of the Exchange Act of 1934 when

they, knowingly with intent to deceive, manipulate, or defraud, and/or with severe recklessness,

solicited and accepted investment moneys from Plaintiffs and the Class while failing uniformly to

inform Plaintiffs and the Class that:

       a.    none of the Defendants were registered with the State of Nevada or any other

            state to sell securities or provide investment advice;

       b.    the securities in which Plaintiffs and the Class were investing were

**COMPLAINT AND DEMAND FOR JURY TRIAL**

not registered;

    c.   any and all returns on investment were dependent on contributions of moneys from new investors; and

    d.   Defendants intended simply to steal Plaintiffs' and the Class' money through a Ponzi scheme.

37. Under these circumstances, and as set forth above, Plaintiffs and all members of the Class are entitled to a Class-wide presumption of reliance because:

    a.   The fraud attributable to defendants created the market for the securities at issue – i.e., there would have been no market for the securities at issue but for the fraud perpetrated by defendants;

    b.   Defendants perpetrated their fraudulent Ponzi scheme primarily via omissions – defendants failed to disclose that payment of the promised investment returns necessarily depended on the contribution of moneys from new investors and, moreover, defendants intended simply to steal the moneys "invested" by Plaintiffs and members of the Class; and

    c.   All plaintiffs and Class Members were victimized by the same common course of fraud perpetrated by Defendants.

38. Plaintiffs and all other members of the Class are entitled to a class-wide presumption of reliance, because Defendants perpetrated a fraudulent Ponzi scheme on unwitting investors, and no reasonable actor would choose to "invest" in a fraudulent Ponzi scheme that aimed simply to steal investors' moneys.

39. As set forth above, the Japanese financial authorities have sanctioned MRI and withdrawn its license. Moreover, Plaintiffs and other Class members have been unable to recover their monies. In addition, Fujinaga has admitted to Japanese financial authorities that no funds were segregated, there was no secure "lockbox," and that the investors' funds are gone. Accordingly, there exists a strong inference that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by acting with knowing intent to deceive, manipulate or defraud and/or with

1  severe recklessness.

2      40.    As a direct and proximate result of the conduct alleged herein and defendants'

3  violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Plaintiffs and the Class

4  have suffered damages in connection with their investments with MRI.

5                                    **COUNT II**

6  **VIOLATIONS OF SECTION 12(a) OF THE SECURITIES ACT OF 1933, 15 U.S.C. 77L**

7                **(AGAINST DEFENDANTS FUJINAGA AND SUZUKI)**

8      41.    Plaintiffs re-allege and incorporate paragraphs 1 through 40 as if fully set forth

9  herein.

10     42.    Defendants failed to file any registration statement as to the securities that they sold

11  to Plaintiffs and the Class Members.

12     43.    Notwithstanding the fact that Defendants failed to file a registration statement,

13  defendants offered and sold securities to Plaintiffs and the Class Members, in violation of Section

14  12(a)(1).

15     44.    The securities were offered and sold to Plaintiffs and the Class Members by

16  Defendant Fujinaga and Suzuki through the use of interstate communication and the mails, which

17  contained material misstatements and omissions, as described above.

18     45.    All Defendants have offered, sold, promoted, solicited, or passed title on the

19  securities to Plaintiffs and the Class, and thus are statutory sellers to Plaintiffs and the Class

20  Members. As such, all Defendants have violated section 12(a) of the Securities Act of 1933 and are

21  liable to all Plaintiffs and the Class who have purchased securities from Defendants.

22     46.    As a direct and proximate result of the conduct alleged herein, Plaintiffs and the

23  Class Members have suffered damages in connection with their investments with Defendants.

24     47.    Plaintiffs and the Class seek to recover the consideration paid for such security with

25  interest thereon.

