JAMES E. GIBBONS (*pro hac vice*)
Cal. State Bar No. 130631
STEVEN J. RENICK (*pro hac vice*)
Cal. State Bar No. 101255
MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
801 South Figueroa Street, 15th Floor
Los Angeles, CA 90017

ROBERT W. COHEN (*pro hac vice*)
Cal. State Bar No. 150310
MARIKO TAENAKA (*pro hac vice*)
Cal. State Bar No. 273895
LAW OFFICES OF ROBERT W. COHEN, A.P.C.
1875 Century Park East, Suite 1770
Los Angeles, CA 90067

JAMES OLSON
State Bar No. 116
OLSON, CANNON, GORMLEY & DESRUISSEAUX
9950 W. Cheyenne Ave.
Las Vegas, NV 89129

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SHIGE TAKIGUCHI, FUMI NONAKA, MITSUAKI TAKITA, KAORUKO KOIZUMI, TATSURO SAKAI, SHIZUKO ISHIMORI, YOKO HATANO, YUKO NAKAMURA, HIDEHITO MIURA, YOSHIKO TAZAKI, MASAAKI MORIYA, HATSUNE HATANO, SATORU MORIYA, HIDENAO TAKAMA, SHIGERU KURISU, SAKA ONO, KAZUHIRO MATSUMOTO, KAYA HATANAKA, HIROKA YAMAJIRI, KIYOHARU YAMAMOTO, JUNKO YAMAMOTO, KOICHI INOUE, AKIKO NARUSE, TOSHIMASA NOMURA, and RITSU YURIKUSA, Individually and On Behalf of All Others Similarity Situated,<br>Plaintiffs,<br><br>vs.<br><br>MRI INTERNATIONAL, INC., EDWIN J. FUJINAGA, JUNZO SUZUKI, PAUL MUSASHI SUZUKI, LVT, INC., dba STERLING ESCROW, and DOES 1-500,<br><br>Defendants. | Case No.: 2:13-cv-01183-JAD-VCF<br><br>**PLAINTIFFS' OPPOSITION TO MRI INTERNATIONAL, INC. AND EDWIN FUJINAGA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT** |

# TABLE OF CONTENTS


I. INTRODUCTION....................................................................................................1

II. ARGUMENT.........................................................................................................1

A. THE SECURITIES CLAIMS ARE ADEQUATELY PLEAD ........................................1

1. Plaintiffs' Have Sufficiently Pled The Existence of a "Domestic Transaction".......................................................................1

a. Title To The Certificates Of Investment Was Transferred In The United States ..............................................2

b. MRI Incurred Irrevocable Liability In The United States...........................5

2. Plaintiff's Section 10(b)/Rule 10b-5 Claims Are Adequately Pled........................6

B. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED STATE LAW CLAIMS AGAINST BOTH FUJINAGA AND MRI .......................................................7

1. Standard for State Law Claims Other than Fraud ...................................................7

2. Alter Ego Liability Against Fujinaga is Adequately Plead ...................................8

3. The Unjust Enrichment Claim is Adequately Plead Against Fujinaga ...........................................................................................9

4. The Breach of Fiduciary Duty Claim is Adequately Plead Against Both MRI and Fujinaga ...........................................................................................10

5. The Causes of Action for Accounting and Constructive Trust are Well Plead ...........................................................................................11

6. The Breach of Contract Claim is Adequately Plead ............................................13

C. PLAINTIFFS HAVE ADEQUATELY ALLEGED THE "WHO, WHAT, WHERE, HOW AND WHEN" OF THE FRAUD SUFFICIENT TO SATISFY BOTH RULE 9 AND THE PSLRA ...........................................................................................14

III. CONCLUSION.......................................................................................................16

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)....................1, 2, 5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)....................8

*Broam v. Bogan*,
320 F.3d. 1023 (9th Cir. 2003)....................8

*Cafasso v. Gen. Dynamics C4 Sys*.,
637 F.3d 1047 (9th Cir. 2011)....................8, 13

*Cladianos v. Friedhoff*,
69 Nev. 41, 46 (Nev. 1952)....................13

*Coffin v. Safeway, Inc*.,
323 F.Supp 2d 997 (D. Ariz. 2004)....................8

*Danning v. Lum's, Inc.,*
86 Nev. 868, 871, 478 P.2d 166 (1970)....................12

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 US 336, 125 S.Ct. 1627 (2005)....................14

*Erickson v. Pardus*,
551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007).................... 8

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736, 742-743 (9th Cir. 2008)....................16

*Hernandez v. Creative Concepts, Inc.,*
862 F.Supp.2d 1073 (D. Nev. 2012)....................10

*Klein v. Freedom Strategic Partners, LLC*,
595 F. Supp. 2d 1152 (D. Nev. 2009)....................10

*Knollenberg v. Harmonic, Inc*.,
152 Fed. Appx. 674 (9th Cir. 2005)....................6

*LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975,*
113 Nev. 747, 942 P.2d 182 (Nev. 1997)....................9

*In re Maxim Integrated Products, Inc. Deriv. Lit.,*
574 F.Supp.2d 1046 (N.D.Cal. 2008)....................11, 12

*In re Maxwell Techs., Inc. Sec. Litig*.,
2014 U.S. Dist. LEXIS 62098 (S.D. Cal. 2014)....................16

