JAMES E. GIBBONS (*pro hac vice*)
Cal. State Bar No. 130631
STEVEN J. RENICK (*pro hac vice*)
Cal. State Bar No. 101255
MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP
801 South Figueroa Street, 15th Floor
Los Angeles, CA 90017

ROBERT W. COHEN (*pro hac vice*)
Cal. State Bar No. 150310
MARIKO TAENAKA (*pro hac vice*)
Cal. State Bar No. 273895
LAW OFFICES OF ROBERT W. COHEN, A.P.C.
1875 Century Park East, Suite 1770
Los Angeles, CA 90067

JAMES OLSON
State Bar No. 116
OLSON, CANNON, GORMLEY & DESRUISSEAUX
9950 W. Cheyenne Ave.
Las Vegas, NV 89129

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SHIGE TAKIGUCHI, FUMI NONAKA, MITSUAKI TAKITA, KAORUKO KOIZUMI, TATSURO SAKAI, SHIZUKO ISHIMORI, YOKO HATANO, YUKO NAKAMURA, HIDEHITO MIURA, YOSHIKO TAZAKI, MASAAKI MORIYA, HATSUNE HATANO, SATORU MORIYA, HIDENAO TAKAMA, SHIGERU KURISU, SAKA ONO, KAZUHIRO MATSUMOTO, KAYA HATANAKA, HIROKA YAMAJIRI, KIYOHARU YAMAMOTO, JUNKO YAMAMOTO, KOICHI INOUE, AKIKO NARUSE, TOSHIMASA NOMURA, and RITSU YURIKUSA, Individually and On Behalf of All Others Similarity Situated,

Plaintiffs,

vs.

MRI INTERNATIONAL, INC., EDWIN J. FUJINAGA, JUNZO SUZUKI, PAUL MUSASHI SUZUKI, LVT, INC., dba STERLING ESCROW, and DOES 1-500,

Defendants.

Case No.: 2:13-cv-01183-JAD-VCF

**PLAINTIFFS' OPPOSITION TO JUNZO SUZUKI AND PAUL MUSASHI SUZUKI'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. PROCEDURAL DEFECT ..... 1

II. ARGUMENT ..... 2

A. THE SECURITIES CLAIMS ARE ADEQUATELY PLEAD ..... 2

1. The Sales of Securities at Issue in This Action Were Domestic Transactions ..... 2

a. Title To The Certificates Of Investment Was Transferred In The United States ..... 3

b. MRI Incurred Irrevocable Liability In The United States ..... 7

2. Plaintiff's Section 10(b)/Rule 10b-5 Claims Are Adequately Pled ..... 8

a. The TAC Alleges Primary Liability Against the Suzukis ..... 9

b. The TAC Alleges the Suzukis' Misrepresentations with Sufficient Particularity ..... 11

c. The Misrepresentations Were Made in Connection with a Purchase or Sale of a Security ..... 14

d. Scienter Is Adequately Alleged ..... 14

3. The Section 12 Claims Are Adequately Plead ..... 18

a. The Section 12 Claims Are Not Time-Barred ..... 18

b. Paul Suzuki is Alleged to be a "Seller" ..... 19

4. The section 20(a) and Section 15 Claims are Adequately Plead ..... 19

B. PLAINTIFFS' STATE LAW CLAIMS ARE ALL WELL PLEAD ..... 20

1. Fraud is Well Plead Against Both Junzo and Paul Suzuki ..... 20

2. The Standard of Review for the Remaining State Cause of Action ..... 22

3. The TAC States Facts Amounting to Unjust Enrichment ..... 23

4. The TAC States Facts Amounting to Breach of Fiduciary Duty ..... 24

5. Accounting is Adequately Plead ..... 25

6. Constructive Trust is Properly Plead ..... 25

7. Fraudulent Transfer .....26

a. Leave to Amend is Not Required .....26

b. Fraudulent Transfer is Well Plead .....27

III. CONCLUSION.....28

## TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)....3, 4, 7

*Andrew W. v. Menlo Park City School Dist*.,
2010 WL 3001216 (N.D. Cal. July 29, 2010)....26

*Arpin v. Santa Clara Valley Transp. Agency*,
261 F.3d. 912 (9th Cir. 2001)....1

*Ashcroft v. Iqbal*,
556 U.S. 662, 679 (2009)....23

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)....23

*Berson v. Applied Signal Tech., Inc.*, 3
527 F.3d 982 (9th Cir. 2008)....16

*BJC Health Systems v. Columbia Cas. Co.*,
348 F.3d 685 (8th Cir. 2003)....1

*Barksdale v. King,*
699 F.2d. 744, 747 (5th Cir. 1983)....26

*Branch v. Tunnell*,
14 F.3d 449 (9th Cir. 2002)....1

*Broam v. Bogan*,
320 F.3d. 1023 (9th Cir. 2003)....23

*Cafasso v. U.S. ex rel. v. General Dynamic C4 Systems, Inc.*,
637 F.3d 1047 (9th Cir. 2011)....23

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp*.,
394 F.3d 126 (3rd Cir. 2004)....11

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2nd Cir. 2002)....1

*Coffin v. Safeway, Inc.*,
323 F.Supp 2d 997 (D. Ariz. 2004)....22

*Craftmatic Sec. Litigation v Kraftsow,*
890 F2d 628 (3rd. Cir.1989)....21

*Cunard Line, Ltd. v Abney,*
540 F Supp 657, 34 (S.D. NY 1982)....26

*Danning v. Lum's, Inc.,*
86 Nev. 868, 871, 478 P.2d 166 (1970)....24

**TABLE OF AUTHORITIES**
**(Continued)**


*Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),*
42 F.3d 1541, 1547 (9th Cir. 1994)....................20

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 US 336, 125 S.Ct. 1627 (2005)....................9

*E.E.O.C. v. Peabody W. Coal Co.*,
400 F.3d 774, 778 (9th Cir. 2005)....................27

*Erickson v. Pardus*,
551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007)....................23

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)....................14

*Forman v. Davis*,
371 US 178, 83 S.Ct. 227 (1962)....................25

*Folsom v Continental Illinois Nat'l Bank & Trust Co.,*
633 F Supp 178 (7th Cir. 1986)....................21

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
896 F.2d 1542 (9th Cir. 1990)....................1

*Hernandez v. Creative Concepts, Inc.,*
862 F.Supp.2d 1073 (D. Nev. 2012)....................24

*Herup v. First Boston Financial, LLC*,
123 Nev. 27, 162 P.3d 870, 873 (2007)....................27

*Hyosung (America), Inc. v. Hantle USA, Inc.,*
2011 WL 835781 (N.D.Cal. Mar. 4, 2011)....................27

*J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.,*
120 Nev. 277, 89 P.3d 1009 (2004)....................20

*Janus Capital Groups, Inc. v. First Derivative Traders*,
564 U.S. __, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011)....................9

*Klein v. Freedom Strategic Partners, LLC*,
595 F. Supp. 2d 1152 (D. Nev. 2009)....................24

*LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975,*
113 Nev. 747, 942 P.2d 182 (Nev. 1997)....................23

*Liberty Mut. Ins. Co. v. Hoge*,
2005 WL 756568 (N.D. Cal. 2005)....................27

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
2011 U.S. Dist. LEXIS 60761 (N.D. Ala. 2011)....................18

**TABLE OF AUTHORITIES**
**(Continued)**

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011)....15

*Martinez v Safeway Stores, Inc.*,
66 F.R.D. 446 (N.D. Cal. 1975)....26

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309, 1324, 179 L. Ed. 2d 398 (2011)....15

*In re Maxim Integrated Products, Inc. Deriv. Lit.*,
574 F.Supp.2d 1046 (N.D. Cal. 2008)....25

*Miles v. Department of Army*,
881 F2d 777 (9th Cir. 1989)....26

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247, 273 (2010)....2

*Nat'l Elevator Industry Pension Fund v. VeriFone Holdings, Inc.*
*(In re VeriFone Holdings, Inc. Sec. Litig.)*, 704 F.3d 694, 701 (9th Cir. Cal. 2012)....9

*Nelson v. Heer*,
123 Nev. 217, 163 P.3d 420 (2007)....20

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. Ariz. 2003)....20

*Nolen v Fitzharris*,
450 F2d 958 (9th Cir. 1971)....26

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010)....15

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
753 F.Supp.2d 166 (S.D.N.Y. 2010)....2

*Powers v. United Services Auto Ass'n.*,
115 Nev. 38, 979 P.2d 335 (1999)....24

*Raber v Osprey Alaska, Inc.*,
187 FRD 675, 12 FLW Fed D 444 (MD Fla. 1999)....21

*Randono v. Turk*,
86 Nev. 123, 466 P.2d 218 (Nev. 1970)....24

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014)....14, 15

*Richardson v. Oppenheimer & Co.*,
2013 WL 1955406, 2013 U.S. Dist. LEXIS 66938 (D. Nev. 2013)....11

