1

2

3

4

5

6

7                    **UNITED STATES DISTRICT COURT**

8                        **DISTRICT OF NEVADA**

9

10   SHIGE TAKIGUCHI, FUMI NONAKA,    )   2:13-cv-01183-JAD-VCF
     MITSUAKI TAKITA, KAORUKO KOIZUMI,)
11   TATSURO SAKAI, SHIZUKO ISHIMORI, )
     YOKO HATANO, YUKO NAKAMURA,      )   ORDER ON MOTIONS TO DISMISS
12   HIDEHITO MIURA, YOSHIKO TAZAKI,  )
     MASAAKI MORIYA, HATSUNE HATANO,  )
13   SATORU MORIYA, HIDENAO TAKAMA,   )
     SHIGERU KURISU, SAKA ONO,        )
14   KAZUHIRO MATSUMOTO, KAYA         )
     HATANAKA, HIROKA YAMAJIRI,       )
15   KIYOHARU YAMAMOTO, JUNKO         )
     YAMAMOTO, KOICHI INOUE, AKIKO    )
16   NARUSE, TOSHIMASA NOMURA, and    )
     RITSU YURIKUSA, Individually and )
17   on Behalf of All Others Similarly)
     Situated,                        )
18                                    )
                    Plaintiffs,       )
19                                    )
     vs.                              )
20                                    )
     MRI INTERNATIONAL, INC., EDWIN J )
21   FUJINAGA, JUNZO SUZUKI, PAUL     )
     MUSASHI SUZUKI, LVT, INC., dba   )
22   STERLING ESCROW, and DOES 1-500, )
                                      )
23                    Defendants.     )
     _____ )
24
              Before the court are the defendants' motions to dismiss
25
     plaintiffs' third amended complaint (hereinafter referred to as
26
     "the complaint" and cited to as "TAC") (#161, #170 & #171).
27
     Plaintiffs have opposed (#169, 170, 171), and defendants have
28

                                      1

replied (#174, 179, 180).[1]

Plaintiffs are several Japanese investors on behalf of a class who have brought this suit against defendants in connection with the alleged operation of a massive Ponzi scheme.  Defendant MRI is a Nevada corporation headquartered in Las Vegas with a branch in Tokyo, Japan.  MRI's U.S. operations are run by its president, CEO and sole shareholder, Edwin Fujinaga ("Fujinaga"), who is a resident of Nevada.  MRI's Tokyo operations, from which marketing and solicitation of investments was controlled, were run by Junzo Suzuki.  Junzo Suzuki and Paul Musashi Suzuki (collectively "the Suzukis") both reside in Tokyo and Hawaii.  Defendant LVT ("Sterling Escrow") was the escrow company that handled MRI's bookkeeping and is located and incorporated in Nevada.

MRI purported to deal in the purchase and collection of "Medical Accounts Receivable."  Plaintiffs allege in the instant complaint that through repeated and specific misrepresentations, MRI, Fujinaga, Junzo Suzuki, and Paul Musashi Suzuki each assured MRI's prospective and existing investors that its business was legitimate and that investors' monies would be secure.  MRI has never registered its securities with the United States Securities and Exchange Commission.

In considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all material allegations in the complaint as well as all reasonable inferences that may be drawn from such allegations.  *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1150 n.2 (9th Cir. 2000).  The allegations of the complaint also must be construed in

---

[1]Sterling Escrow has also joined the Suzukis' motion to dismiss (#173).

the light most favorable to the nonmoving party. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). However, legal conclusions are not entitled to the presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"Under the notice pleading standard of the Federal Rules, plaintiffs are only required to give a 'short and plain statement' of their claims in the complaint." *Paulsen v. CNF, Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009) (quoting *Diaz v. Int'l Longshore & Warehouse Union, Local 13,* 474 F.3d 1202, 1205 (9th Cir. 2007)). While this rule "does not require 'detailed factual allegations,'" it "must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A pleading is insufficient if it offers only labels and conclusions, a formulaic recitation of the elements of a cause of action, or "naked assertions devoid of further factual enhancement." *Id.* (internal punctuation omitted).

## I. Securities Claims

Plaintiffs assert four securities claims in this action: (1) § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10B-5, 17 CFR § 240.10b-5 (Count I); (2) § 12 of the Securities Act of 1933, 15 U.S.C. § 77*l* (Count III); (3) § 15 of the Securities Act of 1933 (Count IV); and (4) § 20 of the Securities and Exchange Act of 1934 (Count II). Defendants argue that plaintiffs' securities claims must be dismissed because they

3

have failed to adequately allege that the transactions at issue were domestic and have otherwise failed to satisfy the relevant pleading standard with respect to each claim.

A. Domestic Transaction

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010), the Supreme Court held that § 10(b) and Rule 10b-5 apply only to securities listed on a domestic exchange or to "domestic transactions in other securities."  Some courts have extended *Morrison* to § 12 claims.  *See In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 56 (S.D.N.Y. 2013).  Plaintiffs have not disputed *Morrison*'s application to their § 12 claims.

The *Morrison* court did not discuss what "domestic purchases and sales" meant.  The Second Circuit, however, has held that a transaction is domestic "if irrevocable liability is incurred or title passes within the United States."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).  "Put another way, these definitions suggest that the 'purchase' and 'sale' take place when the parties become bound to effectuate the transaction."  *Id.*  Irrevocable liability attaches at the time the parties committed to one another, which is where "there was a meeting of the minds."  *Id.* at 68.  A "sale of securities can [also] be understood to take place at the location in which title is transferred."  *Id.*  A "sale is ordinarily defined as the transfer of property or title for a price."  *Id.* (internal punctuation omitted).

