**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SHIGE TAKIGUCHI, FUMI NONAKA, MITSUAKI TAKITA, KAORUKO KOIZUMI, TATSURO SAKAI, SHIZUKO ISHIMORI, YOKO HATANO, YUKO NAKAMURA, HIDEHITO MIURA, YOSHIKO TAZAKI, MASAAKI MORIYA, HATSUNE HATANO, SATORU MORIYA, HIDENAO TAKAMA, SHIGERU KURISU, SAKA ONO, KAZUHIRO MATSUMOTO, KAYA HATANAKA, HIROKA YAMAJIRI, KIYOHARU YAMAMOTO, JUNKO YAMAMOTO, KOICHI INOUE, AKIKO NARUSE, TOSHIMASA NOMURA, and RITSU YURIKUSA, Individually and on Behalf of All Others Similarly Situated, <br><br>　　　　　Plaintiffs, <br><br>vs. <br><br>MRI INTERNATIONAL, INC., EDWIN J FUJINAGA, JUNZO SUZUKI, PAUL MUSASHI SUZUKI, LVT, INC., dba STERLING ESCROW, and DOES 1-500, <br><br>　　　　　Defendants. | 2:13-cv-01183-JAD-VCF <br><br> ORDER ON MOTION FOR PRELIMINARY INJUNCTION |

1

Plaintiffs bring this putative class action against defendants in connection with the alleged operation of a Ponzi scheme. Defendant MRI is alleged to be a Nevada corporation headquartered in Las Vegas with a branch in Tokyo, Japan, operated by its president and CEO, Edwin Fujinaga.  MRI's Tokyo operations were controlled by Junzo Suzuki.  Together with his son, Paul Musashi Suzuki, Junzo Suzuki marketed and solicited for purchase MRI securities in Japan.  The Suzukis reside in Tokyo and Hawaii.

On behalf of the proposed class, plaintiffs have moved for a preliminary injunction "restraining and enjoining Junzo Suzuki and Paul Suzuki, their agents and representatives, from transferring, converting, selling, concealing, any of their assets for purposes other than normal living expenses." (Doc. #133).  Plaintiffs also ask that the Suzukis be ordered to immediately disclose the nature and location of any assets.  The Suzukis have opposed (#135), and plaintiffs have replied (#139).

MRI purports to deal in the purchase and collection of "Medical Accounts Receivable" ("MARs").  Since the late 1990s, MRI has recruited more than 8,000 Japanese investors paying in more than a billion dollars, promising a solid and safe rate of return on their investment. In promotional materials, the company promised that investor funds would be: (1) maintained in a separate "lockbox" managed by an independent escrow company; (2) used only to transact in MARs; and (3) guaranteed by state laws.  Plaintiffs argue none of this was true, and that in fact MRI used investor funds to pay off earlier investors, conduct its business, and finance the lavish lifestyles of its principals, resulting in an inability to now repay its investors.

2

In 2012, customers began complaining to authorities in Japan that MRI was not paying on matured investments.  Japan's Financial Services Agency ("FSA") began an investigation.  On April 26, 2013, the FSA (Kanto Local Finance Bureau) revoked MRI's license.  The FSA adopted the recommendation of the Japanese Securities and Exchange Surveillance Commission ("SESC"), which found that MRI had failed to separately hold investor monies and since at least 2011 had commingled those assets with MRI's own, that investor monies had been used to pay dividends to other investors, that MRI had made false statements to FSA during the investigation, and that MRI had planned to continue soliciting new investors in 2013, even after it became clear it could no longer repay the ones it already had. (Doc. # 133-4 (Igarishi Decl. ¶ 2 & Exs. A-B)).

MRI has stopped paying on its maturing contracts and already owes more than $3,300,000.00, and that number continues to increase.   (Doc. #134 (Taenaka Decl. ¶ 18)).

