**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| SHIGE TAKIGUCHI, FUMI NONAKA, MITSUAKI TAKITA, TATSURO SAKAI, SHIZUKO ISHIMORI, YUKO NAKAMURA, MASAAKI MORIYA, HATSUNE HATANO, and HIDENAO TAKAMA, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) | 2:13-cv-01183-HDM-VCF<br><br>ORDER GRANTING CLASS CERTIFICATION |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| MRI INTERNATIONAL, INC., EDWIN J FUJINAGA, JUNZO SUZUKI, PAUL MUSASHI SUZUKI, LVT, INC., dba STERLING ESCROW, and DOES 1-500, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Before the court is the plaintiffs' motion for class certification (#255). Defendants have opposed (#336, #337 & #338), and plaintiffs have replied (#347).

1    Plaintiffs are nine Japanese investors who bring this suit on
2 behalf of a putative class of 8,700 individuals who invested with
3 defendant MRI International, Inc. ("MRI") between July 5, 2008, and
4 May 1, 2013.  MRI is a Nevada corporation headquartered in Las
5 Vegas with a branch in Tokyo, Japan.  Since 1998, MRI purported to
6 run a business that dealt in the purchase and collection of
7 "Medical Accounts Receivable" ("MARS").  To obtain money, MRI
8 solicited investments – primarily from individuals in Japan – by
9 promising a safe and secure return on investments.  MRI's U.S.
10 operations were run by its president, CEO and sole shareholder,
11 defendant Edwin Fujinaga ("Fujinaga"), and the Tokyo operations –
12 from which marketing and solicitation of investments were
13 controlled – were run by defendant Junzo Suzuki.  Defendant Paul
14 Musashi Suzuki was also involved in the marketing and sales of MRI
15 securities and responsible for many of the oral and written
16 misrepresentations given to investors.  Defendant LVT, Inc.
17 ("Sterling Escrow") received and distributed the investors' funds
18 and effectively operated as MRI's bookkeeper.  Plaintiffs assert
19 that MRI, Fujinaga, and the Suzukis specifically and repeatedly
20 assured MRI's prospective and existing investors that MRI's
21 business was legitimate and that investors' monies would be secure.
22  But instead, they allege, MRI operated as a massive Ponzi scheme,
23 and its collapse in 2013 has led to MRI's now inability to repay
24 its investors.

25    MRI solicited investments by placing ads in Japanese
26 newspapers and magazines and sending mass e-mails to Japanese
27 citizens.  It also hosted a web site.  Interested individuals could
28 contact the Tokyo office for more information, and MRI in return

would send a set of "welcome materials" that included its
pamphlet/offering materials and an investment application.  These
materials were, in all relevant years, substantially identical.  In
addition to describing the various options investors had, the
offering materials stated that:

1.   Investors' money would be invested only in MARS;

2.   Investors' money would be managed not by MRI but by an
     independent escrow company obligated by U.S. law to
     deposit a set percentage of funds with the state
     government each month, which would be used to indemnify
     the investors in the event of a default;

3.   Investors' money would be placed in a "lockbox" account,
     which only the largest and safest banks could establish,
     and which only the most trustworthy of customers could
     obtain;

4.   Funds in the lockbox would be used solely to buy MARS
     that were of greater value than the amount MRI paid for
     them;

5.   The lockbox would be independently managed and, if the
     bank were to fail, the state government would guarantee
     the funds in the account, with the investors having the
     first right of priority to recover the funds;

6.   Each U.S. state guaranteed MARS up to a legal limit, and
     MRI purchased MARS only up to the guaranteed limit; and

7.   If MRI filed for bankruptcy, then the escrow company,
     with the assistance of the state government, would retain
     a new company to collect on the MARS.  The escrow company
     would then be responsible for distributing the funds to

3

the investors.

Plaintiffs allege that every MRI investor received a packet containing the above information.  Those who decided to invest with MRI filled out the application and mailed it back to MRI's Las Vegas headquarters.  Once MRI received an application, it would send the applicant a "Pre-Agreement Disclosure Document" ("PADD") and a "Corporate Certificate of Investment Agreement."  The PADD represented that:

1.    The purpose of the investment was solely to invest in the collection of MARS; and

2.    MARS purchased in accordance with the contract would be separately maintained from MRI's assets and would be managed by a third-party escrow company that had received authorization from the Nevada state government.

To complete the investment, the investor signed and returned the agreement and transferred payment to a Las Vegas Wells Fargo bank account in the name of Sterling Escrow Trustee.  Once the funds were received, MRI would mail each investor a "Certificate of Investment" and a "Financial Products Trading Contract."