26

27

28

### COUNT III

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT OF 1934, 15 U.S.C. § 77T

## (AGAINST DEFENDANTS FUJINAGA, JUNZO SUZUKI AND PAUL SUZUKI)

48.   Plaintiffs re-allege and incorporate paragraphs 1 through 47 as though set forth herein.

49.   As alleged fully above, Defendants' conduct violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

50.   During all times material to this action, Fujinaga, Junzo Suzuki and Paul Suzuki had the power, both direct and indirect, to control MRI and did in fact exercise such control, and was therefore a "controlling person" within the meaning of Section 20(a) of the Exchange Act of 1934.

51.   Plaintiffs and the Class have been damaged by the wrongful conduct of the individual Defendants through their control of MRI, and the wrongful conduct caused Plaintiffs and the Class to invest in Defendants' Ponzi scheme and lose their money.

52.   As such, Defendants Fujinaga, Junzo Suzuki and Paul Suzuki are jointly and severally liable for all damages or losses suffered by Plaintiffs and the Class.

### COUNT IV

## VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933, 15 U.S.C. 77O

## (AGAINST DEFENDANTS FUJINAGA, JUNZO SUZUKI AND PAUL SUZUKI)

53.   Plaintiffs re-allege and incorporate paragraphs 1 through 52 as if fully set forth herein.

54.   As alleged fully above, Defendants' conduct violated Section 5 of the Securities Act of 1933 and Section 12(a)

55.   During all times material to this action, Defendants Fujinaga, Junzo Suzuki and Paul Suzuki had the power, both direct and indirect, to control MRI, and did in fact exercise such control, and were therefore "controlling persons" within the meaning of Section 15 of the 1933 Act.

56.   Plaintiffs and the Class have been damaged by the wrongful conduct of the Individual Defendants through their control of MRI, in that the wrongful conduct caused Plaintiff

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1   and the Class Members to invest in Defendants' Ponzi scheme and lose their moneys.

2       57.     As such, Fujinaga and the Individual Defendants are jointly and severally liable for

3   all damages or losses suffered by Plaintiffs and the Class Members.

4                                   **COUNT V**

5                            **INTENTIONAL FRAUD**

6                         **(AGAINST ALL DEFENDANTS)**

7       58.     Plaintiffs incorporate the allegations the paragraphs 1 through 57 as if set forth in full

8   herein.

9       59.     Fujinaga and employees of MRI made numerous misrepresentations to the public at

10  large and to Plaintiffs and the Class members as set forth above.

11      60.     These Defendants knew that these statements were false when they made them.

12      61.     Defendants intended for Plaintiffs and the Class members to rely upon their false

13  statements.

14      62.     Plaintiffs and the Class did in fact rely on Defendants' false statements, and would

15  never have invested in MRI were it not for the false statements.

16      63.     Defendants have enjoyed substantial financial gain, and Plaintiffs and the Class has

17  suffered severe financial loss as a result of their reliance on the false statements of Defendants.

18      64.     Defendants' conduct described herein was intended by Defendants to cause injury to

19  Plaintiffs or was despicable conduct carried on by Defendants with a willful and conscious disregard

20  of Plaintiffs' rights, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard

21  of Plaintiffs' rights, and was an intentional misrepresentation, deceit or concealment of material

22  facts known to the Defendants with the intent to deprive Plaintiffs of property, legal rights, or to

23  otherwise cause injury, loss, and damage, constituting malice, oppression, or fraud, thereby entitling

24  Plaintiffs to punitive damages against defendants in an amount appropriate to punish or set an

25  example of Defendants.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a

26  sum according to proof.

27

28

## COUNT V

### UNJUST ENRICHMENT

### (AGAINST ALL DEFENDANTS)

65.     Plaintiffs incorporate the allegations the paragraphs 1 through 64 as if set forth in full herein.

66.     By entrusting their money to Defendants, Plaintiffs and the Class conferred benefits on Defendants by investing in their Ponzi scheme.

67.     Defendants voluntarily accepted and retained the benefits conferred by Plaintiffs and the Class.

68.     The circumstances are such that it would be inequitable for Defendants to retain the benefits without paying the value thereof to Plaintiffs and the Class.