**TABLE OF AUTHORITIES**
**(Continued)**

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010)....1

*Nat'l Elevator Industry Pension Fund v. VeriFone Holdings, Inc. (In re VeriFone Holdings, Inc. Sec. Litig.)*, 704 F.3d 694, 701 (9th Cir. Cal. 2012)....14

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. Ariz. 2003)....6, 7

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166 (S.D.N.Y. 2010)....1

*Polaris Industrial Corp. v. Kaplan*, 103 Nev. 598, 747 P.2d 884 (Nev. 1987)....8

*Powers v. United Services Auto Ass'n.*, 115 Nev. 38, 979 P.2d 335 (1999)....10

*Randono v. Turk,* 86 Nev. 123, 466 P.2d 218 (Nev. 1970)....10

*SEC v. Levine,* 462 Fed.Appx. 717 (9th Cir. 2011)....2

*SEC v. United States Reservation Bank & Trust,* 289 Fed. Appx. 228 (9th Cir. 2008)....3

*Schwartz v. Wasserburger*, 117 Nev. 703, 706 (Nev. 2001)....13

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513 (2002)....8

*Thomas v. Wachovia Mortg., FSB,* 2011 WL 3159169, 2011 U.S. Dist. LEXIS 81758 (D. Nev. 2011)....9

*Thompson v. Paul*, 547 F.3d 1055 (9th Cir. 2008)....14

*Topaz Mutual Co. v. Marsh,* 108 Nev. 845, 839 P.2d 606 (1992)....9

*Travelers Cas. & Sur. Co. of Am. v. Williams Bros*., 2013 U.S. Dist. LEXIS 145267 (D. Nev. 2013).... 8

*Unionamerica Mtg. v. McDonald,* 97 Nev. 210, 626 P.2d 1272 (1981)....9

*In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694 (9th Cir. 2012)....14

**TABLE OF AUTHORITIES**
**(Continued)**

*Waldman v. Maini,*
124 Nev. 1121, 195 P.3d 850 (Nev. 2008)....12

*Yang v. Odom*,
2005 U.S. Dist. LEXIS 18089 (D.N.J. 2005)....7

*Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.*,
359 F.Supp.2d 1075 (D. Nev. 2004)....10

*Zucco Partners, LLC v. Digimarc Corp*.,
552 F.3d 981 (9th Cir. 2009)....14

**Statutes** **Page(s)**

15 U.S.C. § 77b *et seq*....2

15 U.S.C. § 77l *et seq*....6

15 U.S.C. § 77m *et seq*....6

15 U.S.C. § 78c *et seq*....3, 4

15 U.S.C. § 78j *et seq*....14

17 C.F.R. § 230.405....6

17 C.F.R. § 240.10b-5(b)....14

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

In this securities class action lawsuit, the plaintiffs, consisting of a group of over 8,000 Japanese investors defrauded of $1.3 Billion, sue Nevada-based MRI International, Inc. and its principals and affiliates for their fraud in the instigation and maintenance of a massive Ponzi scheme. In their Motion to Dismiss, defendants MRI International, Inc. and its principal Edwin Fujinaga, challenge the legal sufficiency of the allegations in plaintiffs' Third Amended Complaint. Defendants' assertions lack merit for the reasons explained below.

## II. ARGUMENT

### A. THE SECURITIES CLAIMS ARE ADEQUATELY PLEAD

#### 1. Plaintiffs' Have Sufficiently Pled The Existence of a "Domestic Transaction"

The defendants argue that the "plaintiffs have again failed to sufficiently plead any cause of action for violations of U.S. securities law because they do not allege facts sufficient to establish the existence of a domestic transaction." Mtn. 4: 21-22. The defendants are wrong both legally and factually. The defendants' argument relates to the finding by the Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 273 (2010) that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." "[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. . . . With regard to securities not registered on domestic exchanges, the exclusive focus [is] on domestic purchases and sale." *Id.* at 266, 268; footnote omitted.

The Supreme Court in *Morrison* "did not have occasion to discuss what it means for a purchase or sale to be 'made in the United States.'" *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F.Supp.2d 166, 176 (S.D.N.Y. 2010). The Second Circuit addressed that issue in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012), holding that "transactions involving securities that are not traded on a domestic exchange are domestic if

irrevocable liability is incurred or title passes within the United States."

> While *Morrison* holds that §10(b) can be applied to domestic purchases or sales, it provides little guidance as to what constitutes a domestic purchase or sale. To determine the meaning of a domestic purchase or sale, we first consider how these terms are defined in the Exchange Act.... [T]hese definitions nonetheless suggest that the act of purchasing or selling securities is the act of entering into a binding contract to purchase or sell securities. Put another way, these definitions suggest that the "purchase" and "sale" take place when the parties become bound to effectuate the transaction.
>
> [¶]
>
> [I]n order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security. ...
>
> [A] sale of securities can [also] be understood to take place at the location in which title is transferred.... Accordingly, to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, we hold that a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Id.* at 67, 68; citation omitted.