**TABLE OF AUTHORITIES**
**(Continued)**


*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d. 1156 (9th Cir. 2009)....................20

*Sanderson v. HCA-The Healthcare Co.*,
447 F.3d 873 (6th Cir. 2006)....................21

*Schlick v Penn-Dixie Cement Corp.*,
507 F2d 374 (2nd Cir. 1974)....................21

*Schreiber Distrib. Co v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986)....................20

*SEC v. Levine*,
462 Fed.Appx. 717 (9th Cir. 2011)....................3

*SEC v. United States Reservation Bank & Trust*,
289 Fed. Appx. 228 (9th Cir. 2008)....................5, 6

*Scoggins v. Fredrick*,
629 F.2d 426 (5th Cir. 1980)....................27

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir.1999)....................15

*Solow v. Citigroup, Inc.*,
827 F. Supp. 2d 280 (S.D.N.Y. 2011)....................18

*South Ferry LP v. Killinger*,
542 F.3d 776 (9th Cir. 2008)....................14, 15

*Sparling v. Daou (In re Daou Sys.)*,
411 F.3d 1006 (9th Cir. 2005)....................19

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506, 513 (2002)....................22

*Sunnyside Devel. Co. LLC v. Cambridge Display Tech. Ltd.*,
2008 WL 4450328 (N.D. Cal. Sept. 29, 2008)....................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................14, 15

*Thomas v. Wachovia Mortg., FSB*,
2011 WL 3159169, 2011 U.S. Dist. LEXIS 81758 (D. Nev. 2011)....................23

*Thompson v. Paul*,
547 F.3d 1055 (9th Cir. 2008)....................9

*Tomera v Galt*,
511 F2d 504 (7th Cir. 1975)....................21

**TABLE OF AUTHORITIES**
**(Continued)**

*Topaz Mutual Co. v. Marsh,*
108 Nev. 845, 839 P.2d 606 (1992)....22, 23

*Unionamerica Mtg. v. McDonald,*
97 Nev. 210, 626 P.2d 1272 (1981)....23

*Union Pac. R.R. Co. V. Nevada Power Co.,*
950 F.2d 1429 (9th Cir. 1991)....26

*United States ex rel. Bledsoe v. Community Health Systems, Inc.,*
501 F.3d. 493 (6th Cir. 2007)....21

*Valentini v. Citigroup, Inc.*,
837 F. Supp. 2d 304 (S.D.N.Y. 2011)....16, 17

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 201)....16

*Waldman v. Maini,*
124 Nev. 1121, 195 P.3d 850 (Nev. 2008)....25

*Williams v. Board of Regents Univ. Systems Georgia,*
477 F.3d 1282 (11th Cir. 2007)....26

*In re XenoPort, Inc. Sec. Litig.*,
2011 LEXIS 142523 (N.D. Cal. Dec. 12, 2011)....18

*Ynclan v. Department of Air Force,*
943 F.2d. 1388 (5th Cir. 1991)....26

*Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.*,
359 F.Supp.2d 1075 (D. Nev. 2004)....24

*Zucco Partners, LLC v. Digimarc Corp*.,
552 F.3d 981 (9th Cir. 2009)....9, 15, 16

**Statutes** **Page(s)**

15 U.S.C. § 77b *et seq*....4

15 U.S.C. § 77e ....5

15 U.S.C. § 77l ....19

15 U.S.C. § 77.. ....19

15 U.S.C. § 78c *et seq*....5

15 U.S.C. § 78j *et seq*....8

15 U.S.C. § 78u-4 *et seq* ....9, 14

## TABLE OF AUTHORITIES
**(Continued)**

17 C.F.R. § 230.405....................................................................................................................20
17 C.F.R. § 240.10b-5(b)..............................................................................................................8
Nev. Rev. Stat. § 112.190 ...........................................................................................................27

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

## I. INTRODUCTION

In this lawsuit, plaintiffs and the class seek redress for defendants' massive Ponzi scheme that defrauded more than 8,000 investors of nearly $1 billion dollars. In their copiously-detailed Third Amended Complaint, plaintiffs spelled out exactly how the fraud worked, what representations the defendants made, why those misrepresentations were false, and why defendants made the misrepresentations with scienter. Thus, the Third Amended Complaint amply satisfies the pleading requirements for plaintiffs' federal securities claims and their state common law and statutory claims. Consequently, and for the reasons set forth below, defendants' attempt to forestall responding to the merits of plaintiffs' claims should be rejected and their motion denied.

## II. PROCEDURAL DEFECT

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d. 912, 919 (9th Cir. 2001). Extraneous matters may be considered only where (1) the relevant documents are specifically referred to in the complaint; (2) where the document clearly undermines plaintiff's central claims; and (3) where it is shown that no party questions the authenticity of the document attached. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 2002); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153, fn.3 (2nd Cir. 2002). Moreover, where the complaint merely alleges a contract or correspondence without specifically identifying a specific document, the court may not consider the document if it is not *indisputably* referenced in the complaint. *BJC Health Systems v. Columbia Cas. Co.*, 348 F.3d 685, 687 (8th Cir. 2003).

The Suzuki defendants now attempt to evade the rules, improperly attaching new documents which were never referenced in the complaint at all, and documents which plaintiffs have never seen before. Exhibit E to Nicole Tadano's declaration, for example, attached a facsimile dated February 17, 2012 from Paul Suzuki to Fujinaga, requesting that Fujinaga complete a registration form with the Ministry of Finance. The fax is not referenced anywhere in the TAC. The Suzukis plainly recognize the violation, but solider on nonetheless, pointing to a "series of faxes" from 2012 referenced at paragraph 78

of the TAC. But there is no attempt to show what the series consists of or why the series included their new evidence.[1] The document is new to the plaintiffs and its authenticity is certainly not beyond question.

Similarly, Exhibit F attached to the Tadano Declaration suffers from the same deficiencies. Exhibit F is consists of two letters from Sterling Escrow to MRI which appear to be a sort of retainer agreement. While paragraph 11 of the TAC states that MRI retained Sterling Escrow for bookkeeping services, there is no mention of any formal agreement or document outlining their relationship anywhere in the complaint. The content of the agreement is not central to plaintiffs' claims in the way the rules require and the documents likewise fail to refute the plaintiffs' claims.

Exhibits G, H, I and K to the Tadano Declaration suffer the same infirmities. Other than pointing to paragraph 78, which already specifically identifies the relevant items of correspondence (none of which are attached to the defendants' motion), the Suzuki defendants fail to identify where any of these newly attached documents were referenced in the complaint. Based on the foregoing, the Court should decline to consider Exhibits E, F, G, H, I, K, and L when ruling on the Suzuki defendants' motion to dismiss.

## III. ARGUMENT

### A. THE SECURITIES CLAIMS ARE ADEQUATELY PLEAD

#### 1. The Sales of Securities at Issue in This Action Were Domestic Transactions

The defendants argue that the "plaintiffs' securities claims should be dismissed because plaintiffs have not adequately alleged that the sale of securities was a 'domestic transaction.'" Mtn, 6: 8-9. The defendants are wrong both legally and factually. The defendants' argument relates to the finding by the Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 273 (2010) that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." "[T]he focus of the Exchange Act is not upon the place where the

---

[1] In fact, paragraph 78 plaintiffs specifically identify by date the three facsimiles at issue and provide excerpts of those particular exchanges. These are the only items in the "series" of facsimiles.

deception originated, but upon purchases and sales of securities in the United States....With regard to securities not registered on domestic exchanges, the exclusive focus [is] on domestic purchases and sale..." *Id.* at 266, 268; fn. omitted.

The Supreme Court in *Morrison* "did not have occasion to discuss what it means for a purchase or sale to be 'made in the United States.'" *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 176 (S.D.N.Y. 2010). The Second Circuit addressed that issue in *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 67 (2d Cir. 2012), holding that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States."

> "While *Morrison* holds that §10(b) can be applied to domestic purchases or sales, it provides little guidance as to what constitutes a domestic purchase or sale. To determine the meaning of a domestic purchase or sale, we first consider how these terms are defined in the Exchange Act. ... [T]hese definitions nonetheless suggest that the act of purchasing or selling securities is the act of entering into a binding contract to purchase or sell securities. Put another way, these definitions suggest that the 'purchase' and 'sale' take place when the parties become bound to effectuate the transaction.
>
> [¶]
>
> [I]n order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security. ...
>
> [A] sale of securities can [also] be understood to take place at the location in which title is transferred.... Accordingly, to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, we hold that a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Id.* at 67-68; citation omitted.

The Ninth Circuit, in a case out of this district, has indicated that it interprets the *Morrison* decision in the same way as the Second Circuit. In *SEC v. Levine,* 462 Fed. Appx. 717, 718 (9th Cir. 2011) (cited pursuant to FRAP 32.1), the court rejected the defendants' "argument that their fraudulent conduct outside the United States is not covered by the securities laws." Citing *Morrison,* the Court explained that "the Securities Act governs the Levines' sales because the actual sales closed in Nevada when Marie Levine received completed stock purchase agreements and payments." *Id.* at 719.