"*Morrison* adopted a transactional test, which focuses not upon the place where deception originated, but upon purchases and sales of securities in the United States."  *Sec. & Exch. Comm'n v.*

*Ficeto*, 2013 WL 1196356, at *2 (C.D. Cal. 2013) (internal
punctuation omitted).  In an unpublished decision, the Ninth
Circuit has found transactions were domestic where the defendant
"received completed stock purchase agreements and payments" in
Nevada.  *Secs. & Exch. Comm'n v. Levine*, 462 Fed. App'x 717, 719
(9th Cir. 2011) (unpublished disposition).

It is undisputed that MRI did not register its securities in
the United States; thus the question is whether irrevocable
liability was incurred or title was passed in the United States.
Defendants argue that plaintiffs have not plead sufficient facts to
determine where irrevocable liability was incurred.[2]

Plaintiffs allege that when investors inquired about investing
with MRI, MRI would send them a welcome packet that included an
application and a "Pre-Agreement Disclosure Document" ("PADD").
The PADD stated that a contract for investment would be effective
"only after [MRI] receive[d] an executed contract at [its] office,
and the total amount of the investment [was] received in the
designated escrow trust account (Wells Fargo Bank, Las Vegas,
Nevada Branch)."  Plaintiffs were instructed to fill out an
application indicating the securities they wanted to purchase, and
to mail those applications to MRI's Las Vegas headquarters.  Upon
receipt of the application, MRI would mail a "Corporate Certificate
of Investment Agreement" to the plaintiffs.  Plaintiffs were
instructed to sign the agreement and wire the funds to a Wells
Fargo account in Las Vegas in the name of "Sterling Escrow Trustee

---

[2] The Suzukis also argue that plaintiffs cannot rely on where title
passed because plaintiffs did not receive title to anything and received
only a lien on a pool of MARS.

for MRI Series."  After the transfers were complete, MRI would mail each investor a "Certificate of Investment," which prominently and in multiple places stated "United States."  The certificates of investment indicated that MRI caused the certificates to be "duly executed by its authorized officers" only after the money was wired to the trust account.  A "Financial Products Trading Contract" sent along with the certificate of investment contained a Nevada choice of law and forum selection clause. (TAC pp. 7-9).

The above alleged facts are sufficient to support an inference that the parties incurred irrevocable liability and/or title was transferred in the United States.  Two conditions were required for MRI and the plaintiffs to incur irrevocable liability: receipt of the executed contracts by MRI and receipt of wired funds in the Sterling Escrow account.  The wiring of money was completed in the United States.  The complaint supports a reasonable inference that the executed contracts were also received in Nevada.[3]  Thus, just as in *Levine*, 462 Fed. App'x 717, both the completed agreement and the money were received in the United States.  However, even if the executed contracts were sent to the Japan branch and not to Las Vegas, irrevocable liability attached and/or title passed in the United States because that is where MRI issued the Certificates of Investment reflecting the plaintiffs' investments.  Further, the transactions' nexus to the United States is substantial.  At least one of two conditions necessary for irrevocable liability to attach took place in the United States.  Moreover, both the certificate of investment and its associated documents clearly invoked U.S. law

---

[3] Where the contracts were executed is irrelevant to this analysis.

1    and were intended to be offered in accordance with such laws,

2    including, in particular, the financial trading products contract,

3    which contained a Nevada choice of law and forum selection clause.

4    Accordingly, the defendants' motion to dismiss the securities

5    claims based on lack of jurisdiction is denied.

6        B.   Section 10(b) and Rule 10b-5

7        Section 10(b) prohibits the use or employment "in connection

8    with the purchase or sale of any security" of "any manipulative or

9    deceptive device or contrivance in contravention of such rules and

10   regulations as the Commission may prescribe as necessary or

11   appropriate in the public interest or for the protection of

12   investors."  15 U.S.C. § 78j.  Rule 10B-5 makes it

13           unlawful for any person, directly or indirectly, by the
             use of any means or instrumentality of interstate
14           commerce, or of the mails or or of any facility of any
             national securities exchange, (a) To employ any device,
15           scheme, or artifice to defraud, (b) To make any untrue
             statement of a material fact or to omit to state a
16           material fact necessary in order to make the statements
             made, in the light of the circumstances under which they
17           were made, not misleading, or (c) To engage in any act,
             practice, or course of business which operates or would
18           operate as a fraud or deceit upon any person, in
             connection with the purchase or sale of any security.
19
20   17 C.F.R. § 240.10b-5.  Plaintiffs' § 10(b) and Rule 10b-5 claim

21   must satisfy both the standard for alleging fraud under Federal

22   Rule of Civil Procedure 9(b) and the pleading requirements of the

23   PSLRA.  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,

24   701 (9th Cir. 2012).

25       Under Rule 9(b), "a party must state with particularity the

26   circumstances constituting fraud. . . . Malice, intent, knowledge,

27   and other conditions of a person's mind may be alleged generally."

28   Fed. R. Civ. P. 9(b).  To comply with the rule, the complaint must

7

state with particularity the circumstances constituting the fraud, including an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004).  "[A]llegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal punctuation omitted).  Rule 9(b) is satisfied if the plaintiff pleads "(i) some of the specific customers defrauded, (ii) the type of conduct at issue, (iii) the general time frame in which the conduct occurred, and (iv) why the conduct was fraudulent." *United States v. Smithkline Beecham Clinical Labs.*, 245 F.3d 1048, 1051 (9th Cir. 2001).  Where several defendants are alleged to be part of the fraud, "Rule 9(b) 'does not allow a complaint to . . . lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant.'" *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).