The third amended complaint ("TAC") alleges, and plaintiffs assert, that the Suzukis were primary actors in consummating MRI's fraud on investors, that they were in charge of virtually all of MRI's solicitations and interactions with the investors, and that they repeatedly made many of the misrepresentations alleged.  In particular, plaintiffs allege the Suzukis represented, at seminars and other social gatherings, that:  (1) investor funds would be used only to purchase MARS; (2) U.S. laws protected investors' funds; (3) investor funds would be kept in a separate "lockbox" in escrow, which account was a specialized bank account used for collecting receivables and which required that the face value of the receivables purchased exceed the actual amount paid to purchase

3

them; (4) only companies that passed a rigorous test were eligible to open lockbox accounts; (5) the escrow company made it impossible for MRI to touch investors' assets; and (6) the escrow system ensured segregation of funds, which protected the funds from creditors in the event that MRI became insolvent. (TAC ¶¶ 46, 47, 51, 52, 53, 57, 58, 59, 63, 64; *see also* Doc. #133-5 (Tobita Decl. ¶ 4)). That all or most of these statements were not true is supported by ample evidence. (*See* Doc. #134 (Taenaka Decl. Exs. V, W, X, Y)).

Various of the Suzukis' assets have been provisionally attached by the courts in Japan. (*Id.* Hiroshi Yamaguchi Decl. ¶ 2). However, since MRI's fraud was uncovered, plaintiffs allege the Suzukis have taken steps to conceal their interests in some of their assets, suggesting, the plaintiffs argue, that the Suzukis will continue to dissipate, hide, conceal, or distance themselves from these and other assets before judgment is reached in this litigation. Accordingly, the plaintiffs move for an order freezing the Suzukis' assets.

"An injunction is a matter of equitable discretion and is an extraordinary remedy that may only be awarded upon a clear showing that the [plaintiffs are] entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).

To obtain a preliminary injunction, plaintiffs must show: (1) they will probably prevail on the merits; (2) they will likely suffer irreparable injury if relief is denied; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008).

4

Alternatively, an injunction may issue under the "sliding scale" approach if there are serious questions going to the merits and the balance of hardships tips sharply in the plaintiffs' favor, so long as plaintiffs still show a likelihood of irreparable injury and that an injunction is in the public interest. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "Serious questions are those which cannot be resolved one way or the other at the hearing on the injunction." *Bernhardt v. Los Angeles County*, 339 F.3d 920, 926-27 (9th Cir. 2003). They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

1. <u>Likelihood of Success on the Merits</u>

Plaintiffs allege, and the Suzukis have not disputed, that the Suzukis were virtually the sole face of MRI in Japan. It was the Suzukis who marketed MRI securities, solicited plaintiffs to invest, and repeatedly represented at seminars, social gatherings, and tours that investing in MRI was safe and secure – a promise that plaintiffs have already shown was demonstrably false. Paul Musashi Suzuki also made these and similar misrepresentations in VIMO.

The Suzukis also controlled MRI's Japan operations. Junzo Suzuki was MRI's foreign registered representative, which vested him with authority to act on the corporation's behalf, and he was in control of MRI's Tokyo office. (Mot. Prelim. Inj. Yamaguchi Decl. ¶¶ 2-3). Paul Musashi Suzuki managed the Tokyo branch. (TAC ¶ 90).

5

While the Suzukis argue that they had no knowledge that MRI was defrauding its investors until Japanese authorities began their investigation[1], the record establishes that the Suzukis were intimately involved in MRI's operations and either knew, or recklessly disregarded, that MRI was perpetrating a fraud. Though the Suzukis argue that their roles were limited to marketing and solicitation and that they had no involvement in, or access to, MRI's financial dealings, they have not disputed that they were, along with Fujinaga, the principal individuals controlling and coordinating the business of MRI. Their critical positions within MRI is corroborated by the fact that both Suzukis were present at several meetings with Fujinaga in which issues fundamental to MRI's business were discussed, including its affiliate companies and the contents of the annual business report. (*See* TAC ¶ 76 (citing filings in S.E.C. case against Fujinaga and MRI that describe audio recordings seized from Junzo Suzuki's residence in Tokyo)).

Plaintiffs also allege that the Suzukis were involved in drafting and submitting the annual reports to Japanese regulators, which materially conflicted with materials sent to MRI's investors. That the Suzukis were involved in drafting the annual reports is supported by the fact that Junzo Suzuki submitted the reports under his seal, (Doc. #140 (Igarishi Decl. ¶ 3), and apparently by the audio recordings referenced in the S.E.C. case. Ample evidence exists that the figures in these documents were inconsistent in material ways, (*see* Doc. #140 (Igarish Decl. ¶¶ 4-9 & Exs A-H), and

---

[1] The Suzukis believe documents prepared by the Japanese SESC will corroborate that they had no knowledge of the fraud. However, the court does not have before it any such documents.