In addition to its advertisements and written offering materials, MRI frequently conducted seminars, informational meetings, and study sessions, as well as tours of the Las Vegas headquarters.  Most of the presentations were given by either or both Junzo and Paul Musashi Suzuki.  The Suzukis reiterated the specific representations set forth in the written materials, all essentially touting the benefits and safety of investing in MRI. MRI also issued monthly newsletters and a magazine called VIMO. VIMO was published by Paul Musashi Suzuki, and in it he authored

4

articles about MRI's investment scheme and the safety of the investment.

The gravamen of plaintiffs' complaint is that none of the representations defendants made about the safety of investing in MRI were true, and that instead of using investors' money to purchase MARS, defendants used the money to pay off earlier investors, fund their lavish lifestyles, and finance other undisclosed ventures.

In 2013, the Financial Services Agency of Japan (Kanto Local Finance Bureau) ("FSA") conducted an investigation of MRI.  On April 26, 2013, it issued findings that MRI had engaged in fraudulent marketing practices and improperly handled investors' funds.  It found that MRI had not followed the promises it had made to investors about how their money would be handled, commingled company assets with investor funds, and used investor funds to pay dividends and redemptions to other investors rather than acquire equities.  As a result of the investigation, MRI's license to conduct business in Japan was revoked.

The findings by the FSA precipitated the collapse of the MRI scheme.  Since that time, multiple lawsuits have been filed in connection with MRI's collapse.  In addition to this putative class action, several individual lawsuits were filed in Japan, the U.S. Securities and Exchange Commission ("SEC") filed suit against MRI and Fujinaga is this district, and a criminal indictment has been returned against Fujinaga, Junzo Suzuki and Paul Musashi Suzuki, also in this district.  Plaintiffs now seek class certification.

**Analysis**

A class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541,2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). To "justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (internal quotation marks omitted).

To obtain certification, plaintiffs must first show that:

(1)  the class is so numerous that joinder of all members is impracticable;

(2)  there are questions of law or fact common to the class;

(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Plaintiffs must also satisfy one of three subsections of Rule 23(b). Here, plaintiffs rely on Rule 23(b)(3), which allows a class action to be maintained where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Plaintiffs, as the parties seeking class certification, bear the burden of affirmatively showing that they meet the requirements of Rule 23. *Wal-Mart*, 131 S. Ct. at 2551. A class action may be certified only if the court is satisfied after a "rigorous

analysis" that the requirements of Rule 23(a) have been met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). This may sometimes require the court to "probe behind the pleadings" into the merits of the plaintiffs' case. *Wal-Mart*, at 2551-52. But as a general rule, the court may not "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, – U.S. –, 133 S. Ct. 1184, 1194-95 (2013). "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

I. Rule 23(a)

A. Numerosity

This element is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs have filed suit on behalf of a class that could number between 4,000 and 8,000 members. Defendants do not contest that this number would make joinder impracticable. Plaintiffs have therefore satisfied the numerosity requirement.

B. Commonality

Commonality requires there to be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, class members must have suffered the same injury; their claims must rely on a common contention, and that contention "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. The Ninth Circuit construes the commonality requirement permissively.

"All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998); *see also Blackie v. Barrack*, 524 F.2d 891, 904 n.19 (9th Cir. 1975) ("We think it is for the predominance and other requirements of Rule 23(b)(3), rather than the common question requirement, to function to keep the balance between the economies attained and lost by allowing a class action.  The common question requirement should not be restrictively interpreted to attain that objective, particularly as to do so would eliminate the class action deterrent for those who engage in complicated and imaginative rather than straightforward schemes to inflate stock prices.").

Here, each class member suffered the same injury – actual or expected loss of his or her investment – through the same conduct – MRI's alleged Ponzi scheme.  Several questions of law and fact are common to all class members, including but not limited to: (1) whether some or all of the representations made by the defendants about the safety of MRI's  investments were false; (2) whether the defendants knew that those statements were false or recklessly disregarded their truth or falsity; (3) whether the representations caused plaintiffs to invest with MRI; (4) whether MRI operated as a Ponzi scheme; and (5) whether the individual defendants were control persons of MRI at the time of the misrepresentations and/or sales of MRI securities, or whether they aided and abetted MRI's fraud.  These are, in fact, the major questions of law and fact at issue in this case.

The same evidence will be used to prove the existence of a Ponzi scheme, the falsity of the representations, each defendant's role and knowledge in the scheme, and the failure of MRI to repay its investors.  A closer question – and that raised by the defendants – is whether the class members' reliance on the representations, which is an element of the securities and state law fraud claims, can be proven on a classwide basis.