69.     Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

70.     Plaintiffs and the Class are entitled to damages as a result of Defendants' unjust enrichment, including the disgorgement of all the funds unlawfully accepted by Defendants from Plaintiffs and the Class.

## COUNT VI

### BREACH OF FIDUCIARY DUTY

### (AGAINST ALL DEFENDANTS)

71.     Plaintiffs re-allege and incorporate paragraphs 1 through 70 as if fully set forth herein

72.     Plaintiffs and the Class Members shared a relationship with Defendants, whereby Defendants held themselves out as worthy of the trust and confidence of Plaintiffs and all Class members. Plaintiffs and the Class Members in fact reposed trust and confidence in Defendants to invest Plaintiffs' and the Class Members' moneys prudently, and to make truthful statements about the investments, and Defendants undertook such trust and assumed a duty to advise and counsel Plaintiffs and the Class Members, and to protect Plaintiffs' and the Class Members' assets.

73.     Defendants breached their duties to advise and counsel Plaintiffs and the Class Members, and to protect Plaintiffs' and the Class Members' assets.

74.     As a direct and proximate result of defendant Sterling Escrow's breach of its

fiduciary duty to Plaintiffs and the Class Members, Plaintiffs and the Class Members have suffered

damages in an amount to be determined at trial.

## COUNT VII

### AIDING AND ABETTING FRAUD

### (AGAINST LVT, INC. dba STERLING ESCROW)

75.     Plaintiffs re-allege and incorporate paragraphs 1 through 74 as if fully set forth

herein.

76.     Sterling Escrow had knowledge of the fraud and the Ponzi scheme committed by

MRI.

77.     As described above, Sterling Escrow substantially assisted MRI and its

representatives in perpetrating the fraud, by wiring plaintiffs' investment funds to MRI to be used

for operation expenses, wiring plaintiffs' funds directly to repay other investors' whose investments

had matured, and commingling investors' monies between different investment funds.  Sterling

Escrow also had knowledge of the fact that, at least since 2011, the funds were not being used to

purchase MARS, which it knew was the only appropriate use of the funds invested by plaintiffs.

78.     As a direct and proximate result of Sterling Escrow's aiding and abetting MRI and its

representatives, MRI's MARS investment fraud flourished, and all of the plaintiffs suffered

damages in an amount to be determined at trial.

79.     Plaintiffs have suffered substantial financial injury as a result of Sterling Escrow's

conduct alleged herein.  The majority of plaintiffs have invested the entirety of their life savings

and retirement savings, and thus are now left with substantially nothing.  As a consequential and

proximate result of their financial injuries, plaintiffs have experienced and continue to experience

severe emotional distress in the form of depression, fear anxiety, worry grief, and  of sleep.

## COUNT VIII

### BREACH OF CONTRACT

### (AGAINST MRI INTERNATIONAL, INC.)

80.    Plaintiffs re-allege and incorporate paragraphs 1 through 79 as if fully set forth herein.

81.    Plaintiffs and the Class have each entered into contracts with Defendant MRI, whereby Plaintiffs agreed to and did invest a specified sum for the purpose of purchasing and collecting MARS, in return for MRI's promises to invest the funds pursuant to the terms of the agreement, and upon maturity, to repay the principal and the accrued interests under the agreements.

82.    At all times relevant, Plaintiffs and the Class have each performed their obligations by making payment in the specified sum as agreed to in each investment contract.  Many of Plaintiffs and the Class' contracts have reached maturity, entitling them to repayment of the principal and the accrued interest.

83.    MRI has breached the contract by failing to invest, segregate, and safeguard the funds as promised, and failing to repay the principal and interest in accordance with the contract.

84.    Plaintiffs and the Class have demanded Defendants to repay the principal and interest in accordance with the contract.

85.    Defendants have refused, and continue to fail and refuse to pay Plaintiff and the Class the monies they are owed.

86.    As direct and proximate result of Defendant MRI's breach, Plaintiffs and the Class have suffered damages in an amount according to proof to be presented at trial together with lawful interest.