The Ninth Circuit, in a case out of this district, has indicated that it interprets the *Morrison* decision in the same way as the Second Circuit. In *SEC v. Levine,* 462 Fed. Appx. 717, 718 (9th Cir. 2011) (cited pursuant to FRAP 32.1), the court rejected the defendants' "argument that their fraudulent conduct outside the United States is not covered by the securities laws." Citing *Morrison*, the Court explained that "the Securities Act governs the Levines' sales because the actual sales closed in Nevada when Marie Levine received completed stock purchase agreements and payments." *Id.* at 719.

**a. Title To The Certificates Of Investment Was Transferred In The United States**

As noted above, a transaction is deemed to be "domestic" if either "irrevocable liability is incurred or title passes within the United States." *Absolute Activist, supra,* 677 F.3d at 67. The defendants have simply ignored the "title passes" method of establishing a domestic transaction, despite the explicit allegation in paragraph 30 of the Third Amended Complaint that MRI transferred title to the securities only when the wired funds were received – in Las Vegas.

Under both statutory and case law, the MRI Certificate of Investment was a security, and it is the transfer of title to that security which confirms that this was a domestic transaction. The term "security" is defined in 15 U.S.C. section 77b(a)(1) as:

> "any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, ***certificate of interest or participation in any profit-sharing agreement,*** collateral-trust certificate, preorganization certificate or subscription, transferable share, ***investment contract,*** voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, ***certificate of deposit,*** or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." (emphasis added)

Similarly, in 15 U.S.C. section 78c(a)(10), the term "security" is defined as:

> "any note, stock, treasury stock, security future, security-based swap, bond, debenture, ***certificate of interest or participation in any profit-sharing agreement*** or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, ***investment contract,*** voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, ***certificate of deposit,*** or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." (emphasis added)

As described by defendant MRI itself in Article 1-1 of its "Financial Products Trading Contract," a copy of which was submitted to the Court as Exhibit B to the Declaration of Nicole Tadano in Support of Defendants Junzo Suzuki and Paul Musashi Suzuki's Motion to Dismiss Third Amended Complaint (Dkt. No. 172-2), the purpose of the investment by the plaintiffs with MRI was that "Party A [the plaintiffs] shall invest money ("Invested Amount") with Party B [MRI] as capital to purchase Medical Accounts Receivables ("MARS"), which Party B will buy from medical industry." MRI then "uses the contributed money to buy MARS and execute collections ("Business Covered by the Investment"), distributing part of the profit generated from the Business Covered by the Investment to Party A and return the Invested Amount upon the expiration of the Contract term." That clearly comes within the statutory definitions of "security" as set out above, as, at the very least, either a "certificate of interest or participation in [a] profit-sharing agreement" or more generally as an "investment contract."

The Ninth Circuit has interpreted these definitions the same way, as can be seen in its opinion in

the case of *SEC v. United States Reservation Bank & Trust*, 289 Fed.Appx. 228, 229 (9th Cir. 2008) (cited pursuant to FRAP 32.1), in which the defendant "challenge[d] the district court's findings that (1) the two-part investment offering by United States Reservation Bank and Trust ('USRBT') was a 'security' as defined in § 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(l), and § 3(a)(10) of the Exchange Act of 1934, 15 U.S.C. § 78c(a)(10)."

> "The district court did not err when it found that the investment offered by USRBT, which consisted of a certificate of deposit ('CD') and a leveraged profit-sharing agreement, was a security. 'The term "security" means any note ... [or] investment contract. . . .' Securities Act § 2(1), 15 U.S.C. § 77b(a)(l); Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10). The instrument was a note, and that conclusion is bolstered by the following facts: (1) its purpose was to raise funds for USRBT's financial investments; (2) the buyers' interest was in the profits to be generated by it; (3) Defendants-Appellants were retained by USRBT to sell it to as many buyers as possible; (4) it was sold to at least twenty investors or investor groups comprising several hundred underlying investors; (5) it was advertised in at least one newspaper; (6) a reasonable investor was likely to regard it as an investment since it was marketed as offering the greater of a fixed rate of return of 6.5% or 20% of the profits gained by use of the leveraged funds; and (7) unlike a CD issued by a national or state-chartered bank and insured by the Federal Deposit Insurance Corporation, the investment was not insured, guaranteed or subject to any alternative regulatory scheme that would reduce its risk. *See Reves v. Ernst & Young*, 494 U.S. 56, 66-67, 110 S.Ct. 945, 108 L.Ed. 2d 47 (1990); *Marine Bank v. Weaver*, 455 U.S. 551, 558-59, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982) (emphasizing that investment in CD linked to profit-sharing agreement was 'abundantly protected under the federal banking laws' where CD was FDIC-insured).
>
> The investment was also an investment contract, and thus a security, because purchasers were required to make an investment of money in a common enterprise with the expectation of profits solely from the efforts of others. *SEC v. W. J. Howey*, 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).
>
> Finally, the instrument should be characterized as a security because its economic risk required the protections provided to investors by the federal securities laws. *See Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)."

*SEC v. United States Reservation Bank & Trust*, 289 Fed.Appx. at 230-231.

The similarities to MRI's investment scheme are obvious. The purpose of the MRI Certificate of Investment "was to raise funds for [MRI's] financial investments." *Id.* "[T]he buyers' interest was in the profits to be generated by it." *Id.* The role of the defendants was "to sell it to as many buyers as possible." *Id.* The Certificates of Investment were sold to thousands of investors. The scheme was heavily advertised and promoted, and was marketed as offering both a payment of shared profits as well as the return of the entire invested principal at the end of the term of the contract.