#### a. Title To The Certificates Of Investment Was Transferred In The United States

As noted, a transaction is deemed to be "domestic" if *either* "irrevocable liability is incurred *or* title passes within the United States." *Absolute Activist, supra*, 677 F.3d at 67. The defendants assert that '[o]nly the 'irrevocable liability' analysis is pertinent here (Mtn, p. 6, fn. 6), but that conclusion is based on an analysis that is both factually and legally erroneous. As the Suzukis themselves acknowledge, the TAC explicitly avers at paragraph 30 that MRI transferred title to the securities only after the transaction was deemed complete. But they brush off the significance of that allegation by asserting that "the Certificate of Investment only indicates that investors' monies are secured by a lien on a pool of MARS. Tadano Decl. Ex. A. There is nothing in the Certificate of Investment or Financial Products Trading Contract to indicate that investors were given title to any MARS or ownership interest in MRI." Mtn, p. 6, fn. 6.

The plaintiffs have never argued – or even hinted – that their investment with MRI gave them either "title to any MARS or ownership interest in MRI." Plaintiffs do argue that the relationship of the plaintiffs to MRI was that of investors in MRI's supposed business of purchasing Medical Accounts Receivables at a discount and making a profit by collecting on those receivables, which profit would then be shared with the investors. Thus, the plaintiffs' claim is that the Certificates of Investment they received in exchange for their payment to MRI are the securities on which the plaintiffs' federal securities claims are based.

The Suzuki defendants are left to argue in effect that the Certificate of Investment is *not* a security -- although that just begs the question of exactly what the defendants believe the plaintiffs were purchasing for their money, since they are adament that it wasn't to obtain "title to any MARS or [an] ownership interest in MRI." But contrary to their assertions, the Certificate of Investment ***is*** a security, and it is the transfer of title to that security which confirms that this was a domestic transaction.

The term "security" is defined in 15 U.S.C.§ 77b(a)(1) as:

> "any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, ***certificate of interest or participation in any profit-sharing agreement,*** collateral-trust certificate, preorganization certificate or subscription, transferable share, ***investment contract,*** voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, ***certificate of deposit,*** or group or index of securities (including any interest therein or based on the value thereof), or any put, call,

> straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." (emphasis added)

Similarly, in 15 U.S.C.§ 78c(a)(10), the term "security" is defined as:

> "any note, stock, treasury stock, security future, security-based swap, bond, debenture, ***certificate of interest or participation in any profit-sharing agreement*** or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, ***investment contract,*** voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, ***certificate of deposit,*** or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." (emphasis added)

As described by defendant MRI itself in Article 1-1 of its "Financial Products Trading Contract," a copy of which was submitted to the Court by these defendants as Exhibit B to the Declaration of Nicole Tadano in Support of Defendants Junzo Suzuki and Paul Musashi Suzuki's Motion to Dismiss Third Amended Complaint (Dkt. No. 172-2), the purpose of the investment by the plaintiffs with MRI was that "Party A [the plaintiffs] shall invest money ("Invested Amount") with Party B [MRI] as capital to purchase Medical Accounts Receivables ("MARS"), which Party B will buy from medical industry." MRI then "uses the contributed money to buy MARS and execute collections ("Business Covered by the Investment"), distributing part of the profit generated from the Business Covered by the Investment to Party A and return the Invested Amount upon the expiration of the Contract term." That clearly comes within the statutory definitions of "security" as set out above, as, at the very least, either a "certificate of interest or participation in [a] profit-sharing agreement" or more generally as an "investment contract."

The Ninth Circuit has interpreted these definitions the same way, as can be seen in its opinion in the case of *SEC v. United States Reservation Bank & Trust*, 289 Fed. Appx. 228, 229 (9th Cir. 2008) (cited pursuant to FRAP 32.1), in which the defendant "challenge[d] the district court's findings that (1) the two-part investment offering by United States Reservation Bank and Trust ('USRBT') was a 'security' as defined in § 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(l), and § 3(a)(10) of the

Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).”

> “The district court did not err when it found that the investment offered by USRBT, which consisted of a certificate of deposit (‘CD’) and a leveraged profit-sharing agreement, was a security. ‘The term “security” means any note ... [or] investment contract. . . .’ Securities Act § 2(1), 15 U.S.C. § 77b(a)(l); Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10). The instrument was a note, and that conclusion is bolstered by the following facts: (1) its purpose was to raise funds for USRBT's financial investments; (2) the buyers’ interest was in the profits to be generated by it; (3) Defendants-Appellants were retained by USRBT to sell it to as many buyers as possible; (4) it was sold to at least twenty investors or investor groups comprising several hundred underlying investors; (5) it was advertised in at least one newspaper; (6) a reasonable investor was likely to regard it as an investment since it was marketed as offering the greater of a fixed rate of return of 6.5% or 20% of the profits gained by use of the leveraged funds; and (7) unlike a CD issued by a national or state-chartered bank and insured by the Federal Deposit Insurance Corporation, the investment was not insured, guaranteed or subject to any alternative regulatory scheme that would reduce its risk. *See Reves v. Ernst & Young,* 494 U.S. 56, 66-67, 110 S.Ct. 945, 108 L.Ed. 2d 47 (1990); *Marine Bank v. Weaver,* 455 U.S. 551, 558-59, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982) (emphasizing that investment in CD linked to profit-sharing agreement was ‘abundantly protected under the federal banking laws’ where CD was FDIC-insured).
>
> The investment was also an investment contract, and thus a security, because purchasers were required to make an investment of money in a common enterprise with the expectation of profits solely from the efforts of others. *SEC v. W. J. Howey,* 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).
>
> Finally, the instrument should be characterized as a security because its economic risk required the protections provided to investors by the federal securities laws. *See Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).”

*SEC v. United States Reservation Bank & Trust*, 289 Fed. Appx. 228 at 230.

The similarities to MRI’s investment scheme are obvious. The purpose of the MRI Certificate of Investment “was to raise funds for [MRI’s] financial investments.” *Id.* “[T]he buyers’ interest was in the profits to be generated by it.” *Id.* The role of the Suzuki defendants was “to sell it to as many buyers as possible.” *Id.* The Certificates of Investment were sold to thousands of investors. The scheme was heavily advertised and promoted, and was marketed as offering both a payment of shared profits as well as the return of the entire invested principal at the end of the term of the contract. And “the investment was not insured, guaranteed or subject to any alternative regulatory scheme that would reduce its risk,” *id.*, although the defendants fraudulently told the plaintiffs exactly the opposite. For that reason, if no other, “the instrument should be characterized as a security because its economic risk required the protections provided to investors by the federal securities laws.” *Id.*

There simply can be no dispute that the MRI Certificate of Investment was a security, “because purchasers were required to make an investment of money in a common enterprise with the expectation of

profits solely from the efforts of others." *Id.* The defendants do not even attempt to dispute that title to the Certificate of Investment, the security at issue in this action, transferred in Nevada. In fact, in footnote 6 of their motion (at page 6), they acknowledge that the plaintiff made that factual allegation in the TAC:

> "Investors were required to ... wire the total investment amount to the designated Wells Fargo Las Vegas branch bank account.... Once MRI confirmed receipt of the funds in the Wells Fargo Bank account the transaction was deemed complete. Only then would MRI transfer title to the securities as evidenced by a 'Certificate of Investment,' which was sent by Federal Express to each investor." TAC ¶¶ 29-30.

Since the plaintiffs have adequately alleged – both legally and factually – that title to the securities at issue in this action passed within the United States, they have adequately alleged domestic transactions for the purposes of the federal securities laws.

**b. MRI Incurred Irrevocable Liability In The United States**

Again, as noted above, a transaction is deemed to be "domestic" if either "irrevocable liability is incurred or title passes within the United States." *Absolute Activist, supra,* 677 F.3d at 67. Even if title had not passed within the United States (which it did, as discussed above in Section III.A.1.a) these sales of the MRI Certificates of Investment would still have to be deemed domestic transactions, because MRI incurred irrevocable liability in the United States. The defendants do not argue that the facts or the allegations of the Third Amended Complaint establish that MRI's irrevocable liability was incurred outside the United States. Rather, they simply argue that the plaintiffs have failed to adequately allege that MRI's irrevocable liability was incurred ***inside*** the United States. But the defendants ignore a portion of the factual allegations set out in the TAC.