The PSLRA requires a complaint to plead both falsity and scienter with particularity.  *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014).  To plead falsity, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Pleading

scienter requires, "with respect to each act or omission alleged to violate this chapter, stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Reese*, 747 F.3d at 568.  "A strong inference of scienter 'must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *Id.* at 569.  "The inference must be that 'the defendant[] made false or misleading statements either intentionally or with deliberate recklessness.' . . . Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not independently sufficient."  *Id.*  The court must "review all the allegations holistically when determining whether scienter has been sufficiently pled."  *Id.*

An inference that as a key company officer, a defendant knew facts critical to a business's "core operations" or important transactions is generally not sufficient to establish scienter on its own.  *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  "Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard."  *Id.* at 784.  However, the "core operations" inference may be considered with other allegations in the complaint to determine whether scienter is sufficiently alleged.  *Id.*  "Allegations regarding management's role in a corporate structure

1   and the importance of the corporate information about which

2   management made false or misleading statements may . . . create a

3   strong inference of scienter when made in conjunction with detailed

4   and specific allegations about management's exposure to factual

5   information within the company." *Id.* at 785.  In addition, a

6   strong inference of scienter may be drawn where the "nature of the

7   relevant fact" that is falsely reported "is of such prominence that

8   it would be 'absurd' to suggest that management was without

9   knowledge of the matter." *Zucco Partners, LCC v. Digimarc Corp.*,

10  552 F.3d 981, 1000 (9th Cir. 2009)

11              i. Fujinaga and MRI

12      Fujinaga and MRI argue that the complaint alleges only

13  generalities, does not separately or consistently ascribe each

14  alleged misstatement to a particular defendant, and contains only

15  conclusory allegations of scienter.[4]  However, plaintiffs clearly

16  and repeatedly identify the specific misrepresentations made by MRI

17  and Fujinaga, as well as the knowledge on the part of both that

18  many, if not all, of those statements were false.  Importantly,

19  plaintiffs allege that Fujinaga is MRI's sole shareholder,

20  president, chief executive officer and a member of MRI's board of

21  directors, has overseen all of MRI's U.S. operations since at least

22  2003, and is the sole shareholder or managing member of 23 MRI

23  affiliates.  Plaintiffs allege that Fujinaga, along with the

24

25      [4] Fujinaga and MRI also focus on the plaintiffs' failure to outline

26  specific dates on which the investors received the alleged
    misrepresentations and the method by which they received them. However, the

27  court has already held that such level of specificity is not required in
    this case.  The complaint is clear that the representations reached each of

28  the plaintiffs multiple times from multiple individuals by multiple methods,
    both before and after they had invested their money with MRI.

Suzukis, had the power and authority to control the representations made in offering books, pamphlets, handouts, advertisements, and other marketing materials, and that these materials contained specific false and misleading statements.  Importantly, plaintiffs allege that beginning in 2008 and continuing through the class period, Fujinaga signed offering books distributed to prospective investors representing that: (1) investors' money would only be invested in MARS; (2) investors' money would be managed not by MRI but by an independent escrow company obligated by U.S. law to deposit a set percentage of its funds with the state government each month, which would be used to indemnify the investors in the event of a default; (3) investors' money would be put in a bank "lockbox" account, which only the largest and safest banks could establish, and which only the most trustworthy of customers could obtain, and the funds in the lockbox would then be used solely to buy MARS that were of greater value than the amount MRI paid for them; (4) the lockbox account would be separately managed and, if the bank were to fail, the state government would guarantee the funds in the account, with the investors having the first right of priority to recover the funds; (5) each state guaranteed MARS up to a legal limit, and MRI purchased MARS only up to this guaranteed limit; and (6) if MRI filed for bankruptcy, then the escrow company, with the assistance of the state government, would retain a new company to collect on the MARS, and the escrow company would then be responsible for distributing the funds to the investors.[5]

---

[5] That these statements are not directly quoted and instead may be paraphrased is of no import.  The content of the representations is clearly and specifically alleged.

11

(TAC pp. 10-11).  Further, plaintiffs allege that Fujinaga also signed a document called "The View," which was sent to investors in 2010, 2011, and 2012, that contradicted information MRI provided to Japan's Financial Services Agency.  Plaintiffs specifically identify several of the alleged misrepresentations contained in issues of The View.  (*See* TAC ¶¶ 40, 44, 45, 50, 56).  In addition, plaintiffs allege MRI misrepresented the safety of its securities to prospective investors in the Pre-Agreement Disclosure Document.

The complaint also contains specific facts demonstrating that representations made by MRI and Fujinaga were false.  Specifically, plaintiffs point to the findings of Japanese regulators that from at least 2011, MRI commingled investor funds with its own, that investor money was used to pay off earlier investors, that MRI continued to solicit new investments even after it could not repay old ones, that MRI submitted false business reports to Japanese regulators to avoid detection, that MRI continued to make false representations even after it knew they were false, and that Fujinaga admitted that MRI had engaged in a Ponzi scheme. Plaintiffs also allege, and provide facts to support, that the representations that investor funds were kept in a lockbox and handled by an independent escrow company were untrue. (*See* TAC ¶¶ 72-73).  Finally, plaintiffs cite statements from Fujinaga in which Fujinaga admitted that MRI had essentially run a Ponzi scheme.