6

that demonstrates at least serious questions going to whether the Suzukis were on actual or constructive notice of the discrepancies, and thus of MRI's fraud.

In addition, the Suzukis and their close relatives received commissions in excess of twenty-two million dollars between 2009 and 2013. These substantial commissions, coupled with the fact that virtually all of the control of MRI was exercised by Fujinaga and the Suzukis, supports an inference that the Suzukis were aware of – or should have been aware of – the fraud. (Taenaka Decl. ¶¶ 7-12)).

Finally, faxes sent by Fujinaga to the Suzukis beginning in April 2012 essentially informed the Suzukis that MRI was engaged in a Ponzi scheme. (Taenaka Decl. ¶ 13 & Ex. U). And, even if the faxes could have been interpreted by the Suzukis as revealing only that MRI's funds were not being distributed to investors because of an escrow audit, it is not disputed that the Suzukis continued to solicit investors and represent MRI as a safe investment when they knew, or should have known, that MRI could not repay its maturing investments. Significantly, Junzo Suzuki exercised considerable control over the activities when he directed Fujinaga to pay investors who might complain to the authorities. (Doc. #134 (Taenaka Decl. Ex. U)). Such conduct creates a strong inference that the Suzukis attempted to conceal MRI's fraud.

On the same facts presented to this court, the Japanese court has attached the Suzukis' assets in Japan. Further, in the related action filed by the S.E.C. against, among others, Fujinaga and MRI, Fujinaga and MRI have entered into a stipulated preliminary injunction and asset freeze. Finally, this court has already

issued a preliminary injunction against MRI and Fujinaga, as officer of MRI, after finding that plaintiffs were likely to succeed on their claims of fraud, breach of contract, and securities violations against MRI and Fujinaga, as officer of MRI.

The Suzukis argue that the fact they transferred their own funds to MRI and encouraged their family members to invest with MRI shows they did not have any knowledge of MRI's fraud. However, that the Suzukis encouraged family members to invest with MRI is not supported by any evidence in the record. Further, combined with the faxes in which they requested that Fujinaga pay certain investors, (Doc. #134 (Taenaka Decl. Ex. U)), the fact the Suzukis transferred some of their own funds to MRI in 2012 supports an inference that they did so to avoid detection by authorities of MRI's massive fraud.

Fraud requires the plaintiffs to show:

(1) a false representation made by the defendant;

(2) the defendant's knowledge or belief that the representation was false (or an insufficient basis for making the representation);

(3) the defendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation;

(4) the plaintiff's justifiable reliance upon the misrepresentation; and

(5) damage to the plaintiff resulting from such reliance.

*Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992). Plaintiffs' allegations and the evidence produced establishes that plaintiffs are likely to prove that the Suzukis repeatedly made false representations to the plaintiffs in order to sell MRI securities. The evidence is persuasive that the Suzukis were aware

of, or should have been aware of, the fraud at the time they made the representations and at the time they received commissions from MRI. Plaintiffs invested large sums of money with defendants after the Suzukis promised the investments would be subject to strict safeguards. The Suzukis made false representations about the manner in which plaintiffs' investments would be handled. Plaintiffs make several specific allegations of misstatements by each Suzuki, including that: (1) investor funds would only be used to purchase MARS (both); (2) U.S. laws protected investors' funds (both)[2]; (3) investor funds would be kept in a separate "lockbox" in escrow, which account was a specialized bank account used for collecting receivables and which required that the face value of the receivables purchased exceed the actual amount paid to purchase them (both); (4) only companies that passed a rigorous test were eligible to open lockbox accounts (both); (5) the escrow company made it impossible for MRI to touch investors' assets (both); and (6) the escrow system ensured segregation of funds, which protected the funds from creditors in the event that MRI became insolvent (Paul Musashi Suzuki). They knew these representations were false, they intended for the representations to induce the plaintiffs into making investments, the plaintiffs justifiably relied on the representations in deciding to enter into contracts with MRI, and plaintiffs will suffer the damage of losing most, if not all, of the money they invested. The court therefore concludes that plaintiffs are likely to succeed on their fraud claim against the Suzukis, or at the very least there are serious questions going to

---

[2] The TAC also details several statements made by Paul Musashi Suzuki in VIMO that relate to this general statement.