In *Blackie v. Barrack*, the Ninth Circuit found the commonality requirement met in a securities fraud case where the defendants, through a common course of conduct, defrauded a class of purchasers over a period of time with similar misrepresentations.  Applying *Blackie*, district courts in this circuit have found that individual questions of reliance do not preclude a finding of commonality where the plaintiffs allege a common course of conduct directed against all investors.  *See McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 608 (S.D. Cal. 2007); *In re Badger Mountain Irrigation Dist. Sec. Litig.*, 143 F.R.D. 693, 697 (W.D. Wash. 1992).  *In re Badger Mountain* concerned litigation over investments that had been marketed by some of the defendants as safe and secure.  Noting that the defendants had failed to demonstrate that there were material variations in the representations given to potential class members, the court found that because plaintiffs were defrauded by the defendants' common course of conduct, common questions predominated over individual issues.  *In re Badger Mountain*, 143 F.R.D. at 697.  *McPhail* involved a homogenized presentation that contained misleading statements and omissions.  *McPhail*, 247 F.R.D. at 602.  In holding that the commonality requirement was met, the *McPhail* court noted that "the Ninth

9

1  Circuit's case law does not require identical misrepresentations to
2  satisfy the commonality requirement." *Id.* at 609-10.

3      The Suzukis' attempts to distinguish the cases relied on by
4  plaintiffs is unavailing, as is their reliance on cases from
5  outside this circuit.  Those cases are not only not controlling,
6  they are – to the extent they conflict with the cases cited above –
7  not persuasive.  The Ninth Circuit has quite clearly held that
8  individual issues of reliance are no bar to finding commonality
9  where the plaintiffs have been deceived by the defendants' common
10 course of conduct.  Here, the same core representations about the
11 safety of MRI's business model and investor funds were made in
12 written materials distributed to every investor – most notably the
13 offering pamphlet and the PADD – before they invested.  In all of
14 these documents defendants repeated some or all of the core
15 representations: that investor money was used only to invest in
16 MARS, that investor money was safeguarded by an independent escrow
17 company and state law, and that MRI was a legitimate business.
18 These alleged misrepresentations were reinforced orally and in
19 writing through other means to new and existing investors.  The
20 sales pitch was thus virtually identical from investor to investor.
21 The Ninth Circuit liberally construes the commonality requirement
22 to enable class certification of fraud claims stemming from a
23 common course of conduct.  Plaintiffs have amply alleged a common
24 course of conduct that defrauded them and resulted in a loss and
25 therefore the commonality requirement is met.

26     The Suzukis, however, argue that they made oral
27 representations to only some of the class members and that those
28 representations differed.  Thus, they argue, the plaintiffs cannot

prove their reliance on the Suzukis' statements on a classwide
basis.  Plaintiffs respond that they are not relying solely on the
Suzukis' oral representations; the Suzukis' oral representations
simply reinforced the misrepresentations made in the written
materials, which were received by each and every investor.
Further, plaintiffs allege that the Suzukis were personally
involved in preparing the PADD.

At a minimum, the Suzukis' alleged role in drafting the PADD,
which was received by each investor before his or her investment,
creates a common question of reliance as to the Suzukis.  Moreover,
and more importantly, the Suzukis are allegedly two of only three
to four people behind MRI's alleged fraud.  Given the close-knit
nature of the fraud, plaintiffs' claim that the Suzukis are liable
for a § 10(b) violation as control persons means MRI's entire
common course of conduct would be attributable to the Suzukis,
whether they directly made the misrepresentations or not.  The
court concludes that plaintiffs have alleged a common course of
conduct perpetrated by MRI and its principals sufficient to satisfy
the commonality requirement.

C. Typicality

Typicality requires that the claims or defenses of the
representative parties are typical of the claims or defenses of the
class.  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality
requirement is to assure that the interest of the named
representative aligns with the interests of the class." *Wolin v.
Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)
(quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.
1992)).  Typicality is satisfied where the lead plaintiff has the

same or similar injury as the class members; where the action is based on conduct which is not unique to the named plaintiff; and where other class members have been injured by the same course of conduct as the named plaintiff. *Id.*

Defendants do not contest that plaintiffs have met this requirement. The named plaintiffs in this case lost or will lose the money they invested in MRI due to the defendants' alleged operation of a Ponzi scheme and repeated misrepresentations. This is the same injury based on the same conduct that all class members have suffered. Accordingly, the court finds the typicality requirement is met.

D. Adequacy

To meet this requirement, the class representative must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy requires considering the competency and any conflicts of interest of class counsel, as well as whether the named plaintiffs and class counsel will vigorously prosecute the action on behalf of the class. *Id.* at 626 n.20; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

Plaintiffs argue that lead plaintiff Yuko Nakamura is adequate because her claim is typical of the class, she has no interests antagonistic to the class, and she has a substantial financial interest which will ensure her vigorous advocacy. Nakamura understands the responsibilities of being lead plaintiff, understands the issues presented in this case, and is willing to

assist in the prosecution of this case through trial.  Plaintiffs further argue that counsel have no conflicts with the class, have thus far vigorously represented the class, and have extensive experience with class actions and complex commercial litigation.