### COUNT IX

### ACCOUNT STATED

### (AGAINST MRI INTERNATIONAL, INC.)

87.    Plaintiffs re-allege and incorporate paragraphs 1 through 86 as if fully set forth herein.

88. An account was stated by and between Defendant MRI and each of the Plaintiffs and the Class, wherein it was agreed that Defendant MRI would be indebted to Plaintiff and the Class in the amount set forth in each of the investment contracts.

89. Defendant MRI promised to pay Plaintiffs and the Class in the amount of the principal invested, together with interest as specified in the investment contracts.

90. Although demands have been made by Plaintiffs and the Class, neither the whole nor any part of the above sums has been paid. There is now due, owing and unpaid from Defendant to Plaintiff and the Class an amount according to proof to be presented at trial together with lawful interest.

## COUNT X

## ACTION FOR ACCOUNTING

## (AGAINST ALL DEFENDANTS)

91. Plaintiffs re-allege and incorporate paragraphs 1 through 90 as if fully set forth herein.

92. Defendants were fiduciaries to Plaintiffs and the Class, and at all times relevant, responsible for managing the funds invested by Plaintiffs and the Class. Contrary to their representations, as fully described above, Plaintiffs' and the Class' investments were commingled and used for purposes other than for the purchase and collection of MARS.

93. Plaintiffs and the Class believe and thereon allege, that Defendants have dissipated the monies invested by Plaintiffs and the Class, are unaware of the extent of the dissipation and the full nature of the disposition of the funds invested, despite demands made to Defendants. Plaintiffs and the Class are entitled to know the nature of those transactions and dispositions, but cannot do so without an accounting from Defendants.

94. Plaintiffs and the Class have demanded an accounting of Defendants' operations, but Defendants have failed and refused, and continued to fail and refuse to render an accounting to Plaintiffs and the Class.

## COUNT XI

## CONSTRUCTIVE TRUST

## (AGAINST ALL DEFENDANTS)

95.     Plaintiffs re-allege and incorporate paragraphs 1 through 94 as if fully set forth herein.

96.     By virtue of Defendants' fraudulent acts describe more fully above, Defendants hold the monies invested by Plaintiffs and the Class as a constructive trustee for the benefit of Plaintiffs and the Class.

97.     Plaintiffs and the Class believe and thereon alleges that Defendants have caused and continue to cause injury to Plaintiffs' and the Class' beneficial interest, and the funds will be further dissipated or wasted unless Defendants' conducts are enjoined.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury.

## PRAYER

The named plaintiffs and the plaintiff Class request the following relief:

1.     Certification of the Class;

2.     A jury trial and judgment against defendants;

3.     Damages in the amount of the named Plaintiffs' and the Class' financial loss as a result of Defendants' conduct and for injury to their business and property, all as a result of Defendants' violations of law, as set forth above.

4.     Disgorgement of all ill-gotten gains obtained by defendants through their participation in their fraudulent activities;

5.     For an order declaring that Defendants hold all of the monies invested by Plaintiffs and the Class in trust for Plaintiffs and the Class;

6.     For an accounting of all monies invested by and owing to Plaintiffs and the Class;

7.     For an order enjoining Defendants from wasting the property held in constructive trust;

8.      For attorneys' fees;

9.      For costs of suit; and

10.     For such other and further relief as the Court deems just and proper.

Dated: July 5, 2013

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP

By: /s/ James E. Gibbons
        JAMES E. GIBBONS
        STEVEN J. RENICK
        Attorneys for Plaintiffs

LAW OFFICES OF ROBERT W. COHEN

By: /s/ Robert W. Cohen
        ROBERT W. COHEN
        MARIKO TAENAKA
        Attorneys for Plaintiffs

OLSON, CANNON, GORMLEY,
ANGULO & STOBERSKI

By:
        JAMES R. OLSON
        PETER M. ANGULO
        Attorneys for Plaintiffs

K:\PMA\CASES\MRI\Complaint Revision 7 3 2013.wpd
**COMPLAINT AND DEMAND FOR JURY TRIAL**