And "the investment was not insured, guaranteed or subject to any alternative regulatory scheme

that would reduce its risk," *id.*, although the defendants fraudulently told the plaintiffs exactly the opposite. For that reason, if no other, "the instrument should be characterized as a security because its economic risk required the protections provided to investors by the federal securities laws." *Id.* There simply can be no dispute that the MRI Certificate of Investment was a security, "because purchasers were required to make an investment of money in a common enterprise with the expectation of profits solely from the efforts of others." *Id.* The defendants do not even attempt to dispute that title to the Certificate of Investment, the security at issue in this action, transferred in Nevada, as alleged by the plaintiffs in the TAC.

> "Investors were required to ... wire the total investment amount to the designated Wells Fargo Las Vegas branch bank account. ... Once MRI confirmed receipt of the funds in the Wells Fargo Bank account the transaction was deemed complete. Only then would MRI transfer title to the securities as evidenced by a 'Certificate of Investment,' which was sent by Federal Express to each investor." TAC ¶¶ 29-30.

Since the plaintiffs have adequately alleged – both legally and factually – that title to the securities at issue in this action passed within the United States, they have adequately alleged domestic transactions for the purposes of the federal securities laws.

**b. MRI Incurred Irrevocable Liability In The United States**

Again, as noted above, a transaction is deemed to be "domestic" if either "irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, *supra*, 677 F.3d at 67. Even if title had not passed within the United States (which it did, as discussed above in Section 1.A.), these sales of the MRI Certificates of Investment would still have to be deemed domestic transactions, because MRI incurred irrevocable liability in the United States.

The defendants argue that the allegations of the TAC establish that MRI's irrevocable liability was incurred outside the United States, because that is where the contracts were executed by the plaintiffs. *See* Mtn, p. 8-9. But MRI's own contract with investors makes clear that execution of the contract by the plaintiffs was ***not*** sufficient to cause MRI to incur irrevocable liability to those plaintiffs.

Specifically, the contracts between the plaintiffs and MRI were not finally formed until both "the payment of the Invested Amount to the bank account prescribed in Article 2-2 has been completed and this contract with the signature of Party A affixed has reached Party B." Article 5-1 of the MRI "Financial Products Trading Contract" (Dkt. No. 172-2). Thus, where the contracts were executed is

irrelevant under the terms of Article 5-1, under which MRI's irrevocable liability was not to be incurred until the executed contract "has reached Party B," i.e. MRI.

As to where the contracts were sent after execution, the allegations set out in paragraph 29 indicate that paperwork was to be sent by the investors to MRI's "Las Vegas headquarters," not to its offices in Japan.

> "29. After completing the application, the investors were then required to mail the application to the Las Vegas headquarters. Upon receipt of the application, MRI prepared and mailed back a 'Corporate Certificate of Investment Agreement' to investors. The Corporate Certificate of Investment Agreement detailed the investors' personal information, the investment terms, and bank remittance information. Investors were required to sign the agreement and then wire the total investment amount to the designated Wells Fargo Las Vegas branch bank account."

Since both conditions for completion of the contract had to occur in Las Vegas, there can be no dispute that the contractual relationship between the plaintiffs and MRI came into being in Nevada, and thus MRI's irrevocable liability was incurred in the United States. On this basis, as well, then, the plaintiffs have adequately alleged domestic transactions for the purposes of the federal securities laws.

### 2. Plaintiffs Have Sufficiently Pled Section 20(a) and Section 15

Fujinaga next argues that plaintiffs have failed to plead sufficient facts to state a claim for "control person" liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act against him. As discussed below, Fujinaga is wrong.

To state a claim for control person liability under Section 15 of the 1933 Act, plaintiff must plead that: 1) the defendant had the power to influence or control the primary violator, and 2) the defendant actively used this influence or control so as to be a "culpable participant" in the primary violation. *Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 685 (9th Cir. 2005). To prove a prima facie case under Section 20(a), plaintiff must plead: 1) a primary violation of federal securities law; and 2) that the defendant exercised actual power or control over the primary violator. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether *through the ownership of voting securities*, by contract, or otherwise." 17 C.F.R. § 230.405 [emphasis added].

Courts often look to traditional indicia of control, such as length of stock ownership, size of stock ownership, and voting power to elect directors, to determine whether a defendant "controlled" the primary violator. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, *supra*, 320 F.3d at 946.

In the TAC, plaintiffs allege that Fujinaga was a control person of MRI because: a. Fujinaga was the President and exclusively responsible for MRI's U.S. operations; b. Fujinaga owned 100% of MRI's shares and had the ability to contractually bind MRI; c. Fujinaga had the power to influence and control, and did influence and control the decision-making of MRI, including the content and dissemination of false and misleading statements in offering circulars, advertisements, and communications directly to investors, and had the ability to prevent or correct them prior to their issuance; d. Fujinaga supervised and directed the day-to-day operations of MRI's Las Vegas branch; and e. Fujinaga had intimate knowledge of MRI's finances and the financial statements prepared on behalf of MRI, because he provided the information to MRI's internal and outside accountants. TAC, ¶¶ 7, 96. These allegations clearly establish that Fujinaga was a "control person" under all relevant elements under both Section 15 and Section 20(a).