The defendants argue – and the plaintiffs agree – that the contracts between the plaintiffs and MRI were not finally formed until both "the payment of the Invested Amount to the bank account prescribed in Article 2-2 has been completed and this contract with the signature of Party A affixed has reached Party B." Article 5-1 of the MRI "Financial Products Trading Contract" (Dkt. No. 172-2). The defendants argue that while the plaintiff has adequately alleged that the payment of moneys occurred in Nevada, the plaintiffs have not alleged where the contracts were executed or "where the investors subsequently send the executed contract (to MRI's Japan office or to the Nevada office)." Mtn, 8: 19-20.

As to where the contracts were executed, that is irrelevant under the terms of Article 5-1, under

which MRI's irrevocable liability was not to be incurred until the executed contract "has reached Party B," i.e. MRI. As to where the contracts were sent after execution, the allegations set out that paperwork was to be sent by the investors to MRI's "Las Vegas headquarters," not to its offices in Japan.

> "29. After completing the application, the investors were then required to mail the application to the Las Vegas headquarters. Upon receipt of the application, MRI prepared and mailed back a 'Corporate Certificate of Investment Agreement' to investors. The Corporate Certificate of Investment Agreement detailed the investors' personal information, the investment terms, and bank remittance information. Investors were required to sign the agreement and then wire the total investment amount to the designated Wells Fargo Las Vegas branch bank account." TAC ¶ 29.

Since both elements of the contractual standard for completion of the contract had to occur in Las Vegas, then there can be no dispute that the contractual relationship between the plaintiffs and MRI came into being in Nevada, and thus MRI's irrevocable liability was incurred in the United States. Thus, on this basis as well, the plaintiffs have adequately alleged that these were domestic transactions for the purposes of their claims under the federal securities laws.

If this Court believes that the inferences that can logically be drawn from paragraph 29 are not sufficient to constitute a factual allegation that the executed contracts were to be sent by the plaintiffs to MRI's Las Vegas headquarters rather than to its offices in Japan, the plaintiffs would ask leave of this Court to amend their complaint to add that one additional sentence to the complaint. Plaintiffs' counsel believed that the language of paragraph 29 was sufficient to meet this element of the plaintiffs' burden of pleading, and the plaintiffs should not be deprived of their viable federal securities claims simply because the manner in which their counsel phrased the allegations in the complaint, given that the facts needed to establish this element of their claims exist and can easily be added to the complaint.

**2. Plaintiff's Section 10(b)/Rule 10b-5 Claims Are Adequately Pled**

Under Section 10(b) of the Securities Exchange Act of 1934, it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a securities fraud claim, plaintiff must allege: 1) a material misrepresentation or omission; 2) scienter; 3) a connection between the misrepresentation or omission with the purchase or sale of a security; 4) reliance; 5) economic loss; 6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo* (2005) 544 US 336, 341, 125 S.Ct. 1627, 1631; *Thompson v. Paul*, 547 F.3d 1055, 1061 (9th Cir. 2008). In addition, a complaint stating claims under Section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Nat'l Elevator Industry Pension Fund v. VeriFone Holdings, Inc. (In re VeriFone Holdings, Inc. Sec. Litig.)*, 704 F.3d 694, 701 (9th Cir. Cal. 2012). Under Rule 9(b), a plaintiff must state with particularity the circumstances constituting fraud or mistake. FRCP 9(b). Under the PSLRA, plaintiff must plead with particularity the elements of falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009). As set forth below, plaintiffs' Third Amended Complaint ("TAC") amply meets these requirements.

**a. The TAC Alleges Primary Liability Against the Suzukis**

Relying on *Janus Capital Groups, Inc. v. First Derivative Traders*, 564 U.S. ___, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011), the Suzukis argue that they have no primary liability for statements that they did not make and did not have authority to make. In *Janus Capital Groups, Inc. v. First Derivative Traders, supra*, 564 U.S. ___, 180 L. Ed. 2d at 175, the court refused to hold an investment adviser liable for making misleading statements contained in a mutual fund's prospectus, because the investment adviser did not "make" the misleading statements, even though it had assisted the fund in preparing them. As Justice Thomas, writing for the court, explained succinctly: "One 'makes' a statement by stating it." *Janus, supra*, 131 S. Ct. at 2302. He then analogized to the relationship between a speech writer and speaker: "Even when a speech writer drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit--or blame--for what is ultimately said." *Id.* Thus, the only person or entity who can be liable for a misleading statement is the person or entity who makes the statement.

*Janus* supports plaintiffs' position, because Suzukis did publicly "make" the misrepresentations

referenced in the Complaint, because they were the speakers of those misrepresentations. As the Complaint alleges, both Junzo and Paul Suzuki made multiple misleading statements, not simply assisted in the preparation of statements made by others. These statements are identified in paragraphs 40, 1, 42, 46, 47, 50, 51 [Paul Suzuki], 52, 53, 56 [Junzo Suzuki], 57 [Paul Suzuki], 58 [Paul Suzuki], 59, 60, 63, 64 [Paul Suzuki], 65, and 67 of the Complaint.

As those paragraphs allege, Junzo Suzuki himself made representations in governmental reports filed under his personal seal, and in seminars and meetings where he addressed plaintiffs and potential investors. In those meetings, as the TAC alleges in the paragraphs referenced above, Junzo Suzuki made specific, identifiable misrepresentations that: 1) the investors' money would be used solely to purchase MARS; 2) that the investors' funds would be controlled by an independent escrow company in a "lockbox" account, preventing MRI from handling the funds; and 3) that U.S. state laws guaranteed the investors' investments.

As to Paul Suzuki, and as the Complaint alleges in the paragraphs referenced above, he likewise made specific, identifiable misrepresentations that: 1) the investors' money would be used solely to purchase MARS; 2) that the investors' funds would be controlled by an independent escrow company in a "lockbox" account, preventing MRI from handling the funds; and 3) that U.S. state laws guaranteed the investors' investments.

Together, these allegations sufficiently plead that both Junzo and Paul Suzuki *themselves* made specific misrepresentations, not merely that they contributed material to statements made by others.

Junzo Suzuki also claims that he did not have ultimate authority over the contents of the Annual Business Reports filed with the Japanese Financial Services Agency. But, as the Complaint alleges (¶ 40), he affixed his personal seal to these reports, effectively signing them. As such, he was the "speaker" and "made" the statements contained in those reports. Similarly, Paul Suzuki claims that he did not have ultimate authority over the editorials he authored in THE VIEW. But he signed the editorial and, therefore, he was the "speaker" and "made" the statements.

In light of the above, the Complaint sufficiently alleges that Paul and Junzo Suzuki made misleading statements sufficient to impose primary liability on them under the federal securities laws.

**b. The TAC Alleges the Suzukis' Misrepresentations with Sufficient Particularity**

The Suzukis next contend that the misrepresentations attributed to them are not alleged with sufficient particularity. A review of the TAC shows otherwise. Plaintiffs have alleged that both Paul and Junzo Suzuki, at different times, made specific misrepresentations: that investors' money was used solely to purchase MARs, that the investments were guaranteed by U.S. state authorities, and that the funds were maintained in an escrow-controlled "lockbox," out of MRI's control. See TAC, ¶¶ 46, 47, 50 [Junzo Suzuki's misrepresentations regarding amount of MARS held by MRI], 51 [Paul Suzuki's signed editorial that U.S. state and regulatory guarantees protected investors]; 52 [Junzo and Paul Suzuki's oral representations to investors that funds were used only for MARS, that an escrow system was in place, and that state governments guaranteed investments], 52 [same], 53 [same], 56 [Junzo Suzuki's misrepresentations to Japanese regulators regarding amount of MARS held by MRI; 57 [Paul Suzuki's signed editorial in June 2011 of VIMO that escrow system was in place and protected investors' money]; 58 [Paul Suzuki's signed editorial in July 2011 edition of VIMO that government guarantees investors' money]; 59 [Junzo and Paul Suzukis' oral representations to investors that funds used only for MARS, that escrow system was in place, and that U.S. governments guaranteed investments]; 60 [same]; 63 [same]; 64 [Paul Suzuki's verbal representations to investors in "MRI Study Rooms" that funds were used only for MARS, that escrow system was in place, and that U.S. governments guaranteed investments]; 65 [Junzo and Paul Suzukis' oral representations to investors at social gatherings in 2012 that funds used only for MARS, that escrow system was in place, and that U.S. governments guaranteed investments].

These allegations satisfy Rule 9's requirements – they specify, the "who, what, when, where, and how of the fraud." *See Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3rd Cir. 2004). The Suzukis' reliance on *Richardson v. Oppenheimer & Co.*, 2013 U.S. Dist. LEXIS 66938 (D. Nev. 2013) is misplaced. There, plaintiff did not allege any specific factual misrepresentations, but merely alleged conclusions Plaintiff drew from specific statements, rather than the statements themselves. *Richardson*, *supra*, 2013 U.S. Dist. LEXIS 66938 at 16. Moreover, plaintiff did not specify which individuals made certain misrepresentations, but instead lumped all Oppenheimer personnel together, alleging only that misrepresentations were made by "Oppenheimer" or "Oppenheimer's agents." *Id.*, at

17. In contrast, the TAC alleges specific misrepresentations and specifically identifies Junzo and Paul Suzuki, respectively, as the makers of those misrepresentations.