Plaintiffs generally allege that MRI and Fujinaga knew these statements were false when made and further allege facts that specifically support a finding that at some point during the class period MRI and Fujinaga knew at least some of the representations were false and yet continued to make them in order to solicit

investment in MRI.  Fujinaga admitted to Japanese regulators that MRI had been using investor funds to pay off earlier investors. Moreover, a substantial and compelling inference may be drawn that Fujinaga was aware of MRI's actual financial condition and performance at all times, as plaintiffs allege he solely controlled the disposition of the investors' funds contained in the Sterling Escrow account and that he used investor funds to pay for his own personal expenses.  As such, Fujinaga would have known that the numbers he presented to investors in The View were at odds with the numbers presented to Japanese regulators, and he would have known that from 2009 on, MRI was insolvent.  In addition, Fujinaga had a motive to lie because he took in hundreds of millions of dollars from the scheme.  Taken together, these allegations, if true, strongly support a compelling inference of scienter on the part of MRI and Fujinaga.

    ii. Suzukis

    Plaintiffs allege that Junzo Suzuki was MRI's Executive Vice President, Asia Pacific, MRI's Foreign Registered Representative in Japan, and on MRI's Board of Trustees.  They also allege he founded and ran MRI's office in Tokyo with minimal oversight from Fujinaga, that he solicited purchase of MRI securities, directed sales and marketing in Japan, spoke at informational seminars and led tours, and handled all customer service inquiries.  Finally, they allege he signed the annual report submitted to Japanese regulators.

    Plaintiffs allege that Paul Musashi Suzuki was the Japan Operations General Manager, solicited purchase of MRI securities, was the editor-in-chief of VIMO (a magazine sent to investors) and in VIMO authored articles touting the safety and security of MRI

13

investments.   Plaintiffs allege Paul Musashi Suzuki coordinated MRI seminars as well as lecturing at them, and coordinated parties and tours for investors.   At seminars, Paul Musashi Suzuki lectured on various topics, including MRI's business, MARS, and the U.S. health industry.

Plaintiffs allege that all marketing and solicitation for the sale of securities was done in Japan by the Suzukis and at the direction of the Suzukis, that the Suzukis had the power and authority to control the representations made in marketing, that the Suzukis sold the MRI securities for substantial commissions (twenty million dollars from 2009-2013), and that the Suzukis knew or recklessly disregarded false statements in the promotional materials they distributed and statements they made to investors and prospective investors.   Plaintiffs also set forth in specific detail the false representations that each Suzuki is alleged to have made, either in writing by authoring editorials in VIMO (Paul Musashi Suzuki) or orally at seminars and social gatherings (both). Those alleged misstatements are set forth in some detail but are generally the same as those MRI and Fujinaga are alleged to have made to investors and prospective investors: claims that investor funds were kept in a secure, independent escrow "lock box," that U.S. laws protected and guaranteed investments, and that investor funds were used only to purchase MARS.   Plaintiffs allege that both Suzukis contributed to both the annual report (sent to Japanese regulators) and The View, and so based on the inconsistencies between those materials they knew or should have known of the falsity of the statements they made to investors.

Plaintiffs allege that the Suzukis had access to MRI's actual

financial condition and performance.  In particular, they allege
that audio recordings show the Suzukis were both present during
discussions about MRI's finances.  Plaintiffs also allege that in
April 2012, Fujinaga advised both Suzukis of MRI's funds shortage,
including advising Junzo Suzuki that more money was needed to be
"raised" in order to pay off investors, but that both Suzukis
continued to represent MRI as a profitable company and to solicit
investments.

The Suzukis attack the 10(b) claim on four grounds: (1)
plaintiffs do not sufficiently allege that either Suzuki was a
maker of many of the alleged false statements; (2) the statements
are not sufficiently particularly plead; (3) in many cases the
statements were made to existing investors and thus, they argue,
were not made in connection with the purchase or sale of a
security; and (4) plaintiffs do not sufficiently allege scienter.

### a. Makers

"For purposes of Rule 10b-5, the maker of a statement is the
person or entity with ultimate authority over the statement,
including its content and whether and how to communicate it."
*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct.
2296, 2302 (2011).  The Suzukis argue that the complaint contains a
number of statements that are not clearly attributable to either,
so they cannot be primarily liable as "makers" of those statements.
However, the complaint does contain several statements that are
directly attributable to the Suzukis, particularly those they made
orally to investors at seminars, as well as statements made by Paul
Musashi Suzuki in VIMO.  These allegations are sufficient to
survive a motion to dismiss.

15

b. Particularity

Plaintiffs make several specific allegations of misstatements by each Suzuki, including that: (1) investor funds would only be used to purchase MARS (both); (2) U.S. laws protected investors' funds (both)[6]; (3) investor funds would be kept in a separate "lockbox" in escrow, which account was a specialized bank account used for collecting receivables and which required that the face value of the receivables purchased exceed the actual amount paid to purchase them (both); (4) only companies that passed a rigorous test were eligible to open lockbox accounts (both); (5) the escrow company made it impossible for MRI to touch investors' assets (both); and (6) the escrow system ensured segregation of funds, which protected the funds from creditors in the event that MRI became insolvent (Paul Musashi Suzuki).  Where the complaint has lumped the Suzukis together, the context is clear that it is because they both, at different times, made these same statements to investors at seminars and social gatherings.  Further, as discussed above, plaintiffs have also sufficiently and particularly alleged the falsity of the statements made by the Suzukis.

c. In Connection with Purchase or Sale

The Suzukis argue that many of the alleged statements they made were to people who had already invested, so those individuals could not have relied on those statements in deciding to purchase MRI securities.  Plaintiffs respond that the Suzukis made the misrepresentations outlined above repeatedly to investors over several years, many of whom would reinvest later on.  Read as a

---

[6] The TAC also details several statements made by Paul Musashi Suzuki in VIMO that relate to this general statement.