9

that claim.

For the same reasons, plaintiffs are also likely to prevail on their claim of constructive trust. "A constructive trust has been defined as a remedial device by which the holder of legal title to property is held to be a trustee for the benefit of another who in good conscience is entitled to it. The requirement that a constructive trustee have title (not mere possession) to the property involved is critical to the imposition of a constructive trust." *Danning v. Lum's, Inc.*, 478 P.2d 166, 167 (Nev. 1970). "[I]mposition of a constructive trust requires: '(1) [that] a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.'" *Waldman v. Maini*, 195 P.3d 850, 857 (Nev. 2008). Constructive trust "is not 'limited to [fraud and] misconduct cases; it redresses unjust enrichment, not wrongdoing.'" *Id.* A constructive trust may be "flexibly fashioned . . . to provide relief where a balancing of interests in the context of a particular case seems to call for it." *In re N. Am. Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985).

The Suzukis argue that one who purchases a tainted asset in good faith may not be subjected to a constructive trust, and plaintiffs cannot show the Suzukis had actual or constructive notice of the fraud at the time they received the tainted commissions. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 51 (2000). As the court has previously concluded, there is a substantial likelihood that plaintiffs will prove that the Suzukis knew of the fraud. The Suzukis repeatedly

10

offered the plaintiffs what they represented was a safe and secure investment, and the plaintiffs in turn invested their assets, and in some cases their life savings, with MRI.  Plaintiffs have established that there are at least serious questions as to whether such actions on the part of the Suzukis created a confidential relationship.  The Suzukis, along with Fujinaga, were the principals in MRI's fraudulent scheme, and they obtained substantial commissions that came directly from plaintiffs' investments funds.  Thus, the court finds plaintiffs are likely to succeed on their a constructive trust claim as to those assets of the Suzukis that can be traced in whole or in part to the commissions they received from MRI.  Plaintiffs have shown at least serious questions going to the merits of their constructive trust claim.

    2. <u>Irreparable Harm</u>

While, in general, harm that can be compensated with monetary damages is insufficient to establish a right to injunctive relief, irreparable harm may be demonstrated by showing a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted.  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *see also Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003).  Simple allegations of past fraud are insufficient, but allegations of past fraud coupled with a present ability to dissipate funds may satisfy this standard.  *See Couturier*, 572 F.3d 1067.

Plaintiffs assert there is a danger that the Suzukis will improperly dissipate or conceal their assets.  Specifically, they

11

point to a rapid series of transactions in May 2013, just after the SESC issued its findings, (*see supra* p. 3), in which a home in Hawaii belonging to "Junzo Suzuki Trust" was ultimately transferred to an entity called Puuikena Investments, LLLP, which was formed by Paul Musashi Suzuki and Catherine Suzuki (Junzo Suzuki's children) the same day the transfers began. (*See* Doc. #134 (Taenaka Decl. ¶¶ 3-4 & Ex. B)). Puuikena Investments is not as readily associated with the Suzukis as the Junzo Suzuki Trust. Similar transfers were made to another piece of real propert located in Hawaii. (Taenaka Decl. ¶¶ 5). In addition, an entity controlled by the Suzukis – Sonnette[3] – cashed out a life insurance policy on the life of Keiko Suzuki before it could be attached by Japanese courts, depositing the proceeds into its Tokyo bank account; despite the policy having paid out nearly $230,000.00, and despite the record showing more than eight million dollars in MRI commissions having been wired to Sonnette between 2009 and 2013, only $4,640 remained in the account as of November 2013. (Doc. #133-3 (Hiroshi Yamaguchi Decl. ¶ 4); Doc. #134 (Taenaka Decl. ¶¶ 7-12)).

The Suzukis argue that the assets which plaintiffs identify as improperly dissipated cannot be tied to any commissions received from MRI because they were purchased in 1987, 2002 and 2004 – well before the Suzukis learned of any fraud and well before the class period. However, regardless of whether these particular assets would be subject to a constructive trust, they show that the Suzukis began taking immediate steps, as soon as MRI's fraud was uncovered, to divest themselves from some of their assets. A

---

[3] *See* Mot. Prelim. Inj. Takashi Yamaguchi Decl. ¶ 5.