The Suzukis argue that the named plaintiffs and class counsel cannot adequately represent the class.  First, they assert that plaintiffs lack an attorney-client relationship with class counsel and that this litigation is not actually being directed by class counsel but instead is being directed by a group of Japanese attorneys who have joined together to represent victims of MRI's fraud.  About 4,000 out of MRI's 8,700 potential victims have signed up with the victim's group created by the Japanese attorneys.  The attorneys have already filed a handful of actions in Japan against MRI and the Suzukis and, the Suzukis argue, the recovery in those actions will go to compensate all victims who have signed up with the group.  The Suzukis argue that the real attorneys behind this case – the Japanese attorneys – have a conflict of interest in representing this class because if they prevail in Japan they may be less motivated to devote resources to prosecuting this class action, which is being pursued on behalf of a substantial number of MRI victims who have *not* signed up with the Japanese victims' group.

The court is not persuaded that any conflict of interest exists.  There is no evidence that Japanese, rather than class, counsel are actually behind this litigation, or that plaintiffs lack a client relationship with class counsel.  However, even if Japanese counsel are involved in this action, the argument that they would be unmotivated to pursue this action were they to

prevail in Japan is, as plaintiffs argue, also unpersuasive.  Not only do the defendants have substantial assets in the United States, which would be easier to collect with a U.S. judgment, but as the Suzukis' argument implicitly concedes, the putative class for which this action is being pursued includes both members and non-members of the Japanese MRI Victim's Group.  There is no reason to conclude that Japanese counsel would abandon a case that would benefit members of their group as well as non-members.  The cases cited by the Suzukis are distinguishable.

The Suzukis also argue that the named class representatives cannot adequately represent the class due to credibility issues.[1]  The court is not persuaded that any omissions in the plaintiffs' declarations or any inconsistencies between the declarations and the depositions are evidence of a lack of credibility.  Further, the cases the Suzukis have cited in this regard are readily distinguishable.

The named plaintiffs have suffered the same injury as the class members and no evident conflict exists between their interests and the interests of the class.  Named plaintiffs and class counsel have vigorously prosecuted this action since its inception, and class counsel are qualified and competent to do so.  Accordingly, the court concludes the adequacy requirement is met.

II. Rule 23(b)

In addition to meeting the requirements of Rule 23(a), plaintiffs must also satisfy one of the three subsections of Rule

---

[1] The Suzukis also focus on the failure of 16 of the 25 named plaintiffs to attend or agree on dates to attend depositions in the United States.  This argument appears to be mooted by the recent reduction in the number of named plaintiffs from 25 to 9.  (*See* Doc. #351 at 2).

23(b) before the court may certify this as a class action. Plaintiffs here rely on Rule 23(b)(3).

    A. Predominance

    The first requirement under Rule 23(b)(3) is that questions of law or fact common to the class members predominate over individual questions. "[T]he common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal punctuation omitted).

    Determining whether common issues predominate begins with the elements of the underlying causes of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. – , 131 S. Ct. 2179, 2184( 2011). Here, plaintiffs have asserted twelve causes of action: (1) Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; (2) Section 12(a) of the Securities Act of 1933; (3) Section 20(a) of the Securities Exchange Act of 1934; (4) Section 15 of the Securities Act of 1933; (5) intentional fraud; (6) unjust enrichment; (7) breach of fiduciary duty; (8) aiding and abetting fraud; (9) breach of contract; (10) action for accounting; (11) constructive trust; and (12) fraudulent transfer.

        I.   Section 10(b) and Rule 10B-5

    Section 10(b) prohibits the use or employment "in connection with the purchase or sale of any security" of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. Rule 10B-5 makes it

        unlawful for any person, directly or indirectly, by the

> use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any
> national securities exchange, (a) To employ any device,
> scheme, or artifice to defraud, (b) To make any untrue
> statement of a material fact or to omit to state a
> material fact necessary in order to make the statements
> made, in the light of the circumstances under which they
> were made, not misleading, or (c) To engage in any act,
> practice, or course of business which operates or would
> operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Thus, the elements of a § 10(b) and Rule 10B-5 claim are: (1) defendants' material misrepresentations or omissions; (2) scienter; (3) connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Erica P. John Fund*, 131 S. Ct. at 2184.