Nonetheless, Fujinaga argues that the TAC's allegations are conflicting, because it argues both that Fujinaga exercised total control and that the Suzukis exercised total control. Motion to Dismiss, p. 11. In fact, there is no such conflict. The TAC alleges that Fujinaga exercised total control over MRI's U.S. operations and ultimately over all of MRI's operations, but that the Suzukis managed and controlled MRI's Tokyo office and MRI's Japanese solications. TAC, ¶¶ 7-10, 75, 78, 96, 97. The allegations thus sufficiently plead control by both Fujinaga and the Suzukis. Moreover, there is no bar, either in logic or law, against asserting control person liability against more than one individual or entity. *See, e.g., Yang v. Odom*, 2005 U.S. Dist. LEXIS 18089 (D.N.J. 2005) [court grants class certification against multiple control persons].

**B. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED STATE LAW CLAIMS AGAINST BOTH FUJINAGA AND MRI**

Defendants make a variety of arguments against plaintiffs' state law claims. They are all meritless.

**1. Standard for State Law Claims Other than Fraud**

Causes of actions not premised on the federal securities law or fraud are governed by Rule 8 (a), and not subject to any heightened pleading requirements. *Coffin v. Safeway, Inc.*, 323 F.Supp. 2d 997 (D. Ariz. 2004). Complaints filed in federal court require only "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2); *Swierkiewicz v. Sorema N.A.*,534 U.S. 506, 513 (2002) . The complaint need only allege facts sufficient enough to give defendants notice of the claim and raise a "plausible" claim for relief. *Bell Atlantic Corp. v. Twombly* 550 U.S. 544, 570-572 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In determining whether a pleading states a plausible claim for relief, courts consider the complaint's factual allegations, together with all reasonable inferences from those allegations. *Cafasso v. U.S. ex rel. v. General Dynamic C4 Systems, Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011). Courts disfavor motions to dismiss under Rule 12(b)(8) and are rarely granted. *Broam v. Bogan*, 320 F.3d. 1023, 1028 (9th Cir. 2003). In determining the sufficiency of the pleading, allegations of material fact are taken as true and construed in the light most favorable to the pleader. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

**2. Alter Ego Liability against Fujinaga is Adequately Pled**

In Nevada, the requirements for finding alter ego are: 1) the corporation must be influenced and governed by the person asserted to be its alter ego; 2) there must be such unity of interest and ownership that one is inseparable from the other; and 3) the facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice. *Polaris Industrial Corp. v. Kaplan*, 103 Nev. 598, 601, 747 P.2d 884, 886 (Nev. 1987).

In determining whether a unity of interest exists between the individual and the corporation, courts have looked to facts like comingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities. *Polaris Industrial Corp. v. Kaplan*, *supra*, 103 Nev. at 601. These factors may indicate the existence of an alter ego relationship, but are not conclusive. There is no litmus test for determining when the corporate fiction should be disregarded, and the result depends on the circumstances of each case. *Id.* at 601-02; *Travelers Cas. & Sur. Co. of Am. v. Williams Bros*., 2013 U.S. Dist. LEXIS 145267, 37-38 (D. Nev. 2013).

Here, the TAC amply pleads these elements. It pleads that Fujinaga was the sole shareholder of MRI, Inc. (TAC, ¶ 7); that he had sole control over the investors' funds that came into the Sterling Escrow bank account, which he put to his own uses as he pleased (TAC, ¶ 72); that he commingled those assets with MRI's general accounts (TAC, ¶ 71); and that he diverted the funds to affiliated phony companies such as The Factoring Company, XIII, LLC, which then paid Fujinaga's alimony, luxury cars, country club dues, and other living expenses (TAC, ¶ 73). Additionally, Fujinaga diverted corporate and investor funds to an entity called CSA Service Center, which them purchased multi-million dollar residences for Fujinaga and his wife. TAC, ¶ 73. These allegations satisfy the elements of alter ego liability against Fujinaga, because they show commingling of funds, diversion of assets, and treatment of corporate assets as his own. Therefore, because alter ego liability is adequately plead against Fujinaga, all state law claims are validly plead against Fujinaga as an individual.

**3. The Unjust Enrichment Claim is Adequately Plead Against Fujinaga.**

Under Nevada law, an unjust enrichment claim arises where the plaintiff confers a benefit on the defendant, the defendant keeps the benefit, and it would be inequitable for him to retain the benefit without paying the value to defendant. *Unionamerica Mtg. v. McDonald*, 97 Nev. 210, 212, 626 P.2d 1272, 1273 (1981). In short, unjust enrichment is "'the unjust retention ... of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Topaz Mutual Co. v. Marsh*, 108 Nev. 845, 856, 839 P.2d 606, 613 (1992), quoting *Nevada Industrial Dev. v. Benedetti*, 103 Nev. 360, 363, n. 2, 741 P.2d 802, 804, n. 2 (1987).