The Complaint's specific factual allegations also rebut the Suzukis' claim that plaintiffs only allege that they made bland statements about the "safety and security" of the investment or about the "claimed safety of the investments." Mtn., p. 11. As the Complaint alleges, though, the Suzukis claimed that the investment in MRI was "safe and secure" *because of specific, identifiable misrepresentations*. These were, again, that the investors' money would be used only to purchase MARS, that an escrow company segregated their investments from MRI's accounts, and that the U.S. states guaranteed the MARS' investments. The TAC also alleges other specific statements by Junzo Suzuki and Paul Suzuki. As to Junzo Suzuki, he affixed his personal seal to the 2008 Annual Business Report submitted to the Japanese Financial Services Agency. That report stated that MRI held 86,933,344,000 Yen from investors. This statement conflicted with the 2010 annual report entitled THE VIEW 2010 stated that in 2008 MRI held 108,840,000,000 Yen in MARS investments, nearly 20% more than what it reported to the FSA. TAC, 40. In addition, in 2009, Junzo and Paul Suzuki lectured to 1010 investors, in which they *both* made specific misrepresentations about MRI, specifically identified as: 1) "The lockbox account was a specialized bank account used for collecting receivables, which required that the face value of the receivables purchased exceeded the actual amount paid to purchase them"; 2) "Only companies that passed a rigorous test were eligible to open lockbox accounts" and 3) "A lock box would provide protection even against the bank's insolvency because the assets were guaranteed by the state government." TAC, ¶ 46. Similarly, the TAC alleges that Junzo and Paul Suzuki spoke at 10 informational gatherings attended by 945 investors. The speeches reiterated the three fundamental misrepresentations. TAC, ¶ 47.

As to Paul Suzuki, the Complaint specifically alleges that he wrote an article in the May 2010 issue of MRI's monthly glossy magazine, VIMO, in which he repeated the core misrepresentations about MRI: 1) "U.S. laws make it mandatory for all insurance companies to join the Insurance Guaranty Association prior to operating in each state"; 2) states implement laws which guarantee payments to medical providers in the event of the insurance company's insolvency; and 3) "In the event the insurance

company becomes financially distressed and is unable to pay on the MARS, the Insurance Guaranty Association will transfer the MARS to another insurance company in the association, which will pay on the MARS and continue to provide coverage to the insureds." TAC, ¶ 51. Likewise, the Complaint alleges that Paul Suzuki authored an article in the June 2011 issue of VIMO, Vol. 33, in which he stated that "a very strict fund management system is implemented through the escrow system . . . [which ensures segregation of funds[,]" and that "MRI segregates investors' funds through the use of trust accounts." TAC, ¶57. Paul Suzuki also wrote an article in the July 2011 issue of VIMO, Vol. 34, in which he misrepresented the role of the Health Insurance Guaranty Association. He stated that MARS were guaranteed by a Health Insurance Guaranty Association in each state, and that Nevada's limit of protection is $100,000 on each MARS. TAC, ¶ 58.

Moreover, in 2010, MRI hosted eight informational seminars, at which Paul or Junzo Suzuki spoke, making specific misrepresentations that the investors' money would be spent only on MARS, that U.S. states guarantee MARS' investments, and that the investors' funds were managed by an escrow company outside of MRI's control. TAC, ¶ 52. And, while the complaint alleges that either Paul or Junzo Suzuki attended, the context is clear that one or the other attended these seminars, and at each seminar they made the standard speeches containing the core three misrepresentations to the plaintiff class. There were also 30 social gatherings hosted in 2010, attended by 1,241 investors. Again, the complaint alleges that Junzo or Paul Suzuki – either one – spoke at these meetings, and made the misrepresentations outlined above.

Further, in 2011, MRI hosted 23 informational seminars attended by 1,333 people, including plaintiffs and class members. Junzo and Paul Suzuki stated that the investors' money would be invested solely in MARS, that the states guaranteed the investment, and that the escrow company would not allow MRI to touch the investors' funds. TAC, ¶ 59. And, at 28 social gatherings, attended by 1,294 people, Paul and Junzo made these misrepresentations about MARS and MRI. TAC, ¶ 60.

Likewise, in 2012, MRI held 11 seminars at which Junzo or Paul spoke, stating that investors' money would be invested solely in MARS, that the state guaranteed the investments, and that the escrow company made it impossible to touch the investors' money. TAC, ¶ 63 (in which the misrepresentations

are quoted). Similarly, in 2012, Paul Suzuki hosted 55 "Study Room" sessions. In each of these sessions, Paul represented that funds would only be invested in MARS, that the state guarantees were in place, and that the escrow system protected plaintiffs from misuse by MRI. ¶ 64. These statements are in quotes. These same misrepresentations were made in 29 social gatherings in which either Paul or Junzo spoke, again the same misrepresentations. TAC, ¶ 65.

As to the seminars and meetings, the Suzukis complain that plaintiffs "lump" them together. To the contrary. The complaint alleges that *both* Paul and Junzo Suzuki made the same key misrepresentations to thousands of investors in person. It is not necessary, possible, or even desirable that plaintiffs identify the date, time, and exact location of each and every one of these seminars, and when Paul Suzuki or Junzo Suzuki made the misrepresentations. In this context – three core misrepresentations made to thousands of investors over many years – such a requirement would effectively operate as a statutory immunity rather than a pleading standard. The complaint specifically identifies the Suzukis' misrepresentations sufficient to meet the requirements of Rule 9 and the PSLRA.

#### c. The Misrepresentations Were Made in Connection with a Purchase or Sale of a Security

The Suzukis also contend that certain individuals had already invested in MRI when certain misrepresentations were allegedly made and, therefore, plaintiffs cannot establish that those investors relied on the misstatements. But, as the TAC alleges, MRI offered securities in two, three, and five-year increments. TAC, ¶ 27. Investors were then encouraged to re-invest into new securities. TAC, ¶ 36. And plaintiffs and members of the class did re-invest in new securities. TAC, ¶ 80. Plaintiffs adequately allege reliance on the Suzukis' misstatements throughout the class period.

#### d. Scienter Is Adequately Alleged

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In determining whether a complaint has adequately alleged scienter, a court must first accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court then must "consider the complaint in its entirety, as

well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*; *Reese v. Malone*, 747 F.3d 557, 568-569 (9th Cir. 2014).

A strong inference of scienter "must be more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, *supra*, 551 U.S. at 314. The inference must be that the defendant "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, *supra*, 552 F.3d at 991. Deliberate recklessness can be shown if the defendant "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010), quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

Also, while facts showing recklessness or a motive and opportunity to commit fraud are not independently sufficient to show scienter, they do provide a basis for reasonable inference of scienter. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999), abrogated on other grounds by *South Ferry LP v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). It is also reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies. *South Ferry LP v. Killinger*, *supra*, 542 F.3d at 785-86.

In the end, the relevant inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, *supra*, 551 U.S. at 323; *Reese v. Malone*, *supra*, 747 F.3d at 569. In making this determination, courts "must review all the allegations holistically[.]" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011), quoting *Tellabs*, *supra*, 551 U.S. at 326.

Significantly, the more egregious the misrepresentation and the higher up the maker of the misrepresentation is, the stronger the inference of scienter. Thus, scienter and falsity inquiries overlap significantly. "[F]alsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual

access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Zucco Partners, LLC v. Digimarc Corp., supra*, 552 F.3d at 1000 (quotation marks and citation omitted, quoting *South Ferry LP v. Killinger*, *supra*, 542 F.3d at 785)*; In re MannKind Sec. Actions,* 835 F. Supp. 2d 797, 808-809 (C.D. Cal. 2011).

The TAC alleges that Junzo and Paul Suzuki managed the Tokyo office with little or no oversight from Fujinaga, and in fact at times gave direction to Fujinaga, telling him which investors to pay. TAC, ¶¶ 75-78. As such, it is absurd to think that both Suzukis, who held such central positions in MRI's business – which virtually relied entirely on Japanese investors and marketing efforts in Japan – had absolutely no idea that the central tenets of what they were selling to investors was not even close to being true. And it can certainly be inferred that both Junzo and Paul Suzuki had access to the true operations of MRI or could have obtained the information without extraordinary effort.

Again, it bears emphasis that the Suzukis' misrepresentations did not concern collateral matters about MRI. The misrepresentations went to the core of MRI's ostensible business. Again, the misrepresentations were that: 1) all investments would be used solely to purchase MARS; 2) the investors money was kept in a separate escrow account not managed by MRI; and 3) U.S. governmental agencies insured the safety of plaintiffs' investments. None of these were remotely true.