whole, the complaint alleges that the statements made by the
Suzukis to existing investors influenced and encouraged decisions
to reinvest.  Accordingly, those statements were made in connection
with the purchase or sale of a security.

               d. Scienter

     Both Suzukis had high-ranking positions with MRI and were
heavily involved in and directed the marketing of MRI securities in
Japan.  In fact, plaintiffs allege, they were the "face" of MRI in
Japan.  Plaintiffs allege that at all times the Suzukis knew MRI
was not using investor funds only for MARS, that MRI had stopped
purchasing independent MARS in 2005, and that MRI was using
investor funds to operate MRI affiliates, and they point to
evidence showing actual exposure to information that put – or
should have put – the Suzukis on notice that the representations
they were making to investors and prospective investors were false.
First, audio recordings place both Junzo Suzuki and Paul Musashi
Suzuki at the scene of discussions regarding MRI's finances, MRI's
affiliates and MRI's marketing materials.  Although the Suzukis
argue that none of these discussions necessarily reveal that they
knew MRI was engaging in a fraudulent Ponzi scheme during the class
period, the inference drawn from their presence at these
discussions is that they both were in positions to be privy to
information about MRI's finances and business operations, which
information clearly would have revealed that MRI was perpetrating a
fraud on its investors.  Second, in April 2012, Fujinaga made
statements via fax to both Suzukis that alerted them to MRI's funds
shortage.  In a later fax to Junzo Suzuki, Fujinaga at least
strongly suggested that MRI was a Ponzi scheme, and an even later

fax to Paul Musashi Suzuki suggests that he, too was aware of this information.  (TAC ¶ 78). These faxes did disclose that MRI could not pay off its maturing investments, which is suggestive of a Ponzi scheme.

Plaintiffs also allege that the Suzukis obtained substantial commissions from MRI, suggesting they had a motive and opportunity to misrepresent MRI's business to investors in order to obtain more commissions.  While substantial commissions are insufficient standing alone to establish scienter, such evidence combined with all the plaintiffs' allegations are enough to support an inference of scienter that is at least as strong as the opposing inference. While the Suzukis argue that plaintiff's own declaration does not show that any of the twenty million dollars in commissions went to Paul Musashi Suzuki, this is not dispositive.  The declaration cited by defendants shows the commissions went to entities related to the Suzukis, and plaintiffs allege the entities were controlled by both Suzukis.

Finally, the complaint also contains several references specific to Junzo Suzuki that also support a compelling inference of scienter.  Plaintiffs allege that Junzo Suzuki ran MRI's Japanese operations with little oversight from Fujinaga and signed the Annual Report submitted to Japanese regulators.  Together these allegations support an inference that Junzo Suzuki had access to and was privy to information about MRI's financial status, or at the very least was familiar with the contents of the report. Further, Junzo Suzuki's request of – or direction to – Fujinaga to pay off critical investors in order to avoid complaints to Japanese regulators strongly supports an inference that he knew MRI was

engaged in wrongdoing; such a request suggests that Junzo Suzuki was attempting to prevent MRI's fraud from being uncovered.  While similar allegations are not made with respect to Paul Musashi Suzuki, given the close relationship alleged to exist (both familial and business) between Paul Musashi Suzuki and his father, Junzo Suzuki, a reasonable inference may be drawn that Junzo Suzuki shared his knowledge with Paul Musashi Suzuki.

Although the Suzukis argue that the more plausible inference to be drawn from the complaint is that they had no control over or knowledge of MRI's U.S. operations, a compelling inference can be drawn, based on the Suzuki's high-ranking positions and attendance at meetings where financial matters were clearly discussed, as well as the substantial commissions they received, that they were aware of the fraud being perpetrated on investors.  At the very least, the April 2012 faxes strongly support a compelling inference that they were aware of the fraud as of that date, and that all marketing and solicitation of investments after that date were in violation of § 10(b) and Rule 10b-5.  Therefore, the court concludes that the allegations in the complaint give rise to an inference of scienter as to the Suzukis that is at least as compelling as an opposing inference of nonfraudulent intent.

> iii. Sterling Escrow

Sterling Escrow asserts that the complaint charges it only under a theory of aiding and abetting and that it cannot be liable for a violation of the securities law under this theory. Plaintiffs concede that Sterling Escrow may not be liable on a theory of aiding and abetting but assert that they are alleging Sterling Escrow committed a primary violation of § 10b and Rule

10b-5.   Sterling Escrow argues that it cannot be liable under the securities laws because it owed no duty to the plaintiffs and because the plaintiffs do not allege Sterling Escrow committed a deception or manipulative act.

The pleadings are insufficient to state a claim under § 10(b) and Rule 10b-5 against Sterling Escrow and said claim is therefore dismissed.   The dismissal is without prejudice to request leave to amend the complaint should discovery in this matter produce evidence that Sterling Escrow committed a primary violation of § 10(b) and Rule 10b-5.

C. <u>Section 12 Claims</u>

Section 12(a)(1) imposes liability for the offer or sale of an unregistered security.   15 U.S.C. § 77*l*(a)(1).   Section 12(a)(2) imposes liability for the offer or sale of securities by means of a prospectus or oral communication that "includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2).

Claims brought under § 12(a)(1) must be brought within one year of the violation and in no event more than three years after the security was "bona fide offered to the public."   15 U.S.C. § 77m.   The Second Circuit has held, in line with "the vast majority of courts" that the statute begins to run from the date of the first bona fide offer as opposed to the last bona fide offer.   *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 100-06 (2d Cir. 2004).