12

reasonable inference can be drawn that the Suzukis are likely to dissipate or conceal other assets and property paid for, at least in part, with commissions received from MRI.  Further, given that the Suzukis and their entities obtained more than twenty-two million dollars over a four- to five-year period, it is likely that some or all of the assets were paid for, at least in part, by commissions.

The Suzukis also argue that the assets were not dissipated or hidden but were transferred as part of an estate planning process that had begun ten years earlier, and that all transfers are part of the public record.  However, the timing of the transfers is highly suggestive of an attempt to secret assets.

The Suzukis argue that the life insurance policy was on the life of Keiko Suzuki and the proceeds were deposited into Sonnette's bank account; neither Keiko Suzuki nor Sonnette is a party to this case.  However, the fact that the holder and insured of the policy are not defendants is irrelevant; both are closely related to – and in the case of Sonnette, controlled by – the Suzukis.  The Suzukis argue that Sonnette's low bank account balance is not evidence of dissipation because plaintiffs have not shown the money was not spent for normal and ordinary purposes.  However, neither have the Suzukis shown the bank account's funds were depleted for normal and ordinary uses.  Finally, the Suzukis argue that because the policy was purchased in 2002 it cannot be tied to the MRI commissions, and because Sonnette's bank account has already been frozen by Japanese courts there is no threat of irreparable harm.  However, the fact that the Suzukis cashed out a life insurance policy at or around the same time MRI's fraud was

13

uncovered suggests an intent to conceal and/or dissipate their assets so that they might not be reached by any judgment in this case, regardless of whether Sonnette's bank account is now frozen and regardless of whether the policy was purchased with MRI commissions.

Finally, the Suzukis argue that the property transfers took place more than five months before the plaintiffs filed their motion, that plaintiffs have twice withdrawn their request against the Suzukis, and that there is no evidence of current asset dissipation, which undercut any alleged urgency or threat of irreparable harm. Any delay in seeking injunctive relief against the Suzukis does not preclude a finding of irreparable harm in this case.

Several named and putative plaintiffs have submitted declarations or statements in this action detailing how they have invested substantial sums of money in MRI – in some cases their life savings. As discussed in this court's prior orders, it is clear that plaintiffs' recovery from MRI and Sterling Escrow is likely to be minimal. As plaintiffs have proffered evidence showing that the Suzukis have taken steps to distance themselves from their assets since MRI's fraud was revealed, the court concludes that there is a danger that, unless restrained, they will continue to do so before final judgment is rendered. Given the substantial commissions earned by the Suzukis, it is likely that a good portion of their assets were paid for with those commissions – commissions that undoubtedly came directly from plaintiffs' investments. A dissipation of these assets would make it impossible to provide any effective relief to the thousands of

investors in this case.  Plaintiffs face the immediate and irreparable harm of not being able to recover their investments unless the Suzukis' assets are frozen.

### 3. Balance of Equities

As already discussed, the plaintiffs have invested substantial sums of money in MRI, including in some cases their life savings, and they will likely not be able to secure any recovery if the Suzukis are not prevented from further dissipating or hiding their assets.  An asset freeze would allow the Suzukis to continue paying their normal living expenses and legal fees but would prevent them from concealing or dissipating assets without specific leave of court.  Accordingly, the balance of these equities tilts sharply in plaintiffs' favor.

### 4. Public Interest

"The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).  Here, there would be no harm to the public interest should an injunction be issued. The court concludes the public interest favors the issuance of an injunction.

Plaintiffs seek the freezing of the Suzukis' assets.  The court has inherent equitable power to grant an asset freeze. *Sec. & Exch. Comm'n v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990).  While the court does not have the authority to freeze assets where the only relief the plaintiffs seek is legal, monetary damages, *Couturier*, 572 F.3d at 1083-84, an asset freeze is properly awarded where the plaintiffs have shown they have an equitable interest in the assets sought to be frozen.  *Textron Fin.*

15

*Corp. v. Unique Marine, Inc.*, 2008 WL 4716965 (S.D. Fla. 2008) (the court "can order an asset freeze as part of preliminary injunctive relief only with respect to assets in which an equitable interest is claimed and established"). As discussed, plaintiffs have demonstrated they are likely to have an equitable interest in funds currently held by the Suzukis. Accordingly, an award of injunctive relief freezing the Suzukis' assets that are traceable to the commissions they received from MRI is proper.