As discussed above in connection with commonality, most of these elements are clearly susceptible to classwide proof, particularly the alleged misrepresentations made by the defendants, scienter, and loss.  The Suzukis argue, however, that two elements are not susceptible to classwide proof: plaintiffs' reliance and the materiality of the representations.

### a. Reliance

Predominance involves many of the same considerations as commonality, but it is a more stringent requirement.  *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 236 (C.D. Cal. 2003).  Even under the higher predominance standard, however, the court concludes that individual issues of reliance do not compel a finding that individual questions predominate over common questions.

The "Ninth Circuit decisions favor a liberal use of class

actions to enforce federal securities laws." *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598 (S.D. Cal. 2007) (internal quotation marks omitted).  In addition, the Ninth Circuit has found class certification to be appropriate where the defendant used a "standardized sales pitch." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006).  In *First Alliance*, the defendant "trained its loan officers to follow a manual and script known as the 'Track,' which was to be memorized verbatim by sales personnel and executed as taught." *Id.* at 985.  Importantly, the court noted that while other courts have adopted somewhat differing standards as to "the degree of factual commonality required in the misrepresentations to class members in order to hold a defendant liable for classwide fraud," the Ninth Circuit "has followed an approach that favors class treatment of fraud claims stemming from a 'common course of conduct.'" *In re First Alliance*, 471 F.3d at 990.

The *First Alliance* court cited and discussed with approval a district court case, *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 140 F.R.D. 425 (D. Ariz. 1992).  *Lincoln Savings* involved a "multifarious scheme to defraud" that included sales presentations to the plaintiffs. *Id.* at 427-28, 430-31.  The defendants argued that the sales presentations were not uniform, and thus individual issues of reliance precluded class certification. *Id.* at 430.  The court noted that class actions are appropriate where a "standardized sales pitch" is employed, because sales presentations "uniformly patterned on a known model provides certitude that material misrepresentations were a causative factor in each plaintiffs' decision and "[t]hus, a

class action may be maintained where plaintiffs can establish that the sales agents' representations did not vary in material respects."  *Id.*  The court held that while the representations were not identical, they were "sufficiently uniform to warrant class treatment."  *Id.*

As discussed above, *McPhail v. First Command Fin. Planning* involved a homogenized presentation given by sales agents which contained misleading statements and omissions.  The defendants in *McPhail* objected to class certification primarily on the grounds that individual issues of reliance predominated over common questions.  In considering the predominance question, the court discussed the holdings of *First Alliance* and *Lincoln Savings* and noted that, "[i]n effect, the *Lincoln Savings* court used the uniformity of the misrepresentations to presume the plaintiffs relied on those misrepresentations in their investment decisions."  *Id.*  It concluded that, on the basis of *First Alliance* and *Lincoln Savings*, "within the Ninth Circuit, plaintiffs can establish a presumption of reliance by means of sufficiently uniform oral misrepresentations in a marketing script."  *McPhail*, 247 F.R.D. at 614.  The court noted, importantly, that "the reliance requirement must encompass the rise of sophisticated marketing strategies which rely on communicating similar misrepresentations to a large class of investors."  *Id.* at 614-15.

Here, plaintiffs allege that defendants made to all investors substantially similar, if not identical, misrepresentations as to the safety of investing with MRI.  The court finds the alleged misrepresentations sufficiently uniform to raise a presumption of

18

reliance under *McPhail*, *First Alliance*, and *Lincoln Savings*.[2]

### b. Materiality

The Suzukis argue that *materiality* is not susceptible to classwide proof.  They assert that materiality will exist only as to plaintiffs investing at the same time.  The Suzukis base their argument on two cases that held that whether a misrepresentation is material depends on the "total mix" of information available to an investor.[3]  *J.H. Cohn Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994 (7th Cir. 1980); *Gelman v. Westinghouse Elec.*, 73 F.R.D. 60 (W.D. Penn. 1976).

Both *J.H. Cohn* and *Gelman*, however, involved evolving situations where the information known to the investing class was constantly changing.  *See J.H. Cohn*, 628 F.2d at 998 & n.3 ("We feel the district court did not abuse its discretion in concluding that the changing factual situation over a thirty-three month period undercuts the predominance of any common course of conduct."); *Gelman*, 73 F.R.D. at 67 ("In this case, however, plaintiffs' claims are based not on a single or substantially

---

[2]  The Suzukis' attempts to distinguish the relevant case law is unavailing as are their other arguments.  The Suzukis argue that many of the plaintiffs made their initial investments outside of the class period, so it is impossible for them to have relied on any misrepresentation during the class period.  This argument is without merit.  Clearly, any decisions to reinvest in MRI would have been influenced by the continuing misrepresentations about the safety of investing in MRI, which were made repeatedly to all investors.  The Suzukis also argue that different subgroups of investors received differing oral disclosures over the class period and that some of the class members never met the Suzukis and never received any representations from them directly.  As discussed above, this argument is irrelevant in this case, where the Suzukis at a minimum were involved in written materials distributed to all investors before they invested and where the Suzukis have been sued as control persons.