Relying on *Thomas v. Wachocia Mortgage*, FSB, 2:10-CV-01819-ECR, 2011 WL 3159169 (D. Nev. July 25, 2011), Fujinaga argues that no unjust enrichment claim lies against him, because plaintiffs' claim involves breach of a written contract. But the reliance on that authority is misplaced. In that case, the district court explained that "an action for unjust enrichment cannot stand when there is an express written contract which guides the activities of the ***parties***" (emphasis added), citing to *LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975,* 113 Nev. 747, 942 P.2d 182 (Nev. 1997).

In *LeasePartners,* defendant argued the same point Fujinaga argues here: "that an action for unjust enrichment was improper because a written contract existed." *Id.* at 755, 942 P.2d at 187. The Nevada Supreme Court rejected the contention, since while "[i]n the instant case, a written contract

existed between Brooks Trust and Danzig Corp., and a written contract existed between LeasePartners and Danzig Corp. ..., no written contract existed between LeasePartners and Brooks Trust. Therefore, we conclude that there was no 'written agreement' ... and a claim for restitution (and unjust enrichment) was not barred on this ground." *Id.* at 756, 942 P.2d at 187.

The same situation is present here. While there are contracts between the plaintiffs and MRI, there is no contractual relationship between *plaintiffs* and *Fujinaga*. Accordingly, even under his own authority, no bar exists against plaintiffs pursuing an unjust enrichment claim against Fujinaga.

**4. The Breach of Fiduciary Duty Claim is Adequately Plead Against both MRI and Fujinaga**

Breach of fiduciary duty has three elements: 1) existence of a fiduciary duty; 2) breach of the duty; and 3) resulting damages. *Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009). A fiduciary relationship exists when one has the right to expect trust and confidence in another's integrity and fidelity. *Powers v. United Services Auto Ass'n*., 115 Nev. 38, 979 P.2d 335, 337-338 (1999). *See Randono v. Turk*, 86 Nev. 123, 466 P.2d 218, 222 (1970) ["confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other. The question in such case is always whether or not trust is reposed."]. *See also Hernandez v. Creative Concepts, Inc*., 862 F.Supp.2d 1073 (D. Nev. 2012). "[T]he question for the Court is whether, under the circumstances of this case, a reasonable jury could conclude that a *reasonable person* would impart special confidence in the other party and whether the other party would *reasonably* know of this confidence." *Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.*, 359 F.Supp.2d 1075, 1088 (D. Nev. 2004) (emphasis in original), overruled on other grounds by *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 881 (9th Cir. 2007). In Nevada, a confidential relationship arises between an investment advisor and his or her client. *See Randono v. Turk*, *supra*, 86 Nev. at 129, 466 P.2d at 222 (D.Nev. 1970) ["[I]n G. Bogert, The Law of Trusts and Trustees § 482 (2d ed. 1960), it is written, 'Investment advisors have been held to occupy a confidential relation toward those advised.'"].

The TAC alleges that "Defendants held themselves out as worthy of the trust and confidence," that the plaintiffs "in fact reposed trust and confidence in Defendants to invest Plaintiffs' and the Class Members' moneys prudently, and to make truthful statements about the investments," and that the

"Defendants undertook such trust and assumed a duty to advise and counsel Plaintiffs and the Class Members, and to protect Plaintiffs' and the Class Members' assets." TAC ¶ 132. The plaintiffs further allege that the defendants breached the fiduciary duty by, among other things, making "material misstatements and omissions" in offering securities to plaintiffs and in diverting investors' funds for their own uses. TAC ¶¶ 8-10, 35, 42, 67, 75.

Under the circumstances, then, plaintiffs' reliance and placement of trust in defendants was reasonable. Defendants skillfully persuaded plaintiffs, through various marketing techniques, that MRI was a legitimate, successful investment. In addition, the defendants' temporarily-successful maintenance of the Ponzi scheme also persuaded the investors that defendants could be trusted, because profits were initially paid.

Defendants are correct, of course, that not *all* economic relationships between persons will give rise to fiduciary duties, but the list they provide of relationships falling short of the duty -- which is the only matter of substance they offer on the issue -- is hardly relevant to the question of their own fiduciary status. Defendants' authorities are distinguishable. A seller of property, a breast implant manufacturer, an assignor of partnership profits, and a car financier may not be fiduciaries to the buyer, customer, assignee, or car dealer under Nevada law. *See* Mtn, p. 14-15. But those relationships are far different from that of an investment advisor to an advisee, a relationship that the Nevada courts *have* found to be fiduciary in nature. *Randono v. Turk, supra*, 86 Nev. at 129, 466 P.2d at 222. The investment advisor urges the other party to invest his or her life savings into the advisor's investment, *with the express promise that the investor can be trusted.*

As noted, Nevada law imposes fiduciary relationships where trust and confidence are expected to exist, and does not impose technical requirements on the equitable doctrine. Under Nevada law, the TAC pleads the requisite facts as to the Breach of Fiduciary Duty claim.

**5. The Causes of Action for Accounting and Constructive Trust are Well Pled**

An "accounting" is an equitable remedy allowing the court to determine a misallocation of expenses and the resulting damages when there is a fiduciary relationship between the parties. *In re Maxim Integrated Products, Inc. Deriv. Lit.*, 574 F.Supp.2d 1046 (N.D. Cal. 2008), citing *Carlson v. Hallinan*, 925 A.2d 506, 538 n. 211-12 (Del.Ch.2006). "Since officers and directors are fiduciaries of a

corporation, the duties they owe with respect to the exercise of their legal power over corporate property supervene their legal rights [citation]. Therefore, they may be required to account for their stewardship over corporate property." *In re Maxim Integrated Products, Inc. Deriv. Lit.,, supra,* 574 F.Supp.2d at 1067.