Gross misrepresentations about such fundamental aspects of MRI's business imply scienter. *Zucco Partners, LLC v. Digimarc Corp.*, *supra*, 552 F.3d at 1001[where defendants "must have known" about information's falsity because falsity was obvious from the company's operations, defendants' awareness of the information's falsity can be assumed]; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352-53 (S.D.N.Y. 2011) [strong inference of scienter may be imputed to an officer or director of a company when alleged misstatements relate to the core operations of that company, such that high-ranking individuals should have known that the statements were false]; *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) [where senior management failed to disclose that customers had issued "stop work orders" on company's four largest contracts, facts were prominent enough that it would be "absurd to suggest" that top management was unaware of orders]; *Valentini v. Citigroup, Inc.*,

837 F. Supp. 2d 304, 316 (S.D.N.Y. 2011) [defendants' repeated failure to provide material adequately describing true nature of investments was an "extreme departure from the standards of ordinary care" demonstrating scienter].[2]

Also probative are the TAC's allegations about the recordings seized by the Japanese regulators. TAC, ¶76. Descriptions of these recordings show that the Suzukis were aware that MRI had "affiliate companies" and was building "pharmaceutical plants." *Id.* But these affiliated companies and pharmaceutical plants were never disclosed to investors. To the contrary, investors were told that all their money would be used to purchase MARS. Moreover, the recordings show that in the summer of 2007 and March 2008, the Suzukis discussed MRI's financials in connection with registration with the Japanese FSA and Japanese registration as a financial broker. This suggests that the Suzukis had access to MRI's financials and were aware that investors' funds were not spent solely on MARS.

Additionally, strong evidence of scienter can be shown where the defendant lies to regulators. *Valentini v. Citigroup, Inc.*, *supra*, 837 F. Supp.2d at 316 [scienter shown where defendants' knowingly provided false forms to regulators]. As the Japanese regulators found, MRI (through the Japanese office which the Suzukis ran) submitted knowingly false information to them. TAC, ¶ 68. While the Suzukis claim they had no involvement in the preparation of these reports, the TAC alleges that Junzo Suzuki submitted reports to the regulators under his own personal seal (¶ 40), and that both Suzukis discussed MRI's registration with Japanese financial regulators as far back as the summer of 2007 and March 2008. TAC, ¶ 76. On this front, the communications between Fujinaga and the Suzukis beginning the early 2012 are particularly damning. In April 27, 2012, Fujinaga faxed Junzo, telling him that delayed payouts on the contracts would start again on April 30, 2012, "but subject to Japan fund raising of $1,000,000 plus or minus to cover past liquidations." TAC, ¶ 78. In other words, Fujinaga was conveying to Junzo in no uncertain terms that MRI was a Ponzi scheme, using new investor money from Japan to pay off existing investors. Moreover, it was Junzo Suzuki who directed Fujinaga in July 2012 which investors to pay off

---

[2] *Also see South Ferry LP v. Killinger*, *supra*, 542 F.3d at 782: "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010), quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000).

with new investor money. Specifically, on July 30, 2012, Junzo faxed Fujinaga, telling him it was critical to pay off existing investors to avoid complaints to the Japanese regulators. TAC, ¶ 78. Two days later, on August 1, 2012, Junzo told Fujinaga to pay off an investor who had complained to a Japanese authority (FINMAC) from new contributions so as to avoid discovery of the scheme. *Id.*

Fujinaga assured Junzo that the payments would be made for the "critical investors" -- i.e., those who complained -- but that the Ponzi scheme had to continue with renewed force to stay afloat. Specifically, Fujinaga said: "I will need your help in raising funds to pay for all liquidations as soon as possible ... I need your help to focus on raising funds to pay for all delayed liquidation payments." *Id.*

Again, the communications involve the essence of a Ponzi scheme. It would thus be absurd to suggest that Junzo Suzuki and Paul Suzuki were unaware of it. Moreover, the Suzukis' acquiescence in further fund-raising – while knowing that MRI was a Ponzi scheme – itself provides compelling evidence of scienter. *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 290 (S.D.N.Y. 2011) [allegations that Citigroup knew its capital and liquidity were deteriorating, while continuing to represent that its capital and liquidity were "strong" and "plentiful" give rise to a strong inference of scienter].

Lastly, scienter can be shown by motive and opportunity. *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,2011 U.S. Dist. LEXIS 60761 (N.D. Ala. 2011), p. 27 [scienter shown because defendants had a motive to inflate the company's income, since their compensation was tied to company performance]; *In re XenoPort, Inc. Sec. Litig.*, 2011 LEXIS 142523 at *14 (N.D. Cal. Dec. 12, 2011) [strong inference of scienter can be shown through a "strong correlation" between the company's financials and compensation]. The TAC alleges that the Suzukis made tens of millions of dollars in commissions from the fraud. TAC, ¶ 10. This provides the motive and opportunity to commit fraud, and implies scienter. In short, taking all of the TAC's allegations as a whole, the TAC amply alleges a strong inference of scienter.

**3. The Section 12 Claims Are Adequately Plead**

The Suzukis next argue that plaintiff's section 12 claims should also be dismissed because they are time-barred, and that Paul Suzuki is not alleged to be a "seller." This is incorrect.

**a. The Section 12 Claims Are Not Time-Barred**

The Suzukis claim that the securities were offered to the public more than three years before this action was filed -- i.e., at least 14 years ago. But MRI's pamphlets and offering materials themselves explain that MRI offers separate, distinct groups of securities to the public each year. For example, in 2008 MRI offered the "Series 2008 Class A" and "Series 2008 Select A" securities, and the following year, MRI offered a group of securities called "Series 2009 Class A" and "Series 2009 Select A."" TAC, ¶ 27. Each year, the securities issued were sold to the public *anew*. For instance, the "Series 2008 Class A" and "Series 2008 Select A" securities were not the same at the "Series 2009 Class A" and "Series 2009 Select A" securities. *Id.* A new certificate of investment was issued and delivered to the investor. *Id.*, ¶ 37. For that matter, the certificate of investment could not be transferred – it could only be transferred by surrendering it to MRI, with MRI then issuing a *new* certificate of investment.

**b. Paul Suzuki is Alleged to be a "Seller"**

The Suzukis also argue that Paul Suzuki is not a "seller," because there is no allegation that Paul Suzuki gained any financial benefit from soliciting securities to plaintiffs. Mtn., p. 20. This is specious. The TAC alleges that Paul Suzuki solicited investors and received tens of millions of dollars in commissions TAC, ¶ 10. To state a claim under Section 12, plaintiff only needs to show that the defendant did not "gratuitously urge another to make a particular investment decision." *Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006, 1029 (9th Cir. Cal. 2005), citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). Here, the TAC, and the inferences properly drawn from it, demonstrate that Paul Suzuki was soliciting the sale of MRI securities not for any gratuitous benefit, but because he was receiving millions of dollars in commissions from doing so.

**4. The section 20(a) and Section 15 Claims are Adequately Pled**

The Suzukis urge the court to dismiss plaintiff's Section 20(a) and Section 15 claims for two reasons. First, they contend that the underlying securities violations are not adequately pled. As set forth in detail above, however, the securities violations are adequately pled and, therefore, the Suzukis' argument fails on that ground. Second, they contend that plaintiffs have not adequately alleged that Junzo and Paul Suzuki "controlled" MRI, the primary violator, sufficient to establish liability. "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's

participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) [internal quotations omitted]. "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

In the TAC, plaintiffs allege that the Suzukis controlled the dissemination of MRI's misrepresentations to investors. The TAC further alleges that the Suzukis played a key role in formulating the sales materials, and Junzo Suzuki directed Fujinaga to pay certain crucial investors in 2012, directives that Fujinaga obeyed. These allegations are sufficient to establish control.

**B. PLAINTIFFS' STATE LAW CLAIMS ARE ALL WELL PLEAD**

**1. Fraud is Well Plead Against Both Junzo and Paul Suzuki**

The elements of common law fraud in Nevada are: (1) a defendant's false representation; (2) with knowledge or belief that the representation was false or without a sufficient basis for making it; (3) intent to induce the plaintiff to act or refrain from acting on the representation; (4) the plaintiff justifiably relied on the representation, and (5) resulting damage. *J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 89 P.3d 1009, 1018 (2004). The suppression or omission "of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist." *Nelson v. Heer*, 123 Nev. 217, 163 P.3d 420 (2007). "[T]he pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Schreiber Distrib. Co v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986). While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind -- or scienter -- of the defendants may be alleged generally. *See Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),* 42 F.3d 1541, 1547 (9th Cir. 1994) (en banc) ("We conclude that plaintiffs may aver scienter generally, just as the rule states -- that is, simply by saying that scienter existed.") Plaintiff may show the defendant's statements was false and misleading by "pointing to inconsistent contemporaneous statements or information which were made by or available to

defendants." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d. 1156, 1161 (9th Cir. 2009).