The Suzukis argue that plaintiffs' § 12(a)(1) claims are time barred because under the allegations of plaintiffs' prior

20

complaint, the first bona fide offer of MRI's securities to the public occurred 14 years ago.  Plaintiffs argue that MRI offered a new series of securities each year and that each years' series was a new and separate security.  Thus, the limitations period would run from the time each year's series was offered and not from the time MRI first began offering securities.  The Suzukis argue that plaintiffs identify no differences between each year's securities so as to render them separate and distinct from the original securities first offered 14 years ago.  Plaintiffs argue that the series were clearly separate because each time an investor purchased a new series of security, MRI issued a new certificate of investment.

Plaintiffs have adequately plead facts supporting a reasonable inference that at least some – perhaps all – of their § 12(a)(1) claims are not time barred.[7]  Each year MRI offered a new series of securities and issued new certificates of investment to those who purchased such securities.

The Suzukis also argue that plaintiffs do not adequately allege that Paul Musashi Suzuki was a "seller" because they do not allege that he solicited purchase of securities for his own financial gain.  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005).  Specifically, they argue there is no factual basis for alleging Paul Musashi Suzuki obtained any commissions because plaintiffs' counsel's own declaration does not attribute any of the twenty million dollars in commissions referenced in the complaint to Paul Musashi Suzuki.  Plaintiffs clearly allege that

---

[7] The court notes that plaintiffs' § 12(a)(1) claim does not assert any violations before July 5, 2010.

1   Paul Musashi Suzuki offered MRI securities for sale and received

2   substantial commissions in return and thus that Paul Musashi Suzuki

3   was a seller.

4       D. Section 15 & Section 20(a)

5       Sections 15 and 20(a) impose liability on control persons for

6   a primary violation of the securities laws – in this case, §§ 12

7   and 10(b).  Control is defined as "the possession, direct or

8   indirect, of the power to direct or cause the direction of the

9   management and policies of a person, whether through the ownership

10  of voting securities, by contract, or otherwise." 17 C.F.R. §

11  230.405.  "To establish 'controlling person' liability, the

12  plaintiff must show that a primary violation was committed and that

13  the defendant 'directly or indirectly' controlled the violator."

14  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161

15  (9th Cir. 1996).  "[W]hether a person is a 'controlling person is

16  an intensely factual question, involving scrutiny of the

17  defendant's participation in the day-to-day affairs of the

18  corporation and the defendant's power to control corporate

19  actions."  *Id.* at 1162.  Traditional indicia of control include

20  "having a prior lending relationship, owning stock in the target

21  company, or having a seat on the board."  *No. 84 Employer-Teamster*

22  *Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d

23  920, 945 (9th Cir. 2003).

24      Defendants argue that plaintiffs' control liability claims

25  must be dismissed because plaintiffs have not sufficiently alleged

26  the primary violations on which they are based.  For the reasons

27  previously discussed, that argument is without merit.

28      The Suzuki defendants further argue that the complaint

22

contains only conclusory assertions that the Suzukis had the power to exercise control over MRI and in fact exercised control. Supported by specific factual allegations, plaintiffs allege that the Suzukis had the power to control the marketing and solicitation for sale of MRI securities, which is the crux of the securities violations in this case.  They allege Paul Musashi Suzuki managed operations in Japan, had the power to control MRI decisionmaking in Japan, and was responsible for day-to-day supervision of MRI's employees.  Paul Musashi Suzuki was the editor-in-chief of VIMO and authored articles and editorials therein that repeatedly made the three core alleged misrepresentations to MRI's investors.  Junzo Suzuki headed the Tokyo branch with minimal oversight from Fujinaga, and was in a position to direct or ask Fujinaga that certain critical investors be paid, which Fujinaga did.  Contrary to the defendants' arguments, the fact that both Fujinaga and the Suzukis are alleged to have had control is not inherently contradictory.  What these allegations show is that the Suzukis had control over the representations MRI made to its investors, and that Junzo Suzuki had sufficient authority and control that he could request that Fujinaga pay certain designated investors to attempt to avoid complaints to authorities that contracts were in default.  While these are not the "traditional indicia of control," in this case they are sufficient to withstand a motion to dismiss.

Fujinaga also argues plaintiffs do not sufficiently plead that he had control over MRI.  This argument is without merit. Fujinaga, as alleged, was MRI's president and exclusively responsible for MRI's U.S. operations including the Las Vegas headquarters' day-to-day operations; was the sole owner of MRI with the ability to

1  contractually bind MRI; had the power to influence and control MRI
2  decisionmaking and marketing of securities, including the ability
3  to control representations made in marketing materials; and had
4  knowledge of and controlled MRI's finances.  These facts support
5  more than a plausible inference that Fujinaga had control over MRI.
6  **II. State Law Claims**
7      A. <u>Fraud</u>
8      Defendants argue that the fraud claim is not sufficiently
9  particularly alleged.  Because the court finds plaintiffs have
10 sufficiently plead their § 10(b)(5) and Rule 10b-5 claim against
11 the Suzukis, Fujinaga and MRI, plaintiffs' claim of intentional
12 fraud against is also sufficiently plead as to those defendants.[8]
13 The court further notes that plaintiffs have sufficiently alleged
14 defendants' states of mind for purposes of this claim.  Fed. R.
15 Civ. P. 9(b).
16     As to Sterling Escrow, however, the fraud claim is not
17 sufficiently particularly plead.  The fraud claim against Sterling
18 Escrow is therefore dismissed.  The dismissal is without prejudice
19 to request leave to amend the complaint should discovery in this
20 matter produce evidence that Sterling Escrow made a false
21 representation to the plaintiffs that it knew was false, on which
22 it intended to induce the plaintiffs to act in reliance and on
23
24
_____
25     [8] The elements of a fraud claim are: (1) a false representation made by
   the  defendant;  (2)  the  defendant's  knowledge  or  belief  that  the
26 representation  was  false  (or  an  insufficient  basis  for  making  the
   representation); (3) the defendant's intention to induce the plaintiff to
27 act or to refrain from acting in reliance upon the misrepresentation; (4)
   the plaintiff's justifiable reliance upon the misrepresentation; and (5)
28 damage to the plaintiff resulting from such reliance. *Bulbman, Inc. v. Nev.
   Bell*, 825 P.2d 588, 592 (Nev. 1992).