Although the plaintiffs also seek expedited and particularized discovery into the Suzukis' assets, the court, in a separate order, has denied the motions to dismiss plaintiffs' securities causes of action. Accordingly, the court will not separately order discovery into the Suzukis' assets but will allow such to be conducted in accordance with the normal discovery order of this case.

The court therefore concludes as follows.

1. There is good cause to believe that Junzo Suzuki and Paul Musashi Suzuki have engaged in fraudulent conduct such that plaintiffs are likely to prevail on the merits of their state law and securities fraud claims as well as their claim of constructive trust;

2. There is good cause to believe that before this action reaches final judgment immediate and irreparable harm will result from the Suzukis' dissipation or concealment of their assets;

3. Balancing the equities, the potential harm to the plaintiffs substantially and sharply outweighs the harm to the Suzukis if an injunction is issued; and

4. Weighing the equities and considering plaintiffs' likelihood of success on the merits, equitable relief is in the

16

1 public interest.
2     It is therefore ordered that except as necessary for normal
3 living expenses and legal fees, defendants Junzo Suzuki, Paul
4 Musashi Suzuki, their agents and representatives, and all persons
5 and entities under the control of or acting in concert with either
6 of them be restrained and enjoined from:
7     A.   Directly or indirectly transferring, converting, selling,
8          concealing, disbursing, spending, withdrawing,
9          liquidating, encumbering, pledging, assigning, or
10         otherwise disposing of any assets, wherever located, that
11         are:
12         1.   Owned or controlled by Junzo Suzuki or Paul Musashi
13              Suzuki, or their affiliates or by any person or
14              entity under the control of either of them; or
15         2.   In the actual or constructive possession of Junzo
16              Suzuki or Paul Musashi Suzuki, or their affiliates
17              or by any person or entity under the control of
18              either of them; or
19         3.   Owned, controlled by, or in the actual or
20              constructive possession of any corporation,
21              partnership, or other entity directly or indirectly
22              owned, managed, or controlled by or under common
23              control with Junzo Suzuki or Paul Musashi Suzuki;
24    B.   Opening or causing to be opened any safe deposit box
25         titled in the name of or for the benefit of Junzo Suzuki
26         or Paul Musashi Suzuki, or their companies, affiliates,
27         or subsidiaries, or subject to access by any of them;
28    C.   Directly or indirectly destroying, secreting, defacing,

17

          transferring or otherwise altering or destroying any documents concerning, evidencing, or relating to the business, assets, and financial affairs of Junzo Suzuki or Paul Musashi Suzuki, or of any business or entity affiliated with either of them or under their control.

    IT IS FURTHER ORDERED that any financial institution, broker, dealer, or escrow agent having possession, custody, or control of any asset titled in the name of or on behalf of Junzo Suzuki or Paul Musashi Suzuki or by any person or entity owned or controlled by either of them shall:

    A.   Hold and retain within its control and prohibit the transfer, encumbrance, pledge, hypothecation, assignment, removal, withdrawal, dissipation, sale, or other disposal of any such asset, other than as authorized by further order of the court;

    B.   Deny access by anyone to any safe deposit box titled in the name of or for the benefit of Junzo Suzuki or Paul Musashi Suzuki or of any person or entity under the control of either of them or otherwise subject to access by either of them.

    Defendants may petition the court to modify this order to allow the transfer, conversion, sale, disbursement, spending, withdrawing, liquidation, encumberance, pledging, assignment, or other disposal of a specific asset for good cause shown.  To the extent that any nonparty has an interest in an asset reached by this order, the court will not preclude that nonparty from petitioning the court to modify this order as may be appropriate.

    The bond in the amount of $10,000.00 already filed by

18

plaintiffs in this action shall serve as security for the injunctive relief herein ordered by the court.

DATED: This 18th day of September, 2014.

_____
UNITED STATES DISTRICT JUDGE

19