[3]  The Suzukis also cite and rely on *TSC Industries, Inc. v. Northway*, Inc., 426 U.S. 438 (1976), but that case merely provides the definition of materiality.  *TSC Indus.*, 426 U.S. 444.

constant misdeed, but rather on a changing, fluctuating series of alleged events . . . .").  Here, the plaintiffs have alleged that throughout the entire class period, the defendants repeatedly made the same core misrepresentations.  Nothing is alleged to have changed through the class period.  In fact, the Suzukis' argument that as to some of the investors, the Suzukis' oral representations did not alter the "total mix" of what they already knew (*see* Opp'n 14) actually supports plaintiffs' position – that the total mix of information more or less remained consistent throughout the class period.

The Suzukis argue that statements they made to individuals who had already invested are less material than statements they made to individuals who were considering investing, and thus materiality will differ from one class member to another.  The Suzukis participated in a common course of conduct in which the same core misrepresentations were constantly repeated.  As noted above, any decisions to reinvest in MRI would have been influenced by the continuing misrepresentations about the safety of investing in MRI which reinforced what the existing investor already believed about MRI.  The court does not see any meaningful difference between the statements made to individuals who had not yet invested and the statements made to existing investors.

ii.   Section 12(a)

Section 12(a)(1) imposes liability for the offer or sale of an unregistered security.  15 U.S.C. § 77*l*(a)(1).  Section 12(a)(2) imposes liability for the offer or sale of securities by means of a prospectus or oral communication that "includes an untrue statement of material fact or omits to state a material fact necessary in

order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2).

Defendants do not argue that individual issues predominate as to this claim, nor does the court believe any element would entail an analysis of individual issues. Whether the defendants offered or sold unregistered MRI securities and whether the defendants made misleading or false statements in connection with the sale or offer to sell MRI securities can be proven on a classwide basis. Accordingly, the predominance requirement is met with respect to this claim.

iii. Sections 15 and 20(a)

Sections 15 and 20(a) impose liability on control persons for a primary violation of the securities laws – in this case, §§ 12(a) and 10(b). Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). "[W]hether a person is a 'controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* at 1162.

Defendants do not argue that individual issues predominate as

to this claim, nor does the court believe any element would entail
an analysis of individual issues.  Whether Fujinaga or the Suzukis
were controlling persons will depend on proof that is specific to
Fujinaga and the Suzukis, which is proof common to the entire
class.  Accordingly, the predominance requirement is met with
respect to this claim.

iv. Fraud

The elements of a fraud claim under Nevada law are: (1) a
false representation made by the defendant; (2) the defendant's
knowledge or belief that the representation was false (or an
insufficient basis for making the representation); (3) the
defendant's intention to induce the plaintiff to act or to refrain
from acting in reliance upon the misrepresentation; (4) the
plaintiff's justifiable reliance upon the misrepresentation; and
(5) damage to the plaintiff resulting from such reliance. *Bulbman,
Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992).

For purposes of certification, the relevant elements of the
state law fraud claim are substantially the same as those of the
securities fraud claim.  Therefore, for the same reasons that
predominance is satisfied with respect to the securities fraud
claim, it is also satisfied with respect to the state law fraud
claim.

v. Unjust Enrichment

Unjust enrichment is "the result or effect of a failure to
make restitution of, or for, property or benefits received under
such circumstances as to give rise to a legal or equitable
obligation to account therefor." *Leasepartners Corp. v. Robert L.
Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).

The elements are:

> (1)   a benefit conferred on the defendant by the plaintiff;
>
> (2)   appreciation by the defendant of such benefit; and
>
> (3)   an acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.

*Unionamerica Mortg. & Equity Trust v. McDonald*, 626 P.2d 1272, 1273 (Nev. 1981).  "Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another."  *Id.*

The Suzukis argue that choice-of-law issues prevent certification of this claim.  The Suzukis cite district court cases finding that because the law of unjust enrichment varies from state to state, certification of a nationwide class on unjust enrichment poses insurmountable choice of law problems.  However, in this case, where nearly all the plaintiffs are Japanese citizens and all alleged misrepresentations occurred in either Japan or Nevada, either Nevada or Japanese law will govern.  The Suzukis have not argued that several types of unjust enrichment standards exist throughout Japan, nor even that Japanese law recognizes such a claim.  The choice between Nevada law, which recognizes this claim, and Japanese law, which may or may not, does not defeat class certification of this claim.