Both MRI and Fujinaga took on the role of plaintiffs' investment advisor, and therefore stood as plaintiffs' fiduciaries when they have unlawfully received millions in funds properly owing to the plaintiffs. Furthermore, the TAC alleges that Fujinaga "was and is MRI's sole shareholder, President, Chief Executive Officer, and a member of its Board of Directors." TAC ¶ 7. He was in a position of control over MRI's property, and, in particular, the flow of funds**.** *See* TAC ¶¶ 71- 74. An accounting will thus properly enable the Court to determine the damages caused by defendants' betrayal of plaintiffs' trust.

As to the Constructive Trust claim, defendants claim that it should be dismissed solely on the ground that it stands or falls within the Fraud and Unjust Enrichment claims. But as set forth above, the Fraud and Unjust Enrichment claims are well plead. Therefore, by defendants' own logic, the claim should survive.

In any event, a claim for Constructive Trust is not dependent on a showing of fraud. To the contrary, imposition of a constructive trust requires: "1) [that] a confidential relationship exists between the parties; 2) retention of legal title by the holder thereof against another would be inequitable; and 3) the existence of such a trust is essential to the effectuation of justice." *Waldman v. Maini* 124 Nev. 1121, 1131, 195 P.3d 850, 857 (2008). In fact, in *Waldman v. Maini, supra*, 124 Nev. at 1131, 195 P.3d at 857, the Nevada Supreme Court explained that "constructive trust as a remedy is not limited to [fraud and] misconduct cases; it redresses unjust enrichment, not wrongdoing." Footnote and internal quotation marks omitted.

In essence, a constructive trust is a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it. *Danning v. Lum's, Inc.*, 86 Nev. 868, 871, 478 P.2d 166 (1970). As explained above, the TAC alleges ample facts to establish that a confidential relationship existed between MRI and Fujinaga by virtue of

their role in advising and selling fraudulent securities to the plaintiffs, and that MRI and Fujinaga hold property that is rightly plaintiffs.' This is sufficient under Nevada law.

**6. The Breach of Contract Claim is Adequately Plead**

Defendants ask the court to dismiss the Breach of Contract claim because not all of the respective contracts have reached maturity. But, even if this were the case, MRI provides no authority as to why the entire Breach of Contract count should be dismissed. In fact, the authorities MRI cites actually argue against dismissal of the count, since MRI cannot dispute that it *is* in breach on thousands of investment contracts with plaintiffs and the class. *See Cafasso v. Gen. Dynamics C4 Sys*., 637 F.3d 1047, 1054 (9th Cir. 2011) [under Rule 12(b)(6) motion, court determines whether plaintiff can state "plausible claim" for relief]. Plaintiffs' claim for Breach of Contract is clearly plausible because thousands of contracts are currently in default.

As to contracts to come due in the future, there is no conceivable scenario under which MRI could ever make good on them. As the TAC alleges, MRI stopped paying interest and liquidations to investors in April 2013; it has been stripped of its license to sell securities in Japan; it is being sued by the SEC and has stipulated to a Preliminary Injunction and an asset freeze; and Fujinaga has admitted that MRI was a Ponzi scheme.[1] TAC, ¶¶ 68-74. The only reasonable inference under these allegations, therefore, is that MRI will never be able to honor its obligations to pay the hundreds of millions of dollars to be owed when the contracts become due in the future.

An anticipatory breach of contract occurs when one party shows, either by words or conduct, that it will not perform under an executory contract. *Schwartz v. Wasserburger*, 117 Nev. 703, 706 (Nev. 2001); *Cladianos v. Friedhoff*, 69 Nev. 41, 46 (Nev. 1952) [where "one party to an executory contract refuses to treat it as subsisting and binding upon him, or, by his act and conduct, shows that he has renounced it, and no longer considers himself bound by it, there is, in legal effect, a prevention of performance by the other party. And it can make no difference whether the contract has been partially performed, or the time for performance has not yet arrived . . . "].

---

[1] The SEC filed a motion for summary judgment on its securities fraud claims against MRI and Fujinaga on July 16, 2014. (2:13-cv-01658-JCM, Dkt. 113)

Here, under the circumstances, MRI has shown that it will never be able to pay off the investment contracts that are to become due in the future. This is an anticipatory breach. Thus, as to both the contracts in default now and those still to mature in the future, plaintiffs have stated a claim for breach of contract.

**C. PLAINTIFFS HAVE ADEQUATELY ALLEGED THE "WHO, WHAT, WHERE, HOW AND WHEN" OF THE FRAUD SUFFICIENT TO SATISFY BOTH RULE 9(b) AND THE PSLRA**

Under Section 10(b) of the Securities Exchange Act of 1934, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a securities fraud claim, plaintiff must allege: 1) a material misrepresentation or omission; 2) scienter; 3) a connection between the misrepresentation or omission with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo* (2005) 544 U.S. 336, 341, 125 S.Ct. 1627, 1631; *Thompson v. Paul*, 547 F.3d 1055, 1061 (9th Cir. 2008). In addition, a complaint stating claims under Section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Nat'l Elevator Industry Pension Fund v. VeriFone Holdings, Inc. (In re VeriFone Holdings, Inc. Sec. Litig.)*, 704 F.3d 694, 701 (9th Cir. 2012). Under Rule 9(b), a plaintiff must state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). Under the PSLRA, plaintiff must plead with particularity the elements of falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009).