Actions rooted in fraud are governed by Rule 9's heightened pleading standard. FRCP 9. The purpose is to place defendants on notice of the alleged fraud so as to enable a meaningful answer to the allegations. *Schreiber Distrib. Co., supra*, 806 F.2d at 1400; *see Anspach v Bestline Products, Inc.*, 382 F Supp 1083 (ND Cal 1974) ["While Rule 9 requires that the circumstances constituting the fraud be stated with particularity, it does not require the pleading of detailed evidentiary matter--it only requires identification of circumstances constituting fraud so that defendant can prepare adequate answer.] Notwithstanding the particularity requirement of Rule 9(b), the heightened pleading requirement must still be read together with liberal notice pleading standard of Rule 8, which emphasizes that the pleading should be short and concise. *See Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006) [Rule 9's particularity requirement must be read in harmony with Rule 8's requirement of a short and plain "statement of the claim"]; *see also Schlick v Penn-Dixie Cement Corp.*, 507 F2d 374 (2nd Cir. 1974) [Rule 9 must be construed in conjunction with Rule 8, and complaint is *not* required to plead evidence.] (Emphasis added.)

In a case of a fraudulent scheme, a complaint is sufficient if it alleges a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants. *Tomera v Galt,* 511 F2d 504 (7th Cir. 1975). And cases, as here, where the complaint alleges numerous fraudulent transactions over an extended period of time, a complaint is sufficient where it pleads the *fraudulent scheme* with particularity and provides representative examples of specific fraudulent acts conducted pursuant to that scheme. *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d. 493, 509-510 (6th Cir. 2007). Moreover, less specificity is required in pleading when transactions at issue are numerous or take place over extended period of time. *Folsom v Continental Illinois Nat'l Bank & Trust Co.*, 633 F Supp 178 (7th Cir. 1986); *see also Raber v. Osprey Alaska, Inc.*, 187 FRD 675, 12 FLW Fed D 444 (MD Fla. 1999) [If alleged fraud occurred over extended period of time and acts were numerous, specificity requirements are less stringently applied.] In corporate fraud cases where plaintiffs cannot have actual knowledge of the corporate affairs and where the information is peculiarly within defendant's knowledge or control, plaintiffs need not specifically allege details of such information. *Craftmatic Sec. Litigation v*

*Kraftsow*, 890 F2d 628 (3rd. Cir.1989).

The TAC precisely describes defendants' fraudulent scheme and specifically identifies the contents of the the misrepresentations (e.g., TAC ¶ 39 "money will only be invested in escrow"; "escrow will independently manage the funds"; "the state guarantees the collection of MARS.") repeated by Junzo and Paul Suzuki verbally at every seminar (TAC ¶¶ 47, 52, 59, 63) and social parties (TAC ¶¶ 53, 60, 65) The specific roles played by both Junzo and Paul Suzuki in the solicitation are laid out in detail. *See* TAC ¶¶ 8-9; 24-25; 34-35, 75. And contrary to defendants' allegations, the the pleading does in fact explain the "who, when, where, and what" of their misrepresentations. *See* TAC ¶¶ 8-11; 38-67. *See also* TAC ¶¶ 75- 79. Junzo and Paul Suzuki's roles in the fraud are not "lumped together" as defendants allege -- the TAC does describe instances at which either or both of them spoke at seminars and other events (because Junzo Suzuki spoke at the seminars, while at other events Paul Suzuki was the keynote speaker, interchanging roles), but is also pleads fraudulent misrepresentations made by each of them. It explains for example that Junzo Suzuki makes inconsistent statements between the figures reported by Junzo Suzuki in MRI's annual business reports from 2008 through 2012 (TAC, ¶¶ 40, 44, 50, 56) and the figures reported in THE VIEW since 2008 until 2012. Paragraph 117 explains in detail each of the misrepresentations Junzo Suzuki made to the plaintiffs. Paragraph 118 details the many misrepresentation Paul Suzuki made to each of the plaintiffs. Paragraphs 46, 51, 57, and 58 identify the misrepresentations he made in the VIMO magazines. And as the complaint explains at ¶¶ 78-79, both Junzo and Paul Suzuki knew or had good reason to know that their representations were false and they each continued to falsely tout the safety and security of the MARS investments despite their knowledge to the contrary. The TAC accordingly provides ample information to allow Junzo and Paul Suzuki to formulate an answer and defend themselves. The heightened pleading requirement does not require plaintiffs to fully prove their case in their complaint, and discovery, of course, has yet to be conducted.

**2. The Standard of Review for the Remaining State Causes of Action**

Causes of actions not premised on the federal securities law or fraud are governed by Rule 8 (a), and not subject to any heightened pleading requirements. *Coffin v. Safeway, Inc.*, 323 F.Supp 2d 997 (D. Ariz. 2004). Complaints filed in federal court requires only "a short and plain statement of the claim

showing that the pleader is entitled to relief." FRCP 8(a)(2); *Swierkiewicz v. Sorema N.A.*534 U.S. 506, 513 (2002) . The complaint need only allege facts sufficient enough to give defendants notice of the claim and raise simply a "plausible" claim for relief. *Bell Atlantic Corp. v. Twombly* 550 U.S. 544, 570-572 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In determining whether a pleading states a plausible claim for relief, courts consider the complaint's factual allegations, together with all reasonable inferences from those allegations. *Cafasso v. U.S. ex rel. v. General Dynamic C4 Systems, Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011). Courts disfavor motions to dismiss under Rule 12(b)(6) and are rarely granted. *Broam v. Bogan*, 320 F.3d. 1023, 1028 (9th Cir. 2003). In determining the sufficiency of the pleading, allegations of material fact are taken as true and construed in the light most favorable to the pleader. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### 3. The TAC States Facts Amounting to Unjust Enrichment

Under Nevada law, an unjust enrichment claim arises where there is a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof. *Unionamerica Mtg. v. McDonald*, 97 Nev. 210, 212, 626 P.2d 1272, 1273 (1981). Unjust enrichment is "'the unjust retention ... of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Topaz Mutual Co. v. Marsh*, 108 Nev. 845, 856, 839 P.2d 606, 613 (1992) (quoting *Nevada Industrial Dev. v. Benedetti*, 103 Nev. 360, 363 n. 2, 741 P.2d 802, 804 n. 2 (1987)).

Suzuki defendants' reliance on *Thomas v. Wachocia Mortgage*, FSB, 2:10-CV-01819-ECR, 2011 WL 3159169 (D. Nev. July 25, 2011) and *LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 113 Nev. 747, 942 P.2d 182 (Nev. 1997) is misguided because plaintiffs are not required to prove "that there was a separate implied agreement with the Suzukis, which unjustly enriched the Suzukis but was never formalized in a contract." Mtn. 24:7-8. Unjust enrichment is instead concerned with the defendants' unjust retention of property. *Unionamerica Mtg., supra*, 97 Nev. at 212. Here, as the TAC (§§ 10, 117) explains, the Suzuki defendants are in receipt of over $20 million in commissions derived exclusively from the process of the Ponzi scheme and from funds that in good conscience, belong only to

the plaintiffs. The Suzuki defendants' maintenance of those funds is unjust by any measure and the unjust enrichment claim is well plead.

**4. The TAC States Facts Amounting to Breach of Fiduciary Duty**

Breach of fiduciary duty has three elements: (1) existence of a fiduciary duty; (2) breach of the duty; and (3) resulting damages. *Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009). A fiduciary relationship is deemed to exist when one has the right to expect trust and confidence in the integrity and fidelity of another. *Powers v. United Services Auto Ass'n.*, 115 Nev. 38, 979 P.2d 335, 337-338 (1999). *See Randono v. Turk*, 86 Nev. 123, 466 P.2d 218, 222 (1970) ["A confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other. The question in such case is always whether or not trust is reposed."]; *See also Hernandez v. Creative Concepts, Inc.*, 862 F.Supp.2d 1073 (D. Nev. 2012). "[T]he question for the Court is whether, under the circumstances of this case, a reasonable jury could conclude that a *reasonable person* would impart special confidence in the other party and whether the other party would *reasonably* know of this confidence." *Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.*, 359 F.Supp.2d 1075, 1088 (D. Nev. 2004), overruled on other grounds by *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 881 (9th Cir. 2007). In Nevada, a confidential relationship arises between an investment advisor and his or her client. *See Randono, supra*, 86 Nev. at 129 ["[I]n G. Bogert, The Law of Trusts and Trustees § 482 (2d ed. 1960), it is written, 'Investment advisors have been held to occupy a confidential relation toward those advised.'"].

The TAC alleges that the "Defendants held themselves out as worthy of the trust and confidence," that the plaintiffs "in fact reposed trust and confidence in Defendants to invest Plaintiffs' and the Class Members' moneys prudently, and to make truthful statements about the investments," and that the "Defendants undertook such trust and assumed a duty to advise and counsel Plaintiffs and the Class Members, and to protect Plaintiffs' and the Class Members' assets." TAC ¶ 132. The plaintiffs further allege that the defendants breached that duty by, among other things, making "material misstatements and omissions" when Junzo and Paul Suzuki offered securities directly to the plaintiffs. TAC ¶¶ 8-10, 35, 42, 67, 75. The Suzukis undertook and breached their fiduciary duties to plaintiffs.