which in fact plaintiffs did rely and thereby suffered damages.[9]

B. Unjust Enrichment

Unjust enrichment is "the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor." *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997). The elements are:

(1)   a benefit conferred on the defendant by the plaintiff;

(2)   appreciation by the defendant of such benefit; and

(3)   an acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.

*Unionamerica Mortg. & Equity Trust v. McDonald*, 626 P.2d 1272, 1273 (Nev. 1981).  "Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another."  *Id.*

Unjust enrichment is not available where the plaintiff asserts its claim pursuant to an express, written contract.  *LeasePartners Corp.*, 942 P.2d at 187.  However, such a claim is not barred if there is no contract between the plaintiff and the defendant.  *See id.*

The defendants argue that plaintiffs' unjust enrichment claim

---

[9] Sterling Escrow has not moved to dismiss the claim of aiding and abetting fraud plaintiffs have asserted against it.  The court notes that such claim is sufficiently plead and properly before this court.

must fail because their claim is based on a contract for investment with MRI.  Plaintiffs have no contract with either of the Suzukis or Fujinaga.  Accordingly, their unjust enrichment claim is not barred at this stage.  *See LeasePartners Corp.*, 942 P.2d at 187.

The Suzukis also argue that plaintiffs have not alleged any facts showing a separate implied agreement with the Suzukis that unjustly enriched the Suzukis, but an "implied agreement" is not an element of an unjust enrichment claim.  The Suzukis also argue that there is no basis for an unjust enrichment claim against them because plaintiffs did not confer any benefit on the Suzukis but rather conferred the benefit on MRI.  However, the complaint supports a reasonable inference that a substantial amount of plaintiffs' funds that were paid to MRI were then distributed to the Suzukis, and the Suzukis were able to receive these funds because they actively solicited investments from plaintiffs by making numerous alleged misrepresentations.  This is sufficient to state a claim of unjust enrichment.

C. <u>Breach of Fiduciary Duty</u>

"A breach of fiduciary duty claim seeks damages for injuries that result from the tortious conduct of one who owes a duty to another by virtue of the fiduciary relationship." *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009).  A "fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Id.*  To prevail on a breach of fiduciary duty claim, the plaintiff must establish: "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) the breach proximately caused the damages." *Klein v. Freedom Strategic*

*Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009).

Sterling Escrow moves to dismiss this claim on the grounds that plaintiffs have not alleged specific facts showing a fiduciary relationship between Sterling Escrow and the plaintiffs.  However, plaintiffs allege that Sterling Escrow portrayed itself as a trustee of the plaintiffs' investment funds.  Further, the complaint supports an inference that Sterling Escrow allowed itself and its name to be used to imprint legitimacy on MRI's business, and Sterling Escrow allowed Fujinaga to use the investors' funds for his personal use and thereby failed to ensure that the investors' funds were protected.  Accordingly, plaintiffs have sufficiently alleged a fiduciary relationship between Sterling Escrow and plaintiffs, as well as a breach of the fiduciary duty.

MRI, Fujinaga, and the Suzukis argue plaintiffs do not allege any fiduciary relationship between them and plaintiffs other than conclusory assertions of such.  They further argue, citing several cases, that no fiduciary relationship exists between a buyer and seller of property, a manufacturer of property and the consumer or between a partnership and a stranger who had been assigned an interest in the partnership's profits, and so no fiduciary relationship exists in this case.  Plaintiffs argue that the cases cited by defendants are distinguishable, and that the relationship in this case is more akin to that between an investment advisor and an investor, in which Nevada has found a fiduciary relationship to exist.  *Randono v. Turk*, 466 P.2d 218, 222 (Nev. 1970).

Plaintiffs allege that the defendants held themselves out as worthy of trust and confidence and plaintiffs in fact reposed trust and confidence in them to invest plaintiffs monies wisely and to

make truthful statements about the investments.  They further allege that MRI, Fujinaga, and the Suzukis made several promises to the plaintiffs in order to induce them to invest their monies with MRI.  Those promises included assertions that their investments would be handled in a safe manner.  Accordingly, the court finds plaintiffs have alleged sufficient facts to state a claim that the defendants breached a fiduciary duty owed by them to the plaintiffs.

D. <u>Accounting</u>

"An action for accounting . . . is a proceeding in equity for the purpose of obtaining a judicial settlement of the accounts of the parties in which proceeding the court will adjudicate the amount due, administer full relief and render complete justice." *Oracle USA, Inc. v. Rimini St., Inc.*, 2010 WL 3257933, at *6 (D. Nev. 2010) (internal citations and quotation marks omitted). Accounting "may be sought where . . . the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable." *Id.*  The District of Nevada "has held that '[a]n action for inspection and accounting will prevail only where the plaintiff can establish that there exists a relationship of special trust between the plaintiff and defendant.'" *Thomas v. Wachovia Mortgage, FSB*, 2011 WL 3159169, at *6 (D. Nev. 2011) (internal citations omitted).