Whether the defendants received and retained money from plaintiffs that they have no just right to retain by operating a Ponzi scheme is a question that can be answered classwide; no

1  individual issues preclude certification of this claim.

2         vi. Breach of Fiduciary Duty

3         "A breach of fiduciary duty claim seeks damages for injuries

4  that result from the tortious conduct of one who owes a duty to

5  another by virtue of the fiduciary relationship." *Stalk v.*

6  *Mushkin*, 199 P.3d 838, 843 (Nev. 2009).  A "fiduciary relation

7  exists between two persons when one of them is under a duty to act

8  for or to give advice for the benefit of another upon matters

9  within the scope of the relation." *Id.*  To prevail on a breach of

10 fiduciary duty claim, the plaintiff must establish: "(1) the

11 existence of a fiduciary duty; (2) breach of that duty; and (3) the

12 breach proximately caused the damages." *Klein v. Freedom Strategic*

13 *Partners, LLC*, 595 F. Supp. 2d 1152, 1162 (D. Nev. 2009).

14        Defendants do not argue that this claim is improper for class

15 certification, nor does the court believe any individual issues

16 would make certification inappropriate.

17              vii. Aiding and Abetting

18        "[L]iability attaches for civil aiding and abetting if the

19 defendant substantially assists or encourages another's conduct in

20 breaching a duty to a third person." *Dow Chem. Co. v. Mahlum*, 970

21 P.2d 98, 112 (Nev. 1998), *overruled on other grounds by GES, Inc.*

22 *v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001).  To prove this claim, which

23 is asserted only against Sterling Escrow, plaintiffs must show: (1)

24 that one or more of the defendants made a fraudulent

25 misrepresentation that injured plaintiffs; (2) that Sterling Escrow

26 was aware of its role in promoting the fraudulent misrepresentation

27 at the time it provided assistance; and (3) that Sterling Escrow

28 knowingly and substantially assisted the defendants in committing

24

1    fraudulent misrepresentation.  *Id.*

2         Sterling Escrow argues that reliance as to the fraud claim

3    cannot be proven on a classwide basis, and thus certification as to

4    the aiding and abetting fraud claim would be improper.  For the

5    reasons discussed above, common questions predominate over

6    individual questions as to the fraud claim, and therefore Sterling

7    Escrow's argument is without merit.  Whether Sterling Escrow was

8    aware of its role in promoting a fraud and knowingly assisted the

9    other defendants in committing the fraud are clearly common

10   questions subject to class certification.

11             viii. Breach of Contract

12        Defendants do not argue that this claim is inappropriate for

13   class certification. Plaintiffs allege that all investors signed

14   the same form contract and MRI either breached or did not breach

15   the contract with respect to all investors.  No individual

16   questions appear to exist with respect to this claim, and therefore

17   class certification is appropriate.

18             ix. Accounting

19        "An action for accounting . . . is a proceeding in equity for

20   the purpose of obtaining a judicial settlement of the accounts of

21   the parties in which proceeding the court will adjudicate the

22   amount due, administer full relief and render complete justice."

23   *Oracle USA, Inc. v. Rimini St., Inc.*, 2010 WL 3257933, at *6 (D.

24   Nev. 2010) (internal citations and quotation marks omitted).  The

25   District of Nevada "has held that '[a]n action for inspection and

26   accounting will prevail only where the plaintiff can establish that

27   there exists a relationship of special trust between the plaintiff

28   and defendant.'"  *Thomas v. Wachovia Mortgage, FSB*, 2011 WL

3159169, at *6 (D. Nev. 2011) (internal citations omitted).

Whether defendants, by their common course of conduct and alleged repeated misrepresentations, created a relationship of special trust with the plaintiffs is subject to classwide proof. No individual issues exist that would impede certification of this claim.

### x. Constructive Trust

"A constructive trust has been defined as a remedial device by which the holder of legal title to property is held to be a trustee for the benefit of another who in good conscience is entitled to it.  The requirement that a constructive trustee have title (not mere possession) to the property involved is critical to the imposition of a constructive trust." *Danning v. Lum's, Inc.*, 478 P.2d 166, 167 (Nev. 1970).  "[I]mposition of a constructive trust requires: '(1) [that] a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice.'" *Waldman v. Maini*, 195 P.3d 850, 857 (Nev. 2008). Constructive trust "is not 'limited to [fraud and] misconduct cases; it redresses unjust enrichment, not wrongdoing.'" *Id.*

For the same reasons that support class certification of the breach of fiduciary and accounting claims, no individual questions exist to preclude class certification as to the constructive trust claim.