The TAC recounts the fraud in copious detail. From 2008 until the date that Japanese regulators shut it down, MRI, under the signature of its CEO and sole shareholder, Fujinaga, made the following demonstrably-false misrepresentations in its offering books:

- the investors' money would only be invested in MARS;

- the investors' money would be managed not by MRI, but by an independent escrow company obligated by U.S. law to deposit a set percentage of its funds with the state government each month, which would be used to indemnify the investors in the event of a default;
- the investors' money would be placed in a bank "lockbox" account, which only the largest and safest banks could establish, and which only the most trustworthy of customers could obtain; the funds in the lockbox would then be used solely to buy MARS that were of greater value than the amount MRI paid for them;
- the "lockbox" account would be independently managed and, if the bank were to fail, the state government would guarantee the funds in the account, with the investors having the first right of priority to recover the funds;
- each U.S. state guarantees MARS up to a legal limit, and MRI purchases MARS only up to this guaranteed limit; and
- if MRI filed for bankruptcy, then the escrow company, with the assistance of the state government, would retain a new company to collect on the MARS. The escrow company would then be responsible for distributing the funds to the investors.

TAC, ¶¶ 38-39, 43, 49, 55, 62.

The TAC explains further that Japanese financial regulators concluded that MRI: 1) commingled investor contributions with MRI's own funds, and did not keep separate accounts, as promised to the investors; 2) used investor money not to buy MARS, but to pay off earlier investors; 3) continued to solicit new investors by touting the soundness of the investment even as MRI could not pay off existing investors; 4) submitted false business reports to Japanese regulators with the goal of avoiding detection and continuing to defraud investors; and 5) continued to prepare brochures and offering materials making the standard representations, which MRI and Fujinaga knew were patently false. TAC, ¶ 68.

Additionally, the TAC alleges Fujinaga himself admitted to running a classic Ponzi scheme for the three to five years before the Japanese regulators' investigation, i.e., using new investor money to pay off old investors. TAC, ¶71. The TAC also alleges that MRI's bookkeeper admitted that MRI's promises of a separate escrow account and a lockbox account for investors' money were lies, because the

lockbox/escrow account was always just a business checking account over which Fujinaga had complete control. TAC, ¶ 72. Further, the TAC alleges that Fujinaga himself instructed the bookkeeper to write checks to MRI's affiliated companies, including millions of dollars to a phony consulting company, Factoring Company XIII, LLC, which then paid for Fujinaga's luxuries and personal expenses. TAC, ¶ 73. Likewise, Fujinaga instructed that in excess of $100 million of investors' money be transferred to CSA Service Center, LLC, another MRI affiliate, which in turn purchased tens of millions of dollars in real estate and luxury homes for Fujinaga and his wife. TAC, ¶ 73.

These allegations provide the requisite detail of the misleading and false statements by MRI and Fujinaga and state why they were misleading. Moreover, the allegations give rise to a strong inference of scienter as to Fujinaga, because he signed offering books that contained the blatantly false representations, which he knew were blatantly false because he was the CEO of MRI and controlled all U.S. operations. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 742-743 (9th Cir. 2008) [scienter shown when individual acts with intent to deceive, manipulate or defraud].

Likewise, the allegations establish scienter on MRI's part. *See Glazer Capital Mgmt., LP v. Magistri*, *supra*, 549 F.3d at 744-45 [scienter of corporation can be established by misrepresentations by senior corporate officials who made them with scienter]; *In re Maxwell Techs., Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 62098 (S.D. Cal. 2014) [same]. Thus, the fraud claims are well plead against both MRI and Fujinaga under Rule 9(b) and the PSLRA.

## III. CONCLUSION

The plaintiffs believe that they have plead sufficient facts to support all of the counts they have alleged against MRI and Fujinaga, and accordingly they urge the Court to deny the defendants' motion to dismiss in its entirety. However, should this Court determine that additional allegations are needed to adequately state one or more of the counts, the plaintiffs state that they can allege all additional facts necessary to adequately state each of those counts, and under those circumstances request leave to amend the complaint to add the necessary allegations.

Dated: July 24, 2014

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP

By: /s/ James Gibbons
JAMES E. GIBBONS
STEVEN J. RENICK
Attorneys for Plaintiffs

LAW OFFICES OF ROBERT W. COHEN
A Professional Corporation

By: /s/ Robert W. Cohen
ROBERT W. COHEN
MARIKO TAENAKA
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2014, a copy of the foregoing document was filed electronically via the Court's CM/ECF system. Pursuant to Local Rule 5.5(h), notice of filing will be served on all parties by operation of the Court's CM/ECF system, and parties may access this filing through the Court's CM/ECF system.

/s/ Mariko Taenaka
MARIKO TAENAKA