**5. Accounting is Adequately Pled**

An "accounting" is an equitable remedy which allows the court to determine the extent of a misallocation of expenses and the damages resulting therefrom when there is fiduciary relationship between the parties. *In re Maxim Integrated Products, Inc. Deriv. Lit.*, 574 F.Supp.2d 1046 (N.D.Cal. 2008) (citing *Carlson v. Hallinan*, 925 A.2d 506, 538 n. 211-12 (Del.Ch.2006)). As discussed above, the Suzukis stood as plaintiffs' fiduciaries and have unlawfully received millions in funds properly owing to the plaintiffs. An accounting will thus properly enable the Court to determine the damages that resulted of the Suzuki defendants' betrayal of plaintiffs' trust and confidence.

**6. Constructive Trust is Properly Plead**

In Nevada, imposition of a constructive trust requires: "(1) [that] a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." *Waldman v. Maini*, 124 Nev. 1121, 1131, 195 P.3d 850, 857 (2008). A constructive trust is a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it. *Danning v. Lum's, Inc.*, 86 Nev. 868, 871, 478 P.2d 166 (1970). As explained above, the TAC alleges facts sufficient to establish that a confidential relationship existed between the Suzuki defendants and plaintiffs by virtue of the Suzuki defendants' role in advising and selling fraudulent securities to the plaintiffs.

There is no requirement, as the Suzuki defendants assert, that a constructive trust requires a showing of fraud. Mtn., 26: 23-24. In *Waldman v. Maini*, supra, 124 Nev. at 1131, the Nevada Supreme Court explained that "constructive trust as a remedy is not limited to [fraud and] misconduct cases; it redresses unjust enrichment, not wrongdoing." Footnote and internal quotation marks omitted.

> For example, in *Bemis v. Estate of Bemis*, [114 Nev. 1021, 967 P.2d 437 (1998),] we held that no fraud was required to impose a constructive trust. In that case, a father and mother agreed in their divorce settlement that the father would create a trust in favor of their two sons in the amount of $25,000. The father never established the trust or provided financial assistance to the boys. We determined that we could not impose a resulting trust because the father had never demonstrated intent to adhere to his agreement and create the trust. However, we imposed a constructive trust upon the father's estate because, in reference to the second two factors, the father inequitably failed to create the trust he had promised to create, and his estate would unjustly benefit from that inequitable act.

*Waldman, supra,* 124 Nev. at 1131-1132, 967 P.2d at 857-858; footnotes omitted.

As the TAC explains, the Suzuki defendants received in excess of $20 million in commissions since 2009, and likely millions of dollars prior to 2009. *See* TAC ¶ 10. It would be manifestly inequitable to countenance the Suzukis' retention of the millions they unjustly derived from plaintiffs and the class.

**7. Fraudulent Transfer**

**a. Leave to Amend is Not Required**

Federal policy strongly favors determination of cases on their merits, and therefore leave to amend is freely given "when justice so requires" and denial is limited. FCRP15(a)(2); *Ynclan v. Department of Air Force*, 943 F.2d. 1388,1391 (5th Cir. 1991). Leave to amend is freely given unless the opposing party makes a showing of undue prejudice. *Forman v. Davis,* 371 US 178, 182, 83 S.Ct. 227, 230 (1962). Amendments seeking to add claims are to be granted more freely than amendments adding parties. *Union Pac. R.R. Co. v. Nevada Power Co.*, 950 F.2d 1429 (9th Cir. 1991). It is implicit in Rule 15 that plaintiff may amend his complaint to add matters that would otherwise have been proper to include in original complaint. *Martinez v Safeway Stores, Inc.*, 66 F.R.D. 446 (N.D. Cal. 1975).

A motion to dismiss is not a responsive pleading for purposes of Rule 15(a). *Nolen v Fitzharris,* 450 F2d 958 (9th Cir. 1971); *see also Miles v. Department of Army*, 881 F2d 777 (9th Cir. 1989) [Where defendant had only filed motion to dismiss, which is not responsive pleading, plaintiff still had right to amend his complaint.]; *Cunard Line, Ltd. v Abney,* 540 F Supp 657, 34 (S.D. NY 1982). Moreover, where there are multiple defendants, the plaintiff may amend the complaint as a matter of course as to those defendants that have yet to answer. *Williams v. Board of Regents Univ. Systems Georgia,* 477 F.3d 1282, 1291-1292 (11th Cir. 2007); *Barksdale v. King*, 699 F.2d. 744, 747 (5th Cir. 1983).

Since the Suzuki defendants have only filed Rule 12(b)(6) motions, they have not submitted a responsive pleading, allowing plaintiffs to amend the complaint as a matter of course. Lastly, even if seeking leave had been required, the remedy would not entail a dismissal, but rather the Court's consideration of the present opposition as the requisite request. *See Andrew W. v. Menlo Park City School Dist.*, 2010 WL 3001216 at *2 (N.D. Cal. July 29, 2010) (agreeing that inclusion of new matter was improper, but construing plaintiff's opposition as belated motion for leave to amend.)

**b. Fraudulent Transfer is Well Plead**

The TAC asserts constructive fraudulent transfer against the Suzukis' retention of millions of dollars from the Ponzi scheme. The elements of constructive fraudulent transfer are: (1) A debtor made a transfer or incurred an obligation; (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation; and (3) The debtor either (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. Nev. Rev. Stat. § 112.190; *Herup v. First Boston Financial, LLC*, 123 Nev. 27, 162 P.3d 870, 873 (2007). A cause of action for constructive fraudulent conveyance is not subject to Rule 9(b) because it does not include an element of fraud. *Hyosung (America), Inc. v. Hantle USA, Inc.*, 2011 WL 835781 at *6 (N.D.Cal., Mar. 4, 2011); *Sunnyside Devel. Co. LLC v. Cambridge Display Tech. Ltd.*, 2008 WL 4450328, at *9 (N.D. Cal. Sept. 29, 2008) ["Its label notwithstanding, an alleged cause of action for fraudulent transfer does not 'sound in fraud,' because the claim focuses entirely on the transaction at issue and does not include elements of knowledge, intent, or purpose]; *Liberty Mut. Ins. Co. v. Hoge*, 2005 WL 756568 at *4 (N.D. Cal. 2005) [noting that the "key distinction" between an actual fraudulent transfer claim and a constructive fraudulent transfer claim "is that the former requires an inquiry into the debtor's intent while the latter requires a calculation of insolvency."] Since plaintiffs allege constructive fraudulent transfer, Rule 8(a)'s liberal pleading standards apply, and the TAC plainly sets forth sufficient details of the Suzukis' receipt of bad money from the Ponzi scheme. TAC ¶¶ 10, 71. Since MRI was insolvent at the time of the transfers (TAC ¶¶ 48, 54, 61, 66, 155-156,159) there was never any exchange for reasonably equivalent value, meaning that the pleading lays out a prima facie case fo fraudulent transfer.

Moreover, the Suzuki defendants' contention that the cause of action must be dismissed because plaintiffs failed to join MRI as a "necessary party" is also unpersuasive because MRI, the transferor, is obviously a party in the action. The Suzuki defendants' reliance on *Scoggins v. Fredrick,* 629 F.2d 426 (5th Cir. 1980) and *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005) are misplaced, because both of those involve cases in which the court did not have jurisdiction over the wrongdoer at all.

That is clearly not the case here. However, if the Court requires additional factual allegations, plaintiffs seek leave to amend to add MRI to this particular cause of action and to allege more facts.

## III. CONCLUSION

The plaintiffs believe that they have plead sufficient facts to support all of the counts they have alleged against the Suzuki defendants, and accordingly they urge the Court to deny the defendants' motion to dismiss in its entirety. However, should this Court determine that additional allegations are needed to adequately state one or more of the counts, the plaintiffs state that they can allege all additional facts necessary to adequately state each of those counts, and under those circumstances request leave to amend the complaint to add the necessary allegations.

Dated: July 24, 2014

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP

By: /s/ James Gibbons
JAMES E. GIBBONS
STEVEN J. RENICK
Attorneys for Plaintiffs

LAW OFFICES OF ROBERT W. COHEN
A Professional Corporation

By: /s/ Robert W. Cohen
ROBERT W. COHEN
MARIKO TAENAKA
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2014, a copy of the foregoing document was filed electronically via the Court's CM/ECF system. Pursuant to Local Rule 5.5(h), notice of filing will be served on all parties by operation of the Court's CM/ECF system, and parties may access this filing through the Court's CM/ECF system.

/s/ Mariko Taenaka
MARIKO TAENAKA