MRI, Fujinaga, and the Suzukis argue this claim must be dismissed because plaintiffs have not alleged any special relationship of trust.  However, as just discussed, plaintiffs sufficiently allege that all defendants held themselves out to plaintiffs as worthy of trust – making repeated alleged

misrepresentations in order to convince them of such – and that plaintiffs did in fact trust the defendants to properly handle their investments.

The Suzukis also argue that plaintiffs have not adequately alleged that the Suzukis have access to or control over the accounts necessary to provide an accounting, because plaintiffs wired their money to Sterling Escrow and the plaintiffs themselves allege that the Suzukis had no control or access to the Sterling Escrow funds.  However, while the Suzukis may not have had control over the Sterling Escrow account, they certainly have control over their own accounts, which the complaint suggests contained money that was wrongfully transferred from MRI's investors.

E. <u>Constructive Trust</u>

"A constructive trust has been defined as a remedial device by which the holder of legal title to property is held to be a trustee for the benefit of another who in good conscience is entitled to it.  The requirement that a constructive trustee have title (not mere possession) to the property involved is critical to the imposition of a constructive trust." *Danning v. Lum's, Inc.*, 478 P.2d 166, 167 (Nev. 1970).

"[I]mposition of a constructive trust requires: '(1) [that] a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.'" *Waldman v. Maini*, 195 P.3d 850, 857 (Nev. 2008). Constructive trust "is not 'limited to [fraud and] misconduct cases; it redresses unjust enrichment, not wrongdoing.'" *Id.*

The Suzukis argue that the plaintiffs have not alleged the Suzukis hold legal title to plaintiff's money because the money was wired directly to Sterling Escrow.  The Suzukis also argue that no confidential relationship has been alleged.  For the same reasons already discussed, these arguments are without merit.  The motion to dismiss is denied without prejudice to renew at the close of discovery.

F. Fraudulent Transfer

In its order of May 6, 2014, the court granted plaintiffs leave to amend their complaint to cure the deficiencies of the second amended complaint.  It did not grant plaintiffs leave to add additional claims to the complaint.  Plaintiffs are incorrect that they had a right to amend without leave of court.  Rule 15(a) would have allowed plaintiffs to file an amended complaint within 21 days of the filing of the motion to dismiss without first securing leave of court.  *See* Fed. R. Civ. P. 15(a) ("A party may amend its pleading once as a matter of course within: . . . 21 days after service of a motion under Rule 12(b). . . .).  Plaintiffs' third amended complaint was not filed within 21 days of the motions to dismiss.  Accordingly, plaintiffs' claim for fraudulent transfer is **DISMISSED WITHOUT PREJUDICE.**

G. Alter Ego

In order to hold an individual liable under an alter ego theory, the plaintiffs must show: (1) the corporation was influenced and governed by the person asserted to be the alter ego; (2) there is such unity of interest and ownership that one is inseparable from the other; and (3) the facts are such that adherence to the corporate fiction of a separate entity would,

under the circumstances, sanction a fraud or promote injustice.
*LFC Mktg. Group Inc. v. Loomis*, 8 P.3d 841, 846-47 (Nev. 2000).
Several factors, none conclusive, may indicate alter ego: (a)
commingling of funds; (b) undercapitalization; (c) unauthorized
diversion of funds; (d) treatment of corporate assets as the
individual's own; and (e) failure to observe corporate formalities.
*Id.* at 847.

Fujinaga argues that plaintiffs do not allege any facts that
would support alter ego liability in this case.  However, Fujinaga
is alleged to have had exclusive control over MRI's – and thus the
plaintiffs' – funds and to have used MRI's funds for his own
personal expenses.  Plaintiffs also allege MRI did not have
sufficient funds to repay its existing investors.  Accordingly,
plaintiffs have plead unauthorized diversion of funds and treatment
of corporate assets as Fujinaga's own.  This is sufficient to state
a claim of alter ego liability.

H. Breach of Contract

MRI argues that this claim should be dismissed as to the
contracts that have not yet matured.  Plaintiffs argue they have
sufficiently asserted breach of contract even as to contracts that
have not matured based on a theory of anticipatory breach.

Plaintiffs clearly allege that MRI cannot repay its investors
because it stopped doing so in April 2013, it has been stripped of
its license to do business in Japan, it is subject to an asset
freeze in the SEC action, and Fujinaga has admitted that MRI
operated a Ponzi scheme.  Accordingly, plaintiffs have adequately
asserted a claim for breach of contract based on anticipatory
breach.  *See Schwartz v. Wasserburger*, 30 P.3d 1114, 1116 (Nev.

1  2001); *see also Mobley v. New York Life Ins. Co.*, 295 U.S. 632, 638

2  (1935) ("Repudiation by one party, to be sufficient in any case to

3  entitle the other to treat the contract as absolutely and finally

4  broken and to recover damages as upon total breach, must at least

5  amount to an unqualified refusal, or declaration of inability,

6  substantially to perform according to the terms of his

7  obligation.").

8  **Conclusion**

9       In accordance with the foregoing, the Suzuki defendants'

10  motion to dismiss is **GRANTED** as to the fraudulent transfer claim,

11  and such claim is **DISMISSED WITHOUT PREJUDICE.**  Sterling Escrow's

12  motion to dismiss the fraud and § 10(b) and Rule 10b-5 claims

13  against it is **GRANTED**, and said claims are **DISMISSED WITHOUT**

14  **PREJUDICE.**  In all other respects, the motions to dismiss (#161,

15  #170 & #171) are **DENIED.**

16       **IT IS SO ORDERED.**

17       DATED: This 18th day of September, 2014.

18

19  _____

20  UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28

32