### xi. Fraudulent Transfer

Plaintiffs allege a claim of constructive fraudulent transfer under Nevada Revised Statutes § 112.180(1)(b) against the Suzukis

and Sterling Escrow.  Such a claim requires showing that MRI made transfers to the Suzukis and Sterling Escrow without "receiving a reasonably equivalent value in exchange for the transfer or obligation" at a time that MRI believed or reasonably should have believed that it would not be able to repay its investors.

The defendants do not claim that individual issues predominate as to this claim.  Accordingly, this claim is proper for class action.

B. Superiority

The class action must be superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3). Factors to consider in this respect include:

(A)   the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)   the likely difficulties in managing a class action.

Plaintiffs argue that a class action is superior because the costs of individual litigation would be prohibitively high compared to each individual plaintiff's measure of damages.  While the damages run from tens of thousands to hundreds of thousands of dollars, travel to the United States for each plaintiff would be a hardship to their finances and their health.  Further, individual litigation of these cases would be a substantial burden on this court.  Finally, litigation in this district is desirable because Fujinaga and Sterling Escrow, along with their assets, are here, as

1   are some of the Suzukis' assets.

2        The Suzukis argue that the class action here in the United

3   States is not superior to individual litigation in Japan,

4   especially since – as Japan may not recognize class actions – any

5   judgment in this case may not be entitled to preclusive effect and

6   the Suzukis would therefore face continued exposure in Japan even

7   after expending significant resources to defend this action.  They

8   argue that where foreign plaintiffs are involved, the fact that a

9   foreign court may not recognize the judgment will count against a

10  finding of superiority and may, in consideration of other facts,

11  lead to the exclusion of foreign claimants from the class.

12       The enforceability of the class action in Japan is of less

13  significance given that substantial assets of the defendants are

14  located in this district and country.  The Suzukis have not

15  identified any other method that would be better suited to resolve

16  this controversy.  The only alternative suggested to the court is

17  the filing of individual claims, which would "burden the judiciary

18  [and] prove uneconomic for potential plaintiffs."  *Hanlon*, 150 F.3d

19  at 1023.  The court is not persuaded that dozens or hundreds or

20  even thousands of individual actions in either Japan or the United

21  States, which would occur if class certification is denied, would

22  be a fairer or more efficient method of resolving this controversy

23  – to the plaintiffs, to the court, or to the Suzukis.  The burdens

24  it would place on plaintiffs to individually litigate their claims

25  outweigh any interest in individually controlling the litigation.

26  Further, it is desirable to concentrate litigation in the District

27  of Nevada, where much of the relevant assets of the defendants are

28  located.  Although some individual cases are pending against some

of the defendants in Japan, Japan does not have a class action mechanism.  The fact that other cases are pending in another jurisdiction, and that jurisdiction also contains assets of the defendants apart from the assets located in this district, persuades the court that the existing actions will have little impact on this case.  Finally, while class actions can be difficult to manage, that factor alone does not outweigh the benefits of consolidating the claims of thousands of investors into one action that will reduce the caseload on both this court and the courts in Japan.  Accordingly, the court concludes that a class action is the superior method for handling this dispute.

**Conclusion**

In accordance with the foregoing, the plaintiffs' motion for class certification (#255) is hereby **GRANTED.  IT IS ORDERED** that the following class is certified.

> The MRI Investor Class consisting of: all persons who purchased MRI securities during the period July 5, 2008, through May 1, 2013, and were injured as a result of the defendants' conduct.  Excluded from the class are the defendants, their employees, their family members and their affiliates, and the following 26 individuals who are plaintiffs in the pending litigation against the defendants in Japan: (1) Tomoyasu Kojima; (2) Keiko Amaya; (3) Masakazu Sekihara; (4) Chiri Satou; (5) Meiko Murakami; (6) Masayoshi Tsutsumi; (7) Yumiko Ishiguro; (8) Reiko Suzuki; (9) Hiroji Sumita; (10) Eiko Uchiyama; (11) Hideyo Uchiyama; (12) Youzou Shiki; (13) Naoki Nagasawa; (14) Noboru Yokoyama; (15) Masami Segawa; (16) Fumiko Takagi; (17) Kumiko Kaita; (18) Fumi Kobayashi; (19) Ikuko Miyazaki; (20) Hina Nagase; (21) Akio Iwama; (22) Kouji Kishida; (23) Eri Kishida; (24) Nomai Nii; (25) Youko Miyahara; and (26) Tsukiko Kurano.

/

/

/

/

1      Plaintiffs shall file with the court a proposed form of notice
2  in accordance with Rule 23(c)(2)(B) on or before April 5, 2016.
3  Any objection to the proposed notice should be filed on or before
4  April 15, 2016.

5      **IT IS SO ORDERED.**

6      DATED: This 21st day of March, 2016.

_____
UNITED STATES DISTRICT JUDGE