JAMES E. GIBBONS (*pro hac vice*)
Cal. State Bar No. 130631
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 South Figueroa Street, 15th Floor
Los Angeles, CA 90017
Tel. (213) 624-6900
jeg@manningllp.com

ROBERT W. COHEN (*pro hac vice*)
Cal. State Bar No. 150310
MARIKO TAENAKA (*pro hac vice*)
Cal. State Bar No. 273895
**LAW OFFICES OF ROBERT W. COHEN, A.P.C.**
1901 Avenue of the Stars, Suite 1900
Los Angeles, CA 90067
Tel. (310) 282-7586
rwc@robertwcohenlaw.com
mt@robertwcohenlaw.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

SHIGE TAKIGUCHI, et. al, Individually and On Behalf of All Others Similarity Situated,

Plaintiffs,

v.

MRI INTERNATIONAL, INC., EDWIN J. FUJINAGA, JUNZO SUZUKI, PAUL MUSASHI SUZUKI, LVT, INC., dba STERLING ESCROW, and DOES 1-500,

Defendants.

Case No. 2:13-cv-01183-HDM-VCF

**FIFTH AMENDED COMPLAINT**

Plaintiffs SHIGE TAKIGUCHI, FUMI NONAKA, MITSUAKI TAKITA, TATSURO SAKAI, SHIZUKO ISHIMORI, YUKO NAKAMURA, MASAAKI MORIYA, HATSUNE HATANO, and HIDENAO TAKAMA, on behalf of themselves and those similarly situated, sue defendants MRI INTERNATIONAL, INC. (“MRI”), EDWIN Y. FUJINAGA; JUNZO SUZUKI; PAUL MUSASHI SUZUKI; LVT, INC., dba STERLING ESCROW (“STERLING ESCROW”); KEIKO SUZUKI; PAUL MUSASHI SUZUKI AS TRUSTEE OF THE PAUL MUSASHI SUZUKI IRREVOCABLE TRUST DATED MAY 10, 2013; CATHERINE MAI SUZUKI AS



MANNING & KASS ELLROD, RAMIREZ, TRESTER LLP ATTORNEYS AT LAW

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1  TRUSTEE OF THE CATHERINE MAI SUZUKI IRREVOCABLE TRUST DATED MAY 10,

2  2013; FIRST HAWAIIAN BANK AS TRUSTEE OF THE JUNZO SUZUKI IRREVOCABLE

3  TRUST UAD 07/12/2013; FIRST HAWAIIAN BANK AS TRUSTEE OF THE KEIKO SUZUKI

4  IRREVOCABLE TRUST UAD 07/12/2013; FIRST HAWAIIAN BANK AS TRUSTEE OF THE

5  JUNZO SUZUKI AND KEIKO SUZUKI IRREVOCABLE LIFE INSURANCE TRUST U/A

6  DTD 5/1/2008; SUZUKI ENTERPRISES INC.; SUZUKI ENTEPRISES, INC. PROFIT

7  SHARING PLAN; PUUIKENA INVESTMENTS, LLLP; and ICAG, INC.

8                               **NATURE OF ACTION**

9        1.      This is an action to recover damages and ancillary equitable relief due to

10 defendants' long-standing operation of a Ponzi scheme.  Under the scheme, MRI purported to

11 operate – and assured investors that it did operate – a legitimate business dealing in "Medical

12 Account Receivables," or "MARS."  MARS are account receivables that U.S. medical providers

13 hold against insurance companies.  MRI assured investors, including plaintiffs, that its business

14 was legitimate, that it would use investors' monies to deal in MARS, and that plaintiffs'

15 investments were secure because they were managed by an independent escrow agent, were

16 monitored by U.S. regulators, and were even guaranteed under U.S. law.

17       2.      In fact, MRI used the investors' money to pay off earlier investors and fund its

18 principals' lavish lifestyles; misled investors about U.S. regulatory and legal oversight and

19 guarantees; and then lied to Japanese regulators who investigated the scam.  MRI has defaulted on

20 its payment obligations to its investors.  Japanese regulators have stripped MRI of its license to

21 engage in financial transactions in Japan.

22       3.      The Class Period is from July 5, 2008 to July 5, 2013.

23       4.      In compliance with the Private Securities Litigation Act, notice of the lawsuit was

24 published in a widely circulated national business-oriented publication, advising members of the

25 putative class of the pendency of the action, the claims asserted, and the putative class period.  The

26 notice was published on March 28, 2014 in the Investor's Business Daily.  In addition, since

27 nearly all of the investors are residents of Japan, a separate notice was published in the Sankei

28 Shimbun, a business oriented daily newspaper with national circulation in Japan, on March 31,

2014.

## THE PARTIES

5.      Plaintiffs SHIGE TAKIGUCHI, FUMI NONAKA, MITSUAKI TAKITA, TATSURO SAKAI, SHIZUKO ISHIMORI, YUKO NAKAMURA, MASAAKI MORIYA, HATSUNE HATANO, and HIDENAO TAKAMA, are all residents of Japan.  And as set forth in the accompanying certification, each of them suffered damages as a result of the purchase of MRI securities and/or suffered damages as a result of defendants' securities law violations, false and misleading statements, material omissions, wrongful acts, and other state law violations during the Class Period.

6.      MRI is a Nevada corporation founded in July 1998, headquartered in Las Vegas, Nevada.  MRI has a branch office in Tokyo, Japan.  In June 2008, under the authority of the Japanese Financial Services Agency, MRI registered as a "Type II Financial Instruments Business."  Despite the fact that the federal Securities Act of 1934 and applicable state laws require sellers of securities to register and file statements with the United States Securities and Exchange Commission ("SEC"), MRI never registered its securities with the SEC and was therefore never authorized under any Nevada or U.S. law to deal in securities.

7.      Edwin Y. Fujinaga is an individual and resident of the State of Nevada.  At all relevant times, he was and is MRI's sole shareholder, President, Chief Executive Officer, and a member of its Board of Directors.  Since 2003, Fujinaga has overseen all of MRI's U.S. operations.  He is also the sole shareholder or managing member of 23 separate entities affiliated with MRI.  Fujinaga does not speak or read Japanese, and therefore deferred all investor solicitation to MRI's Tokyo branch.

8.      Junzo Suzuki is an individual residing in Tokyo, Japan and in the State of Hawaii. At all relevant times, Junzo Suzuki was, and is on MRI's Board of Trustees and was MRI's "Executive Vice President, Asia Pacific."  Junzo Suzuki was also registered as MRI's "Foreign Registered Representative" in Japan.  Junzo Suzuki was the head of MRI in Tokyo, founded the Tokyo office at his insistence, and oversaw its operations with virtually no oversight or control from Fujinaga.  He solicited the purchase of MRI securities to plaintiffs and the Class.  Junzo

3

**FIFTH AMENDED COMPLAINT**

1    Suzuki directed the sales and marketing of MRI securities in Japan, placed advertisements in

2    Japanese news outlets, prepared the Japanese offering materials, spoke at MRI informational

3    seminars and MRI parties, and led investors on tours to MRI's Las Vegas headquarters.  Junzo

4    Suzuki was also responsible for handling all customer service inquiries, and he could and did

5    direct Fujinaga to make payments to investors who complained about late payments on their

6    investments.

7            9.      Paul Musashi Suzuki is an individual residing in Tokyo, Japan and in the State of

8    Hawaii.  He is the son of Junzo Suzuki and at all times relevant was the "Japan Operations

9    General Manager" of MRI.  As Operations General Manager, he solicited the purchase of MRI

10   securities to plaintiffs and the Class.   He was also the Editor-in-Chief of "VIMO," MRI's monthly

11   magazine distributed to all investors, in which he regularly authored editorials and articles falsely

12   touting the safety and security of MRI's investment scheme and MARS.  Additionally, Paul

13   Suzuki was responsible on a day-to-day basis for coordinating MRI seminars held all over Japan,

14   where he and Junzo Suzuki regularly lectured about MARS and the safety and benefits of

15   investing with MRI.  Paul Suzuki was also responsible for coordinating lavish parties hosted for

16   high amount investors, as well as coordinating, leading and translating during the Las Vegas tours

17   for these investors.

18          10.      Keiko Suzuki, who also uses her maiden name of Keiko Nakamachi, is an

19   individual residing in Tokyo, Japan and in the State of Hawaii.  She is the wife of Junzo Suzuki

20   and mother of Paul Suzuki, and functioned as a co-manager and controller of MRI's Tokyo office.

21   At all times relevant she held herself out to the Japanese investors as the representative of MRI's

22   Tokyo office, and was responsible for communicating with prospective and current investors to

23   solicit the purchase of MRI securities.  She acted as the primary liaison between MRI's

24   headquarters and the Tokyo office from its inception.  She also was instrumental in obtaining

25   MRI's registration with the Japanese Financial Services Agency, as well as leading the marketing

26   of MRI securities in Japan.

27          11.      At all relevant times, Junzo, Keiko and Paul Suzuki offered, promoted, and

28   solicited MRI's securities to plaintiffs and the Class for value, and thus are statutory sellers to

**FIFTH AMENDED COMPLAINT**

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

Plaintiffs and the Class Members.  Together with business entities that they own and control, including Suzuki Enterprises, Ltd. and Sonnette, Ltd., Junzo, Keiko and Paul Suzuki received in excess of $75 million in commissions from 1998 to 2013 in exchange for offering, promoting and soliciting MRI's securities.

12.     During the Class Period, Edwin Fujinaga, Junzo Suzuki, Paul Suzuki, and Keiko Suzuki collectively the "Individual Defendants," each possessed the power and authority to control the representations made in the offering books, pamphlets, handouts, advertisements, and other marketing material distributed by MRI.  Specifically, the Individual Defendants were each actively involved in the drafting, preparation, approval and distribution of MRI's offering books, pamphlets, handouts, advertisements, other marketing material, and other communications complained of herein.  Each was aware of, or recklessly disregarded, the false and misleading statements contained therein.  Because of their executive and managerial positions, each of the Individual Defendants had access to MRI's actual financial condition and performance and knew that the representations made by or about MRI were materially false and misleading, or were deliberately and consciously reckless of the truth and falsity of the representations.  Additionally, the Individual Defendants had the motive to make these false representations: Fujinaga made hundreds of millions of dollars and the Suzukis made tens of millions of dollars from making these misrepresentations.

13.     Sterling Escrow is a Nevada corporation incorporated under the name LVT, Inc.  It was established in 1988 and was a licensed escrow company under the laws of Nevada (License Number 904).  During the Class Period, Sterling Escrow was responsible for the bookkeeping of MRI, and knew or should have known that MRI was a Ponzi scheme and that the services it provided facilitated the fraud.

14.     Suzuki Enterprises, Inc. is a Hawaii corporation owned and controlled by Junzo and Keiko Suzuki.   During the Class Period, Junzo and Keiko directed that $5,502,410 of the commissions they earned be paid to Suzuki Enterprises, Inc.  The commissions received by SEI were proceeds from MRI's illegal Ponzi scheme.

15.     Suzuki Enterprises, Inc. Profit Sharing Plan which is a retirement plan owned and funded by Suzuki Enterprises, Inc., for the benefit of Junzo Suzuki, Keiko Suzuki, Paul Suzuki and Catherine Suzuki.  The plan is funded with over $4,121,862, consisting solely of proceeds from MRI's Ponzi scheme.

16.     First Hawaiian Bank is a Hawaii corporation and the duly appointed trustee of the Junzo Suzuki Irrevocable Trust UAD 07/12/2013, an irrevocable trust held for the benefit of Keiko Suzuki, Paul Suzuki and Catherine Mai Suzuki.  The trust owns an investment account with First Hawaiian Bank worth over $430,000.  The account was funded solely from proceeds from MRI's Ponzi scheme.

17.     First Hawaiian Bank is also the duly appointed trustee of the Keiko Suzuki Irrevocable Trust UAD 07/12/2013 an irrevocable trust held for the benefit of Junzo Suzuki, Paul Suzuki and Catherine Mai Suzuki.  The trust owns an investment account with First Hawaiian Bank worth over $430,000.  The account was funded solely from proceeds from MRI's Ponzi scheme.

18.     First Hawaiian Bank is also the duly appointed trustee of the Junzo Suzuki and Keiko Suzuki Irrevocable Life Insurance Trust U/A DTD 5/1/2008 is an irrevocable trust held for the benefit of the Suzuki defendants.  The trust owns an investment account with First Hawaiian Bank worth over $2.3 million.  The account was funded solely from proceeds from MRI's Ponzi scheme.

19.     Paul Musashi Suzuki is a Hawaii resident and the duly appointed trustee of the Paul Musashi Suzuki Irrevocable Trust, dated May 10, 2013, an irrevocable trust held for the benefit of the Suzuki defendants.  The trust owns an investment account with First Hawaiian Bank and fifty percent interest in Puuikena Investments LLLP.  The account was funded solely from proceeds from MRI's Ponzi scheme.

20.     Catherine Mai Suzuki is a Hawaii resident and the duly appointed trustee of the Catherine Mai Suzuki Irrevocable Trust, dated May 10, 2013, an irrevocable trust held for the benefit of the Suzuki defendants.  The trust owns an investment account with First Hawaiian Bank

and fifty percent interest in Puuikena Investments LLLP.  The account was funded solely from proceeds from MRI's Ponzi scheme.

21.      Puuikena Investments LLLP is a Hawaii limited liability partnership, owned by Paul and Catherine Mai Suzuki (Junzo and Keiko's daughter).  The company received real properties located at 398 Puuikena Drive, Honolulu, Hawaii and 445 Seaside Avenue, Unit 3014, Honolulu, Hawaii.  These properties were formerly owned by Junzo and Keiko Suzuki, who purchased the properties from proceeds they received from MRI's illegal Ponzi scheme.  Junzo and Keiko Suzuki transferred their interests in these properties to Puuikena Investments LLLP on May 10, 2013, 14 days after the Japanese authorities publicly revealed that MRI was a Ponzi scheme and revoked its license to do business.

22.      ICAG, Inc., is a Nevada corporation and was controlled by Richard Shintaku, who was the Chief Operating Officer of MRI.  ICAG, Inc. received $48,600,728.43 in commissions derived from MRI's Ponzi scheme, of which approximately $9 million was paid during the Class Period.

## JURISDICTION AND VENUE

23.      The Court's jurisdiction is predicated on 28 U.S.C. § 1331 because this action arises under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 77 *et seq.* and 15 U.S.C. § 78J.

24.      The defendants are subject to this Court's jurisdiction.  The corporate defendants at all relevant times have engaged in continuous and systematic business in the State of Nevada, and have designated agents for service of process in this State, and/or have committed tortious acts in this State. Likewise, the Individual Defendants have at all relevant times been engaged in continuous and systematic business in Nevada and/or have availed themselves of the benefits and protections of the laws of the state of Nevada, and/or have committed tortious acts in this State.

25.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) and (b), because a substantial number of the acts and transactions that gave rise to Plaintiffs' claims occurred within this District.

26.      In connection with the acts, transactions, and conduct alleged herein, defendants

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1  directly and indirectly used the means and instrumentalities of interstate commerce, including the

2  United States mail, and interstate telephone communications.

3  **CLASS ACTION ALLEGATIONS**

4      27.    This action is brought by plaintiffs as a class action pursuant to Federal Rule of

5  Civil Procedure 23.

6      28.    Plaintiffs seek relief on behalf of themselves and a class of all persons, during the

7  Class Period, who were MRI investors and who were injured as a result of defendants' illegal

8  Ponzi scheme and actions ("Class or Class Members").  Excluded from the Class are the

9  Defendants, their employees, their family members, and affiliates of defendants.

10      29.    The members of the Class number approximately 8,700, so joinder of all class

11  members in a single action is impracticable.  Questions of law and/or fact common to the class

12  predominate, including but not limited to:

13  • Whether defendants were operating an unlawful Ponzi scheme;

14  • Whether defendants failed to segregate monies, as promised, between accounts;

15  • Whether defendants failed to keep investors' monies in secure escrow accounts;

16  • Whether defendants misled plaintiffs and the class by advising them that MRI and

17      Plaintiffs' investments were regulated by Nevada state law; and

18  • Whether and to what extent the conduct has caused injury to the plaintiffs and the

19      Class Members.

20      30.    The plaintiffs' claims are typical of the claims of the Class because plaintiffs were

21  persuaded to invest in MRI through MRI's standard sales representations, and the plaintiffs lost

22  money as a result of investing in what was in reality a Ponzi scheme.

23      31.    The plaintiffs will fairly and adequately represent the interests of the Class, because

24  plaintiffs' claims are typical of those of the Class, and plaintiffs' interests are fully aligned with

25  those of the Class. The plaintiffs have retained counsel who are experienced and skilled in

26  complex class action litigation.

27      32.    Class action treatment is superior to the alternatives for the fair and efficient

28  adjudication of the controversy alleged in this action, because class treatment will permit a large

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

1  number of similarly-situated persons to prosecute their common claims in a single forum

2  simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense

3  that numerous individual actions would engender.

4       33.    The Plaintiffs know of no difficulty likely to be encountered in the management of

5  this action that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

8       34.    MRI is a Nevada based corporation, purportedly in the business of purchasing

9  medical accounts receivables from hospitals and medical clinics at a discounted rate, and then

10  collecting the face value of the receivables from insurance companies.  In order to secure funding

11  to purchase these receivables, beginning in 1998 and continuing through 2013, MRI solicited

12  money directly from individual investors, virtually all of whom are Japanese residents.  All of the

13  marketing and solicitation of investors in Japan was handled by MRI's Tokyo office, at the

14  direction of Junzo and Paul Suzuki.

15       35.    Typically, MRI placed its advertisements in Japanese newspapers and magazines,

16  and sent mass emails to attract investors.  Interested investors then contacted MRI's Japanese

17  branch for additional information, and in response were mailed a set of "welcome materials,"

18  which included MRI's pamphlet/offering materials, investment applications, and a "Pre-

19  Agreement Disclosure Document" from MRI's Tokyo branch.

20       36.    The Pre-Agreement Disclosure Document, which was sent to every single investor,

21  provided as follows:

22     •    "The purpose of this investment is solely to invest in the collection of United States

23      Medical Accounts Receivables."

24     •    "The Medical Accounts Receivables purchased in accordance with this contract

25      will be separately maintained from the Company's assets, and will be managed by

26      a third party agent escrow company that has received authorization from the

27      Nevada state government."

28

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

- "This contract shall only be effective after we receive an executed contract at our office, and the total amount of the investment is received in the designated escrow trust account (Wells Fargo Bank, Las Vegas, Nevada Branch).  Interest payments shall be calculated from the date that the total investment amount is received in the escrow trust account.  The date of this contract shall be based upon United States Pacific Time."

37.     MRI's pamphlet/offering material explained that MRI offered a separate and distinct group of securities to the public each year; by way of example, in 2008 MRI offered the "Series 2008 Class A" and "Series 2008 Select A" securities.  The following year, MRI offered a group of securities called "Series 2009 Class A" and "Series 2009 Select A," and so on.  Both the "Select A" and the "Class A" contracts offered investment units of $10,000, $50,000 and $100,000 in Dollar-denominated Plans, or 1.5 Million Yen, 7.5 Million Yen, and 15 Million Yen in the Yen-denominated Plans.  Investors had the option of receiving profit distributions annually (Option A) or at maturity of the investment (Option B).  The interest rates varied between "Select A" and "Class A" ranging from 6.0 to 10.32 percent.  Investors were also given options to choose investment terms of two years, three years, and five years.

38.     After investors received MRI's "welcome materials," plaintiffs and the Class were required to complete an application, indicating the various terms of the securities they wished to purchase.

39.     After completing the applications, the investors were then required to mail the applications to the Las Vegas headquarters.  Upon receipt of the application, MRI prepared and mailed back a "Corporate Certificate of Investment Agreement" to investors.  The Corporate Certificate of Investment Agreement detailed the investors' personal information, the investment terms, and bank remittance information.  Investors were required to sign the agreement and then wire the total investment amount to the designated Wells Fargo Las Vegas branch bank account.

40.     The wire transfers were made to bank accounts in the name of "STERLING ESCROW TRUSTEE for MRI Series" indicating the year and type of investment, i.e., either Class A or Select A (for example "STERLING ESCROW TRUSTEE for MRI Series 2008 Class A

10

**FIFTH AMENDED COMPLAINT**

Account").  Once MRI confirmed receipt of the funds in the Wells Fargo Bank account, the transaction was deemed complete.  Only then would MRI transfer title to the securities, as evidenced by a "Certificate of Investment," which was sent by Federal Express to each investor.

41.    "The United States of America" is prominently displayed at both the top and bottom of each certificate.  Each certificate explicitly states that a specified sum of money "has been deposited with the Sterling Escrow Company in Las Vegas, Nevada" in exchange for the Certificates.  At the bottom of the certificate is the language "In Witness Whereof, MRI International, Inc. has caused this MRI Series  . . . Certificate to be duly executed by its authorized officers."  There are then two signature lines for the Secretary and the President of MRI, both signed by defendant Edwin Y. Fujinaga.  Between the two signatures is a seal, which reads "MRI International, Inc. Corporate Seal 1998 Nevada."  The Certificates of Investment establish that the money to fund the investments was deposited into a trust account in Nevada, only after which did MRI "cause" the certificates to be "duly executed by its authorized officers."

42.    Along with the Investment Certificate a "Financial Products Trading Contract" was also mailed to the investors.  Article 11 of the Financial Products Trading Contract provides:  "The laws governing this contract shall be the laws of the United States of America and the laws of the State of Nevada and all disputes arising from the Contract shall be filed in a court in the State of Nevada of the United States of America as the exclusive and agreed upon competent court."  These representations and designation of jurisdiction and choice of law provisions notwithstanding, MRI did not register each of its series of securities with any federal or state authorities.

43.    Thereafter, MRI provided quarterly statements with interest calculations to the investors, assuring them that the investments were profitable.  These statements were prepared by MRI in the U.S. and mailed to each investor in Japan.  Investors who contracted to receive annual interest payments (Option A) received wire transfers from the designated Sterling Escrow account.

44.    MRI communicated with its investors in writing through a variety of means, including monthly newsletters.  In October 2008, it began publishing a magazine called "VIMO," which contained interviews of celebrities and features on luxury brand items, such as high end

**FIFTH AMENDED COMPLAINT**

1   watches and yachts.  VIMO was published and supervised by Paul Suzuki, who regularly authored

2   editorials touting the safety and security of the MARS investment scheme.

3        45.    The Suzuki defendants also hosted complimentary vacations to Las Vegas, in

4   which customers who invested large amounts of money were given tours of MRI's headquarters

5   and the buildings of its affiliated companies.   At these events, both Junzo and Paul Suzuki spoke

6   directly with investors, including plaintiffs and the Class, and solicited increased investments,

7   based on the claimed safety of the investments.  Keiko Suzuki also regularly chaperoned these Las

8   Vegas tours, speaking to investors directly regarding the MARS investments.

9        46.    Two months prior to maturity, MRI mailed investors maturity notices, which

10  contained information about maturity dates, investment balances, and accounts designated for

11  redemption.  The notice also advised that, if redemption were sought at maturity, special privileges

12  would be lost and no additional investments could be made.

13       47.    Investors who chose to reinvest at maturity were required to begin the application

14  process anew.  That is, investors would send the application to Las Vegas, MRI would issue a new

15  Corporate Certificate Investment Agreement of the investors, and if necessary, the investors would

16  wire additional investment funds.  MRI would then issue a new Certificate of Investment with the

17  new terms and a new certificate number.

18  **MRI'S MISREPRESENTATIONS**

19  **Misrepresentations Made in 2008**

20       48.    The Class Period begins on July 5, 2008.  From 2008 until April 2013, when the

21  Japanese government announced its findings regarding MRI's fraud, MRI continually made

22  misrepresentations to plaintiffs and the Class by which it induced them to invest or renew their

23  investments with MRI.

24       49.    In its 2008 offerings ("MRI Series Select A 2008" and "MRI Series Class A

25  2008"), distributed to all existing and interested investors, MRI stated in relevant part:

26      •    the investors' money would only be invested in MARS;

27      •    the investors' money would be managed not by MRI, but by an independent escrow

28          company obligated by U.S. law to deposit a set percentage of its funds with the

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
*Attorneys at Law*

state government each month, which would be used to indemnify the investors in the event of a default

- the investors' money would be placed in a bank "lockbox" account, which only the largest and safest banks could establish, and which only the most trustworthy of customers could obtain; the funds in the lockbox would then be used solely to buy MARS that were of greater value than the amount MRI paid for them;

- the "lockbox" account would be independently managed and, if the bank were to fail, the state government would guarantee the funds in the account, with the investors having the first right of priority to recover the funds;

- each U.S. state guarantees MARS up to a legal limit, and MRI purchases MARS only up to this guaranteed limit; and

- if MRI filed for bankruptcy, then the escrow company, with the assistance of the state government, would retain a new company to collect on the MARS. The escrow company would then be responsible for distributing the funds to the investors.

The offering book was signed by Fujinaga.

50.     In its 2008 Annual Business Report submitted to the Japanese Financial Services Agency[1], MRI reported that it only held 86,933,344,000 Yen from investors. Junzo Suzuki's personal seal, which is equivalent to and used in lieu of signatures in Japan, is affixed to the 2008 Annual Business Report vouching for its accuracy. MRI, in order to attract new and renewed investments, distributed its 2010 annual report entitled THE VIEW 2010 to all of its investors in Japan. THE VIEW 2010 was signed by Fujinaga. There, MRI falsely stated that in 2008 it held 108,840,000,000 Yen in MARS investments, nearly 20% more than what it reported to the FSA. These figures cannot both hold true, and Junzo, Paul and Keiko Suzuki, as authors and/or

---

[1] Businesses registered as Type II Financial Instruments Business with the Japanese Financial Services Agency are required to submit a Business Report with the Kanto Local Financial Bureau (the regional arm of the Japanese Finance Services Agency) on an annual basis. In accordance with this requirement, MRI submitted annual Business Reports to the Kanto Local Financial Bureau.

**FIFTH AMENDED COMPLAINT**

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1  contributors to both the 2008 FSA report and the 2010 THE VIEW, had actual knowledge of the

2  inconsistencies.  Therefore, Junzo, Paul and Keiko Suzuki knew that their representations were

3  false or they were made with deliberate and conscious recklessness as to their truth or falsity.

4      51.    In 2008, MRI hosted seven tours to Las Vegas.  These trips were complimentary to

5  the high-amount investors, and were led by Paul Suzuki and Keiko Suzuki.  During the trips, Paul

6  Suzuki took the investors to tour MRI's Las Vegas office and its affiliates.  Investors also briefly

7  met with Fujinaga, where they were allowed to take photos with him.  The purpose of these tours

8  was to impress upon the investors the swarm of activity surrounding MRI.  In actuality, however,

9  there were only a few MRI employees, and these employees were made to scurry from floor to

10  floor, keeping just ahead of the investor tour, to make a false impression that the office was full

11  and bustling.

12      52.    In addition to the Las Vegas tours regularly hosted by MRI, in November 2008,

13  MRI hosted a 10th Anniversary Party in Hawaii, and invited approximately 300 of the high-

14  amount investors.  This trip was also led by Paul Suzuki, along with Junzo and Keiko Suzuki and

15  Fujinaga.  During the trip, investors were required to attend a seminar in which MRI reiterated the

16  representations made in its 2008 offering materials.  In addition, Junzo, Paul and Keiko Suzuki

17  solicited investors to open bank accounts at Bank of Hawaii. The Suzukis escorted many of the

18  participants to a local Bank of Hawaii branch, where they opened bank accounts for the purpose of

19  handling MRI investment transactions.

20  **Misrepresentations Made in 2009**

21      53.    In its 2009 offerings, entitled MRI Series Select A 2009 and MRI Series Class A

22  2009, MRI made the same misrepresentations as in its 2008 offerings.  The 2009 offering books

23  were signed by Fujinaga.

24      54.    In THE VIEW 2010, MRI represented that as of the end of 2009 it collected and

25  held 111,970,000,000 Yen in MARS investments.  However, in its 2009 Annual Business Report

26  submitted to the Japanese authorities, MRI reported that it held only 96,267,197,000 Yen from

27  investors, nearly 14 percent less than what MRI stated to its investors.  Junzo Suzuki's personal

28  seal is affixed to the 2009 Annual Business Report vouching for its accuracy.  Junzo, Paul and

14

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1   Keiko Suzuki, as authors and/or contributors to both the 2009 FSA report and the 2010 THE

2   VIEW, had actual knowledge of the inconsistencies.  Therefore, Junzo, Paul and Keiko Suzuki

3   knew that their representations were false or were made with deliberate or conscious recklessness

4   as to their truth or falsity.

5          55.     Further, in THE VIEW 2010, Fujinaga included a personalized message to

6   investors, reporting that in 2009, MRI maintained contracts with 116 medical providers and 72

7   pharmacies to purchase claims.  In actuality, however, the company's own books revealed MRI

8   had contracts with no more than 30 medical providers and 20 pharmacies, the vast majority of

9   which were owned or controlled by Fujinaga himself.

10         56.     According to THE VIEW 2010, in 2009 MRI held 11 seminars throughout Japan,

11  attracting a total of 1,010 investors, including many of the plaintiffs.  At each seminar, Junzo and

12  Paul Suzuki lectured about MRI's business model, including MARS, the U.S. healthcare industry,

13  and lockbox accounts.  Junzo and Paul Suzuki made the following misrepresentations verbally and

14  in handouts distributed to the attendees:

15     •      The lockbox account was a specialized bank account used for collecting

16            receivables, which required that the face value of the receivables purchased

17            exceeded the actual amount paid to purchase them.

18     •      Only companies that passed a rigorous test were eligible to open lockbox accounts.

19     •      A lock box would provide protection even against the bank's insolvency because

20            the assets were guaranteed by the state government.

21  In light of Junzo and Paul Suzuki's managerial positions in MRI and intimate knowledge of MRI's

22  business operations, they knew that their representations were false or were made with deliberate

23  and conscious recklessness as to their truth or falsity.

24         57.     In addition to the seminars, MRI also held social gatherings at four star hotels in

25  Japan, where MRI employees socialized with investors and responded to their questions.  In 2009,

26  according to THE VIEW 2010, ten social gatherings were held, attended by 945 investors,

27  including many of the class.  All of the social gatherings began with an introductory speech by

28  Junzo or Paul Suzuki reiterating the misrepresentations outlined in the written materials as set out

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

above.

58.     In contrast to MRI's representations that it was a profitable and financially sound company, its own financial statement for 2009 reported that its equity stood at negative $366,210,061.  Therefore, in 2009, MRI was insolvent.

**Misrepresentations Made in 2010**

59.     In its 2010 offerings, entitled MRI Series Select A 2010 and MRI Series Class A 2010, MRI repeated the same misrepresentations as in its 2008 offerings.  The 2010 offering books were also signed by Fujinaga.

60.     In THE VIEW 2011, which was also signed by Fujinaga, MRI represented that it had collected and held 120,220,000,000 Yen of investor money in 2010.  However, in its 2010 Annual Business Report submitted to the Japanese Financial Services Agency, MRI reported that it collected and held only 97,392,635,000 Yen in 2010, 22,827,365,000 Yen less (nearly 19 percent) than what it had reported to investors in its pamphlet.  Junzo Suzuki's personal seal is affixed to the 2010 Annual Business Report vouching for its accuracy. Both of these numbers, however, cannot be true.  Junzo, Paul and Keiko Suzuki, as authors and/or contributors to both the 2010 FSA report and the 2011 THE VIEW, had actual knowledge of the inconsistencies. Therefore Junzo, Paul and Keiko Suzuki knew that their representations were false or they were made with deliberate and conscious recklessness as to their truth or falsity.

61.     In MRI's May 2010 issue of its monthly magazine, VIMO Vol. 20, Paul Suzuki authored an article concerning the safety of investing in MRI.  In relevant part, he stated:

- Laws make it mandatory for all insurance companies to join the Insurance Guaranty Association prior to operating in each state.

- States implement laws which guarantee payments to medical providers in the event of the insurance company's insolvency.

- In the event the insurance company becomes financially distressed and is unable to pay on the MARS, the Insurance Guaranty Association will transfer the MARS to another insurance company in the association, which will pay on the MARS and continue to provide coverage to the insureds.

16

**FIFTH AMENDED COMPLAINT**

In light of Paul Suzuki's managerial position in MRI and intimate knowledge of MRI's business operations, he knew that his representations were false or they were made with deliberate and conscious recklessness as to their truth or falsity.

62.     According to THE VIEW 2011, in 2010, MRI also hosted eight informational seminars throughout Japan, with 671 attendees, many of whom included members of the class.  At each of these seminars, Junzo Suzuki or Paul Suzuki promised to potential and existing investors, that their investments would "only be invested in MARS," that "investment in MARS is secure, because of the state guarantee," and that "the escrow company makes it impossible for MRI to handle the investors' money."

63.     According to THE VIEW 2011, in 2010, MRI also hosted 30 social gatherings throughout Japan, with a total of 1,241 attendees, many of whom included plaintiffs and Class Members.  These social gatherings were coordinated by Paul Suzuki, and either Junzo Suzuki or Paul Suzuki provided introductory speeches, again concerning MARS and the fact that the investors' money was secure.  Junzo and Paul Suzuki always touted MRI as a profitable and financially secure company, and encouraged investors to increase their investments.

64.     In contrast to MRI's representations that it was a profitable and financially sound company, its own financial statement for 2010 reported that its equity stood at negative $379,985,504.  Therefore, in 2010, MRI was insolvent.

**Misrepresentations Made in 2011**

65.     In its 2011 offerings, entitled MRI Series Select A 2011 and MRI Series Class A 2011, MRI repeated the same misrepresentations as in its 2008 offerings.  These offering books were also signed by Fujinaga.

66.     In The VIEW 2012, MRI reported that it collected and held 127,240,000,000 Yen of investor money in 2011.  Fujinaga signed THE VIEW 2012.  However, in its 2011 Annual Business Report, MRI reported that in 2011 it held only 98,321,745,000 Yen, which was approximately 23 percent less than what was reported to plaintiffs and the Class in THE VIEW 2012.  Junzo Suzuki's personal seal is affixed to the 2011 Annual Business Report vouching for its accuracy.  These numbers, however, cannot both be true.  Junzo, Paul and Keiko Suzuki, as

17

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

authors and/or contributors to both the 2011 FSA report and the 2012 THE VIEW, had actual or constructive knowledge of the inconsistencies.  Therefore, Junzo, Paul and Keiko Suzuki were false or they were made with deliberate and conscious recklessness as to their truth or falsity.

67.     In MRI's June 2011 issue of VIMO, Vol. 33, Paul Suzuki authored an article concerning the role of escrow companies and how trust accounts protect customers' investments.  In relevant part, he stated:

- "With respect to the MRI series, a very strict fund management system is implemented through the escrow system.  The presence of the escrow system ensures segregation of funds.  Of course it is extremely important to ensure the safety of the investors' funds through segregation, but simply managing funds separately may not be enough."

- "MRI segregates investors' funds through the use of trust accounts.  This ensures that even if the company becomes insolvent, creditors will not be able to reach the investors' funds."

In light of Paul Suzuki's managerial position in MRI and intimate knowledge of MRI's business operations, he either knew that his representations were false or he made them with deliberate and conscious recklessness as to their truth or falsity.

68.     In MRI's July 2011 issue of VIMO, Vol. 34, Paul Suzuki wrote an article explaining the function of the Health Insurance Guaranty Association.  In relevant part, he wrote:

- All MARS from insurance companies are protected up to the maximum amount guaranteed by the Health Insurance Guaranty Association of each state;

- When MRI purchases MARS, as long as MRI only purchases MARS valued up to the amounts guaranteed by the association, even if the insurance company becomes insolvent, the entire value of the MARS will be paid, resulting in no loss to MRI; and

- In Nevada, where MRI is located, the state protects up to 100,000 dollars on each MARS.

In light of Paul Suzuki's managerial position in MRI and intimate knowledge of MRI's business

18

**FIFTH AMENDED COMPLAINT**

1  operations, he either knew that his representations were false or he made them with deliberate and

2  conscious recklessness as to their truth or falsity.

3        69.    According the 2012 THE VIEW, in 2011, MRI hosted 23 informational seminars

4  throughout Japan, attended by 1,333 people, including plaintiffs and members of the Class.  At

5  each of these seminars, Junzo or Paul Suzuki stated that the investments would "only be invested

6  in MARS," that "investment in MARS was secure because of the state guarantee," and that "the

7  escrow company makes it impossible for MRI to touch the investors' money."

8        70.    According the 2012 THE VIEW, in 2011 MRI hosted 28 social gatherings in Japan,

9  with a total of 1,294 attendees.  These social gatherings were coordinated by Paul Suzuki, and

10  either Junzo or Paul Suzuki provided an introductory speech concerning MARS and the fact that

11  the investors' money was secure.  Junzo and Paul Suzuki always touted MRI as a profitable and

12  financially secure company, and encouraged investors to increase their investments.

13        71.    In contrast to MRI's representations that it was a profitable and financially sound

14  company, its own financial statement for 2011 reported that its equity stood at negative

15  $405,866,868.  Therefore, in 2011, MRI was insolvent.

16  **Misrepresentations Made in 2012**

17        72.    In its 2012 offerings, entitled "MRI Series Select A 2012" and "MRI Series Class

18  A 2012," MRI repeated the same misrepresentations as in its 2008 offerings.  The 2012 offering

19  books were signed by Fujinaga.

20        73.    According to plaintiffs and the Class, in 2012 MRI held 11 seminars throughout

21  Japan.  At each of these seminars, Junzo or Paul Suzuki spoke, advising potential and existing

22  investors that their investments would "only be invested in MARS," that "MARS investments

23  were secure because of the state guarantees," and that "the escrow company makes it impossible

24  for MRI to touch the investors' money."

25        74.    In addition to the seminars, MRI hosted 55 "MRI Study Room" sessions in Japan.

26  These "Study Rooms" were more intimate seminars where Paul Suzuki lectured to investors about

27  various topics such as MRI's business, MARS and the U.S. health industry.  Paul Suzuki

28  represented that the investors' funds would "only be invested in MARS," that "MARS

19

**FIFTH AMENDED COMPLAINT**

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

investments were secure because of state guarantees," and that "the escrow company makes it impossible for MRI to touch the investors' money."

75.    In 2012, MRI hosted 29 social gatherings attended by plaintiffs and Class Members.  These social gatherings were coordinated by Paul Suzuki, and either Junzo or Paul Suzuki would provide an introductory speech, again touting the security of MARS investments.

76.    In contrast to MRI's representations that it was a profitable and financially sound company, its own financial statement for 2012 reported that its equity stood at negative $498,883,800. Therefore, in 2012, MRI was insolvent.

77.    In April 2012, Fujinaga wrote to Junzo, Paul and Keiko Suzuki advising of MRI's chronic fund shortages and ongoing inabilities to meet its obligations to its investors.  He requested their redoubled efforts to solicit more investors.  Despite MRI's chronic shortages and inabilitiy to pay off its investors, Junzo, Paul and Keiko Suzuki nonetheless continued to represent to investors that MRI was a profitable and financially sound company, and they continued to solicit new investments.

### ACTIONS TAKEN AGAINST MRI BY JAPAN'S FINANCIAL SERVICES AGENCY

78.    Following an extensive investigation by Japanese regulatory authorities, MRI's license to conduct business in Japan was revoked on April 26, 2013.  In its public announcement of the revocation, the Financial Services Agency of Japan (Kanto Local Finance Bureau) explained that its decision was made in light of MRI's fraudulent practices with its marketing and handling of the MARS investments, and that MRI had moreover attempted to mislead the FSA during the investigation.  Concluding that MRI's violations of Japanese law were "extremely unjust" and "especially serious," the FSA found, *inter alia*, the following:

- "[MRI] explained to many individual customers that investments would be separately managed through trust accounts and other accounts, opened in the name of a third-party institution.  It was found, however, that nearly all of the funds, which were deposited in the trust account for Fund A as investments by customers for the purpose of acquiring Fund Equities were remitted to the trust account for Fund B.  In addition, it was found that funds were remitted from Fund B trust

20

accounts to bank accounts opened in the Company's name as well as to customers of Fund A and Fund B, and thus the Company's own assets and the assets of Fund A and Fund B were commingled from at least 2011."

- "[F]unds invested by customers for the purpose of acquiring Fund Equities were not used in the business but were used to pay dividends and redemptions to other customers."

- "[T]he payment of dividends and redemptions to customers were delayed. Despite such situation regarding the trust accounts which manage the deposits and withdrawals of funds invested by customers, the Company continued solicitation for acquisition of Fund Equities."

- "Although [MRI] notified customers that investments would be used exclusively for the business involving the purchase and collection of MARS ... from at the least 2011, funds invested by customers were used to pay dividends and redemptions to other customers."

- "Although [MRI] notified . . . [customers] that it would pay customers dividends out of the profits realized in the business ... the Company used funds invested by customers to pay distributions to other customers from at the least 2011."

- "[MRI prepared] business reports with false statements and submit[ed] such reports to the director-general of the Kanto Local Finance Bureau."

- "[MRI] replied that it had performed an internal assessment of the trust accounts jointly with a third-party institution[.]  However, the fact that such an internal assessment had been performed by the Company jointly with a third-party institution was not found."

- "[A]n extremely improper situation continues with respect to the protection of investors, such as the situation where the Company has already prepared brochures and other solicitation materials for 2013 and planned to make solicitation for acquisition to many new customers, and that this situation urgently requires correcting."

**FIFTH AMENDED COMPLAINT**

79.     In short, the regulators found that investors' funds were not segregated and managed in an independent escrow account, but were kept by MRI and commingled with its operating funds.  Moreover, payments to existing investors were not derived from the sale of MARS, but were derived from new investors' contributions.  Further, even though it could not meet its obligations to investors, MRI nonetheless continued to solicit investments from new investors to perpetuate the scheme.

### ACTIONS TAKEN AGAINST MRI BY THE
### U.S. SECURITIES AND EXCHANGE COMMISSION

80.     On September 11, 2013, the United States Securities and Exchange Commission initiated a separate securities law violation action against MRI and Edwin Fujinaga, naming CSA Service Center, LLC as a relief defendant.  In that action, the SEC obtained a temporary restraining order, freezing the assets of MRI, Edwin Fujinaga, and CSA Service Center, LLC. Defendants thereafter stipulated to a preliminary injunction, and have answered the complaint without filing a Motion to Dismiss.

### DEFENDANTS ADMIT TO THE PONZI SCHEME

81.     In connection with the Japanese Securities and Exchange Surveillance Commission's investigation of MRI, in April 2013 Fujinaga was interviewed by authorities. Fujinaga testified:

> Question (SESC): When did you start appropriating the investments from your investors to pay principal and interest?
>
> Answer (Fujinaga): I think from 3, 4, 5 years ago, we started to appropriate investments from our investors to pay the principal and interest of other investors. I will give you an answer after I check.
>
> Question: You have appropriated the investments from your investors to pay the principal and interest of other investors.  Is this right?
>
> Answer: That's right. We had MARS collaterals and so we handled it that way.
>
> *       *       *

**FIFTH AMENDED COMPLAINT**

Question: Have the funds of Class A trustee account and/or Select A

trustee account ever been spent to pay expenses of MRI through the

general account?

Answer: They were transferred to pay the expenses of MRI and

commissions.

<p style="text-align:center">*        *        *</p>

Question: Yesterday, we were told that Select A and Class A accounts were

separate and they were not commingled.  However, according to the information on

the accounts provided by MRI, no principal and interest were paid from the Select

A trustee account.  It seemed that all had been transferred to Class A trustee

account.  Is this understanding correct?

Answer: It seemed to according to the documents presented just now

(the analyzed business checking of Select A and Class A).  It is true

that principal and interest were not paid from the Select A trustee

account.  My understanding was that the transfer was made to cover

foreign exchange, the principal and interest for Select A was paid

from Class A, which I am responsible for.  I am very sorry.

82.    Peter Munoz, the principal of Sterling Escrow, testified under oath that Sterling Escrow never provided any escrow services, but instead functioned only as MRI's bookkeeper, transferring money in and out of the MARS accounts at Fujinaga's direction.  Mr. Munoz and Sterling exercised no oversight or control over the investors' funds.  There was likewise never any "lockbox" account, but simply a general business account maintained in Sterling's name and controlled entirely by Fujinaga:

Q.  And this account that was called the lockbox, was it different from a business

checking account in any way?

A.  I would say it's the same.  It's a business checking account.

Q.  With respect to the lockbox accounts, who had control or authority to say how

the money in there would be spent?

**FIFTH AMENDED COMPLAINT**

1    A.  Who, Mr. Fujinaga -- of course, Mr. Fujinaga, sir.

2    Q.  Okay.  And with respect to these lockbox accounts, did Sterling maintain any

3    independent control over how that money would be used?

4    A.  No, no. No.

5    Q.   Did Sterling have any authority as to how the money in the lockbox accounts

6    would be used?

7    A.  No, sir, never. Never.

8    MRI had stopped purchasing MARs from independent hospitals and medical facilities in

9    2005.  Mr. Munoz testified:

10    Q.  You said MRI wasn't buying MARS from independent healthcare facilities, and

11    so, I was trying to find out: Were they buying MARS from some other entity?  And

12    that's what I'm trying to find out.

13    A.  I'm saying they stopped buying MARS from independent, from different

14    companies they don't control.

15                           *        *        *

16    Q.  Okay.  As best as you understand, when did MRI get away from

17    the account receivables business and into the clinics and

18    pharmaceuticals business?

19    A. About 2005.

20    83.    Sterling Escrow was instructed by Edwin Fujinaga to write checks to MRI's

21    various affiliated companies.   Recipients of this money included the Factoring Company XIII,

22    LLC, which received anywhere from $25,000 to $100,000 each month to pay Edwin Fujinaga's

23    alimony, luxury cars, pool maintenance, country club dues, and other living expenses for the

24    Fujinagas.  Over the course of MRI's operations, investors' money in excess of $100 million was

25    transferred to CSA Service Center, LLC, another MRI affiliate, which in turn purchased

26    Fujinaga's primary residence in Las Vegas valued at $3.2 million, his $7.8 million weekend home

27    in Beverly Hills, 62 acres of property in Solvang, California, a retreat in Hawaii, two

28

**FIFTH AMENDED COMPLAINT**

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1  condominiums at the MGM Signature Hotel in Las Vegas, three warehouse properties in Las

2  Vegas, and MRI's headquarters in Las Vegas.

3      84.    At least since 2011, Munoz and Sterling Escrow were receiving funds from new

4  investors and immediately transferring those same funds to pay off existing investors on a daily

5  basis.  Munoz and Sterling Escrow were accordingly on notice of facts by which they knew, or in

6  exercise of reasonable prudence should have known, that they were aiding and abetting a fraud,

7  perpetuating a Ponzi scheme, and breaching their duty of due care to the plaintiff investors.

8  ## ROLE OF THE SUZUKIS

9      85.    Excerpts of the discovery conducted by the SEC, and made publicly available

10  through Pacer, shows that the Suzukis controlled the contents of MRI's misrepresentations, and

11  were deeply involved in the development of the marketing materials used to induce plaintiffs to

12  invest in MRI.  It was the Suzukis who actually conducted the soliciting and recruitment efforts;

13  and it was the Suzukis who presented the face of MRI to the Japanese public.  This is supported by

14  Fujinaga's testimony, in a deposition conducted by the SEC.  He testified:

15      86.    As demonstrated in court filings by MRI itself in the SEC's case, Junzo, Paul and

16  Keiko Suzuki were always well informed and deeply involved in MRI's business operations in the

17  United States, and knowledgeable about its true financial conditions.  One such filing, for

18  example, sets forth a list of audio recordings that the Japanese SESC confiscated from Junzo

19  Suzuki's residence -- characterized by the SESC as his "hideout" -- in Tokyo.  The descriptions of

20  the audio recordings reveal that the Suzukis were actively involved in devising the content of

21  MRI's marketing materials and were involved in developing the false and misleading information

22  disseminated to the public, as well as informed about the contents of MRI's disclosures and

23  financial reports to the Japanese FSA.  The following audio recordings were confiscated:

| Fujinaga, Junzo, Paul, Shintaku | Recording of the meeting held at MRI headquarters in March 2007.  They discussed on the contents of the brochure for investors, especially on whether they should disclose the affiliate companies |
|---|---|

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

| Fujinaga, Junzo, Paul, Shintaku, John Rogers | "They drove to pharmaceutical plant under construction and Fujinaga show them facilities" |
|---|---|
| Fujinaga, Junzo, Keiko, John Rogers | "They discussed on the disclosure of the affiliate Companies at the lunch." |
| Fujinaga, Junzo, Paul, Shintaku | "Fujinaga instructs Suzukis about the brochure's modification and told them not to disclose the affiliate companies." |
| Fujinaga, Junzo, Keiko, Shintaku | "Recording of meeting held in the summer of 2007. They discussed on the registration to Japanese FSA, Investment solicitation strategy and advertisement" |
| Fujinaga, Junzo, Paul, Shintaku | "Recording of the meeting held at MRI headquarters in March 2008. They discussed on MRI's financials to prepare the documents for Japanese FSA's registration as the financial broker." |

87.     At all times relevant, Junzo, Paul and Keiko Suzuki knew that MRI was not using investors' funds solely for the purchase of MARS, and that, in fact, MRI had not purchased any MARS from independent medical facilities since approximately 2005.  Despite their representations that the investors' funds were used solely and exclusively for the purchase of MARS, the Suzukis both knew that in reality tens of millions of dollars were instead diverted to allow MRI and its affiliates to purchase and operate entirely separate business enterprises, including pharmaceutical plants.

88.     Moreover, as early as 2007, the Suzukis were aware that Sterling Escrow's role was not what was represented in MRI's marketing materials, seminars, and tours.  For example, on March 25, 2007, Paul Suzuki faxed Fujinaga, raising concerns that investors' money was being diverted to fund an MRI affiliate, Four Seasons Medical Group – which was contrary to MRI's core representation that investor funds would be used only to invest in MARS.  Likewise, on March 16, 2009 Keiko Suzuki received a Sterling Escrow letter laying out its relationship with

26

1   MRI.  In that letter, Sterling Escrow acknowledged that it was authorized to disburse investor

2   funds at MRI's direction – contrary to MRI's representation that Sterling Escrow alone controlled

3   disbursement of the funds.

4        89.    In addition, a series of faxes between the Suzukis and Fujinaga in 2012 shows the

5   Suzukis' active attempt to prevent the discovery of the fraud, and demonstrates their knowledge of

6   a Ponzi scheme and efforts to prevent its discovery.  For example, on April 27, 2012, Fujinaga

7   sent a fax to Junzo Suzuki stating:

8        Dear Junzo, "... All payments for liquidation and interest, effective April 30, 2012, will be

9        paid on time but subject to Japan fund raising of approximately $1,000,000 plus or minus

10       to cover past liquidations."

11  Fujinaga's communication reflects the essence of a Ponzi scheme -- existing investors could only

12  be paid if Japan raised $1 million in new investments.  Moreover, when Fujinaga told the Suzukis

13  of MRI's inability to pay investors, Junzo Suzuki repeatedly insisted to Fujinaga that certain of his

14  favored -- or feared -- investors be given priority in repayment despite the shortages, explicitly

15  aiming to appease certain investors who had reported or threatened to report the payment delays.

16  On July 30, 2012, Junzo Suzuki wrote to Fujinaga stating:

17       "If we can tell that the wire will be sent to your account Monday or Tuesday, then we can

18  keep from their unfavorable action."

19       On August 1, 2012, Junzo Suzuki also wrote:

20           "Dear Mr. Fujinaga

21           'URGENT'

22           I have to report the urgent matter.  One investor reported the wire

23           delay [sic] the FINMAC.[1]  This organization accept complain from

24           customer and does its solution of the conflict...We have to reply to

25

26

27  _____

[1] FINMAC stands for Financial Instruments Mediation Assistance Center, and is a dispute
28  resolution organization in Japan.

**FIFTH AMENDED COMPLAINT**

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1     the authority regarding this trouble and call him to explain what is

2     done for him...Please wire above amounts as soon as possible."

3     In follow up, Fujinaga wrote to Paul Suzuki on August 1, 2012:

4     "Dear Paul,

5     The wires for the critical investors has been paid.  See attached.

6     However, I will need your help in raising funds to pay for all

7     liquidations as soon as possible ... I need your help to focus on

8     raising funds to pay for all delayed liquidation payments.  With

9     you['re] help on liquidations, we should be

10     90.    Junzo, Paul and Keiko Suzuki therefore had actual knowledge that MRI was

11 perpetrating a Ponzi scheme by using new investor money to pay the distributions and principal of

12 existing investors.  This was clearly not the first time that the Suzukis were made aware of this,

13 because the records do not disclose that the Suzukis expressed surprise to Fujinaga or protested to

14 him.  To the contrary, they actively participated in the scheme.

15 **LOSS CAUSATION**

16     91.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

17 the economic loss suffered by plaintiffs.  Plaintiffs and the Class did in fact rely on Defendants'

18 false statements, and would not have invested in MRI were it not for the false and misleading

19 statements.

20     92.    During the class period, plaintiffs purchased MRI securities, but MRI has not

21 paid plaintiffs the principal or interest it owes them.  Plaintiffs and the class were thereby

22 damaged.

23 **SCIENTER ALLEGATION**

24     93.    As alleged herein, defendants acted with scienter in that defendants knew that the

25 public documents and statements issued or disseminated in the name of the Company were

26 materially false and misleading; knew that such statements and documents would be issued and

27 disseminated to the investing public; and knowingly and substantially participated in the issuance

28 and dissemination of false and misleading information in violation of federal securities laws.

28

**FIFTH AMENDED COMPLAINT**

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

Alternatively, defendants showed deliberate and conscious recklessness for whether the information was true or false.  Defendants were in receipt of and privy to confidential proprietary information reflecting the true facts regarding MRI, but failed to disclose materially adverse financial information and participated in the concealment of the true facts and disseminated false and misleading information, and participated in the fraudulent scheme alleged herein.

<div align="center">

**COUNT I**
**VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934,**
**15 U.S.C. § 78J AND RULE 10B-5, 17 C.F.R. 240.10B-5**

**(AGAINST DEFENDANTS FUJINAGA, JUNZO SUZUKI,**

**PAUL SUZUKI, AND KEIKO SUZUKI)**

</div>

94.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 93 as if fully set forth herein.

95.     MRI, Fujinaga, Junzo, Paul and Keiko Suzuki each violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5.

96.     During the Class Period, defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

97.     Defendants, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails, engaged and participated in a continuous course of conduct to disseminate false and misleading information about MRI's business and concealed adverse information about MRI's business.

98.     During the Class Period, MRI deceived plaintiffs and the Class and caused them to purchase securities in reliance on the deception.  In furtherance of their unlawful scheme, plan and course of conduct, defendants:

- Perpetrated a Ponzi scheme by which they used new investors' funds to make distributions owing to prior investors;

<div align="center">

29

**FIFTH AMENDED COMPLAINT**

</div>

- Represented to plaintiffs that their investments would be used solely to purchase MARS.  Instead the funds were appropriated for defendants' own uses and MRI failed to purchase MARS from any independent medical facilities;

- Defendants represented to investors that their funds would be managed and controlled by an independent third party escrow company.  However, the escrow company functioned only as a facilitating service under MRI's control, and investors' funds were commingled with MRI's operating funds;

- Defendants represented to investors that in the event of MRI's insolvency, their investments would be protected by collection programs and guarantees put in place by the Nevada state government.  In reality, Nevada had no such program.

- Defendants represented to investors that their funds would be protected in the event of the bank's insolvency, because lockbox accounts were purportedly protected by Nevada state laws giving investors priority liens on the funds.  However, lock boxes are no different from regular bank accounts and no relevant state law exists; and

- Defendants represented to investors that each state implements a system by which it guarantees payment on MARS, and MRI only purchases MARS valued at less than the maximum state guarantee, and therefore, even if the insurance company becomes insolvent, the MARS is guaranteed by the state.  No such state guarantee exists.

99.     By way of example and not limitation, Fujinaga violated the Exchange Act Section 10(b) and Exchange Act Rule 10b by means of the following acts and omissions:

- Fujinaga was at all times relevant, the president and sole shareholder of MRI. Fujinaga had actual knowledge MRI's true finances and business operations. Fujinaga personally designed and implemented MRI's marketing and business solicitation strategies, the contents of which he knew or should have known were materially false and misleading;

- With the intent to deceive, manipulate, or defraud, and/or with severe recklessness, Fujinaga collaborated with Junzo and Paul Suzuki to develop the deceptive contents of MRI's offerings and marketing materials;

- With the intent to deceive, manipulate, or defraud, and/or with severe recklessness, Fujinaga caused Sterling Escrow to divert investors' funds to MRI's operating accounts, and to its affiliated entities, which in turn funded his lavish lifestyle; and

- With intent to deceive, manipulate, or defraud, and/or with deliberate or conscious recklessness, Fujinaga caused Sterling Escrow to divert new investors' funds to pay off prior investors.

100.    By way example and not limitation, Junzo Suzuki violated the Exchange Act Section 10(b) and Exchange Act Rule 10b by means of the following acts and omissions:

- Junzo Suzuki was at all times relevant, Vice President of Asia Pacific of MRI and part of the management team. He founded the Tokyo office and ran it with only minimal supervision by and communication with Fujinaga. Junzo Suzuki was privy to and had actual knowledge of the true business operations of MRI and its finances. Suzuki directed and implemented MRI's solicitation strategies and advertisements, and was the person responsible at MRI for dissemination of information to the investors which he knew or, absent his reckless disregard, should have known, was materially false and misleading to the plaintiffs.

- Junzo Suzuki had actual knowledge of the misrepresentations and/or omissions of material facts or acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were available to him. Junzo Suzuki's material misrepresentations and/or omissions were done knowingly or recklessly for the purpose of concealing MRI's Ponzi scheme and MRI's actual financial condition.

- With intent to deceive, manipulate, or defraud, and/or with deliberate or conscious recklessness of the truth, Junzo Suzuki collaborated with Fujinaga and Paul Suzuki

**FIFTH AMENDED COMPLAINT**

to develop and disseminate the deceptive contents of MRI's offerings and marketing materials.

- Throughout the Class Period, Junzo Suzuki lectured at informational seminars where he knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, falsely represented to investors that MRI would invest plaintiffs' deposits only in MARS, that Nevada's government guaranteed the investments, that an independent escrow company was managing investors' funds, and that lock box accounts guaranteed the security of the investments.

- Throughout the Class Period, Junzo Suzuki hosted social gatherings at which he falsely, fraudulently, and recklessly informed the investors that MRI was using their money only for the purchase of MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds, and that lock box accounts assured the safety of the deposits.

- With deliberate or reckless disregard for the truth, Junzo Suzuki repeatedly disseminated financial information regarding MRI to the plaintiffs that was wholly inconsistent with financial reports submitted and attested to in filings he made on MRI's behalf to the Japanese authorities.

- Junzo Suzuki knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, failed to inform investors of MRI's inability to pay investors' their principal and distributions, and failed to inform MRI's investors of the true facts regarding MRI's hundreds of millions of dollars in deficits.

101.   By way of example and not limitation, Paul Suzuki violated the Exchange Act Section 10(b) and Exchange Act Rule 10b by means of the following acts and omissions:

- Throughout the Class Period, Paul Suzuki was the Manager of MRI's Tokyo branch and personally responsible for the marketing of MARS to the Japanese public and in MRI's interactions with the plaintiffs.  Paul Suzuki was privy to and had actual knowledge of the true business operations of MRI and its finances. He created and implemented MRI's solicitation strategies and advertisements, and was

32

aware of MRI's dissemination of information to the investors which he knew or absent his reckless disregard, should have known, was materially false and misleading.

- Paul Suzuki authored articles in MRI's magazine circulated to the investors, by which he knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, falsely informed the plaintiffs that MRI was using investors' money only in MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds, and that lock box accounts guaranteed the security of the MARS investments.

- Paul Suzuki led tours during the Class Period where he knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, represented to investors that MRI was using investors' money only in MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds, and that lock box accounts guaranteed the security of the MARS investments.

- Throughout the Class Period, Paul Suzuki lectured at informational seminars where he knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, represented to investors that MRI was using investors' money only in MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds and lock box accounts held MARS in the same amount as investors' funds.

- Paul Suzuki held "MRI Study Room" sessions during the Class Period whereby he knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, represented to investors that MRI was using investors' money only in MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds and lock box accounts held MARS in the same amount as investors' funds.

- Paul Suzuki participated in the social gatherings hosted by MRI during the Class Period whereby he knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, represented to investors that MRI was using investors' money only in MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds and lock box accounts held MARS in the same amount as investors' funds.

- With intent to deceive, manipulate, or defraud, and/or with severe recklessness, Paul Suzuki failed to inform investors of MRI's inability to pay investors' their principal and distributions, and failed to inform MRI's investors of the true facts regarding MRI's hundreds of millions of dollars in deficits.

- Paul Suzuki had actual knowledge of the misrepresentations and/or omissions of material facts or acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were available to him. Paul Suzuki's material misrepresentations and/or omissions were done knowingly or recklessly for the purpose of concealing MRI's Ponzi scheme and MRI's actual financial condition.

102. By way of example and not limitation, Keiko Suzuki violated the Exchange Act Section 10(b) and Exchange Act Rule 10b by means of the following acts and omissions:

- Throughout the Class Period, Keiko Suzuki was the face and head of MRI's Tokyo branch and personally responsible for the marketing of MARS to the Japanese public. Keiko Suzuki was privy to and had actual knowledge of the true business operations of MRI and its finances. She worked with Junzo and Paul to implement MRI's solicitation strategies and advertisements, and was aware of MRI's dissemination of information to the investors which she knew or absent her reckless disregard, should have known, was materially false and misleading.

- Keiko Suzuki chaperoned tours during the Class Period where she knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness,

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

represented to investors that MRI was using investors' money only in MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds, and that lock box accounts guaranteed the security of the MARS investments.

- Keiko Suzuki participated in the social gatherings hosted by MRI during the Class Period, where she knowingly, with intent to deceive, manipulate, or defraud, and/or with severe recklessness, represented to investors that MRI was using investors' money only in MARS, that Nevada's government guaranteed the collection of MARS, that an independent escrow company was managing investors' funds and lock box accounts held MARS with value at least equal to the investors' funds.

- With intent to deceive, manipulate, or defraud, and/or with severe recklessness, Keiko Suzuki failed to inform investors of MRI's inability to pay investors' their principal and distributions, and failed to inform MRI's investors of the true facts regarding MRI's hundreds of millions of dollars in deficits.

- Keiko Suzuki had actual knowledge of the misrepresentations and/or omissions of material facts or acted with reckless disregard for the truth in that she failed to ascertain and to disclose such facts, even though such facts were available to her. Keiko Suzuki's material misrepresentations and/or omissions were done knowingly or recklessly for the purpose of concealing MRI's Ponzi scheme and MRI's actual financial condition.

103. This action is brought within five years from the time the securities were either sold to plaintiffs and the Class or from the time that defendants failed to pay investors in accordance with their obligations, both in violation of Section 10(b) of the Exchange Act and Rule 10b-5. This action is also brought within two years from the time when plaintiffs and the Class discovered or reasonably could have discovered the facts upon which this cause of action is based, which is April 26, 2013, when the Japanese Securities Exchange Surveillance Commission reported its findings concerning MRI.

**COUNT II**
**VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT OF 1934, 15 U.S.C. § 77T**

**(AGAINST DEFENDANTS FUJINAGA, JUNZO SUZUKI,**
**PAUL SUZUKI, AND KEIKO SUZUKI)**

104.    Plaintiffs re-allege and incorporate paragraphs 1 through103 as though set forth herein.

105.    As alleged fully above, Defendants' conduct violated Section 20(a) of the Securities Exchange Act of 1934.

106.    During all times material to this action, Fujinaga, Junzo Suzuki, Paul Suzuki and Keiko Suzuki had the power, both direct and indirect, to control MRI and did in fact exercise such control, and were therefore "controlling persons" within the meaning of Section 20(a) of the Exchange Act of 1934.

107.    In particular, Fujinaga was a control person because:

- Fujinaga was the President and of the highest-level position at MRI's Las Vegas branch, exclusively responsible for its operations;

- Fujinaga owned 100% of the shares of MRI and had the ability to contractually bind MRI;

- Fujinaga directed MRI's operations and therefore had knowledge of the false statements disseminated to the investing public;

- Fujinaga had the power to influence and control, and did influence and control the decision-making of MRI, including the content and dissemination of the false and misleading statements;

- Fujinaga had full access and control of MRI's reports to the Japanese Financial Services Agency, offering books, press releases, monthly magazines, seminars, and other statements alleged by plaintiffs to be misleading and deceptive and had the ability to prevent or correct them prior to their issuance;

- Fujinaga supervised and directed the day-to-day operations of MRI's Las Vegas branch;

- Fujinaga had intimate knowledge of the finances of MRI and the financial statements prepared by MRI.  Fujinaga was responsible for communicating with and addressing issues raised by MRI's outside accountant.

108. In particular, Junzo Suzuki was a control person because:

- Junzo Suzuki was the Vice President of Asia Pacific and of the highest-level position at MRI's Tokyo branch, exclusively responsible for its operations;

- Junzo Suzuki directed MRI's operations in Japan and therefore had knowledge of the false statements disseminated to the investing public;

- Junzo Suzuki had the power to influence and control, and did influence and control the decision-making of MRI in Japan, including the content and dissemination of the false and misleading statements;

- Junzo Suzuki had full access and control of MRI's reports to which he personally attested to the Japanese Financial Services Agency, as well as the offering books, press releases, monthly magazines, seminars, and other statements alleged by plaintiffs to be misleading and deceptive and had the ability to prevent or correct them prior to their issuance;

- Junzo Suzuki supervised and directed the day-to-day operations of MRI's Tokyo branch.

109. In particular, Paul Suzuki was a control person because:

- Paul Suzuki was the Manager at MRI's Tokyo branch, responsible for its day-to-day operations and supervising its employees;

- Paul Suzuki directed MRI's operations in Japan and therefore had knowledge of the false statements disseminated to the investing public;

- Paul Suzuki had the power to influence and control, and did influence and control the decision-making of MRI in Japan, including the content and dissemination of the false and misleading statements;

- Paul Suzuki had full access and control of MRI's reports to the Japanese Financial Services Agency, as well as the offering books, press releases, monthly magazines,

seminars, and other statements alleged by plaintiff to be misleading and deceptive prior to the statements being issued and had the ability to prevent or correct and had the ability to prevent or correct them prior to their issuance.

110.   In particular, Keiko Suzuki was a control person because:

- Keiko Suzuki was the face of and controlled MRI's Tokyo branch, responsible for its day-to-day operations and supervising its employees;

- Keiko Suzuki directed MRI's operations in Japan and therefore had knowledge of the false statements disseminated to the investing public;

- Keiko Suzuki had the power to influence and control, and did influence and control the decision-making of MRI in Japan, including the content and dissemination of the false and misleading statements;

- Keiko Suzuki had full access and control of MRI's reports to the Japanese Financial Services Agency, as well as the offering books, press releases, monthly magazines, seminars, and other statements alleged by plaintiff to be misleading and deceptive prior to the statements being issued and had the ability to prevent or correct them prior to their issuance.

111.   Plaintiffs have been damaged by the wrongful conduct of the individual Defendants through their control of MRI, and the wrongful conduct caused plaintiffs to invest in the Ponzi scheme and lose their money.

112.   As such, defendants Fujinaga, Junzo Suzuki, Paul Suzuki and Keiko Suzuki are jointly and severally liable for all damages or losses suffered by plaintiffs during the Class Period.

## COUNT III
## VIOLATIONS OF SECTION 12(a)(1) OF THE SECURITIES ACT OF 1933, 15 U.S.C. 77L
**(AGAINST MRI, FUJINAGA, JUNZO SUZUKI, PAUL SUZUKI AND KEIKO SUZUKI)**

113.   Plaintiffs re-allege and incorporate paragraphs 1 through 112 as if fully set forth herein.

114.   MRI offered a separate and distinct group of securities to the public each year.  For example, in 2008 MRI offered the "Series 2008 Class A" and "Series 2008 Select A" securities. The following year, MRI offered a group of securities called "Series 2009 Class A" and "Series

38

2009 Select A," and so on.  In accordance with Section 5 of the Securities Act of 1933, defendants were required to register their securities each time a new "series" was offered to the public.  In violation of Section 5 of the Securities Act, defendants failed to file registration statements as to the "Series 2010 Class A" and "Series 2010 Select A" securities, "Series 2011 Class A" and "Series 2011 Select A" securities, "Series 2012 Class A" and "Series 2012 Select A" securities, and "Series 2013 Class A" and "Series 2013 Select A" securities.

115.    These unregistered securities were offered and sold to plaintiffs through the use of interstate communication and the mails, which contained material misstatements and omissions, as described herein.

116.    Defendants are sellers of securities, because each offered, sold, promoted, solicited, or passed title on the securities to plaintiffs and the Class, and thus are statutory sellers to Plaintiffs and the Class Members.  As such, pursuant to section 12(a) of the Securities Act of 1933 defendants are liable to all plaintiffs and the Class who purchased unregistered securities offered between 2010 and 2013 from defendants.

117.    As a direct and proximate result of the conduct alleged herein, plaintiffs and the Class Members who purchased unregistered securities offered between 2008 and 2013 suffered damages in connection with their investments with defendants.

118.    Plaintiffs and the Class seek to recover the consideration paid for such security with interest thereon.

## COUNT IV
## VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933, 15 U.S.C. 77o
### (AGAINST DEFENDANTS FUJINAGA, JUNZO SUZUKI, PAUL SUZUKI AND KEIKO SUZUKI)

119.    Plaintiffs re-allege and incorporate paragraphs 1 through 118 as if fully set forth herein.

120.    As alleged fully above, Defendants' conduct violated Section 5 of the Securities Act of 1933 and Section 12(a).

121.    During all times relevant, defendants Fujinaga, Junzo Suzuki and Paul Suzuki had the power, both direct and indirect, to control MRI, and did in fact exercise such control, and were

39

Manning & Kass
Ellrod, Ramirez, Trester LLP
Attorneys at Law

therefore "controlling persons" within the meaning of Section 15 of the 1933 Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and knowledge of the false statements disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control the decision-making of MRI and the MARS investment scheme.  The Individual Defendants had full access and control of MRI's reports to the Japanese Financial Services Agency, offering books, press releases, monthly magazines, seminars, and other statements alleged by plaintiffs to be misleading and deceptive prior to the statements being issued and had the ability to prevent the issuance of such statements or cause the statements to be corrected.

122.    Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of MRI and, therefore had the power to control and influence the actions alleged by plaintiffs to be securities violations.

123.    Plaintiffs have been damaged by the wrongful conduct of the Individual Defendants through their control of MRI because the wrongful conduct caused plaintiffs to invest in defendants' Ponzi scheme and lose their money.

124.    As such, MRI and the Individual Defendants are jointly and severally liable for all damages or losses suffered by plaintiffs.

## COUNT V
## INTENTIONAL FRAUD
### (AGAINST MRI, FUJINAGA, JUNZO SUZUKI, PAUL SUZUKI, AND KEIKO SUZUKI)

125.    Plaintiffs incorporate the allegations the paragraphs 1 through 124 as if set forth in full herein.

126.    The representations made by MRI, Fujinaga, Junzo Suzuki, Paul Suzuki and Keiko Suzuki to plaintiffs and the Class members were false.

127.    In particular, MRI made the following representations to plaintiffs and the Class Members, which was communicated to them through MRI's offering materials, MRI's annual

reports and in its monthly magazine, THE VIEW, and the monthly newsletters disseminated to each and every investor, each year from 2008 through 2013:

- Defendants represented to the investors that their money would be invested solely in the purchase of MARS.  However during the Class Period, MRI failed to purchase MARS from any independent medical facilities;

- Defendants represented to investors that their funds would be managed and controlled by an independent third party escrow company rather than MRI, ensuring the safety of the investors' funds;

- Defendants represented to investors that if MRI becomes insolvent, then the Nevada state government would supervise the escrow company to retain a new collections agency to collect the MARS on MRI's behalf and the investments are guaranteed;

- Defendants represented to the investors that in the event the escrow company becomes insolvent, the state of Nevada would use the contingency funds deposited by the escrow company with the state to reimburse investors;

- Defendants represented to investors that their funds were protected even in the event of the bank's insolvency, because investors' funds were deposited into a lockbox account, and state laws prevent creditors from accessing funds in lock boxes.  Defendant further represents that investors had a priority lien on the funds; and

- Defendants represented to investors that each state implements a system by which it guarantees payment on MARS, and MRI only purchases MARS valued at less than the maximum state guarantee, and therefore, even if the insurance company becomes insolvent, the MARS is guarantees by the state.

128.    In particular, Fujinaga made the following representations to plaintiffs and the Class Members, which he knew were false or were made with deliberate and conscious recklessness as to their truth or falsity:

**FIFTH AMENDED COMPLAINT**

- Represented to plaintiffs that their investments would be used solely to purchase MARS;

- The lockbox account was a specialized bank account used for collecting receivables, which required that the face value of the receivables purchased exceeded the actual amount paid to purchase them;

- Only companies that passed a rigorous test were eligible to open lockbox accounts;

- A lock box would provide protection even against the bank's insolvency because the assets were guaranteed by the state government;

- Investment in MARS is secure, because of the state guarantee;

- The escrow company makes it impossible for MRI to handle the investors' money;

- MRI maintained contracts with 116 medical providers and 72 pharmacies to purchase claims in 2009;

- That in the event the escrow company becomes insolvent the state of Nevada would use the contingency funds deposited by the escrow company with the state, to reimburse investors; and

- That each state implements a system by which it guarantees payment on MARS, and MRI only purchases MARS valued at less than the maximum state guarantee, and therefore, even if the insurance company becomes insolvent, the MARS is guaranteed by the state.

Each of these representations were communicated to plaintiffs and the Class through MRI's offering materials, MRI's THE VIEW, the monthly newsletters and VIMO, which were disseminated to each and every investor, each year from 2008 through 2013.

129.   In particular, Junzo Suzuki made the following representations to plaintiffs and the Class Members, which he knew were false or were made with deliberate and conscious recklessness as to their truth or falsity:

- Represented to plaintiffs that their investments would be used solely to purchase MARS;

- The lockbox account was a specialized bank account used for collecting receivables, which required that the face value of the receivables purchased exceeded the actual amount paid to purchase them;

- Only companies that passed a rigorous test were eligible to open lockbox accounts;

- A lock box would provide protection even against the bank's insolvency because the assets were guaranteed by the state government;

- Investment in MARS is secure, because of the state guarantee;

- The escrow company makes it impossible for MRI to handle the investors' money;

- MRI maintained contracts with 116 medical providers and 72 pharmacies to purchase claims in 2009;

- That in the event the escrow company becomes insolvent the state of Nevada would use the contingency funds deposited by the escrow company with the state, to reimburse investors; and

- That each state implements a system by which it guarantees payment on MARS, and MRI only purchases MARS valued at less than the maximum state guarantee, and therefore, even if the insurance company becomes insolvent, the MARS is guaranteed by the state.

Each of these representations were communicated to plaintiffs and the Class through MRI's offering materials, MRI's THE VIEW, the monthly newsletters and VIMO, which were disseminated to each and every investor, each year from 2008 through 2013.

130.    In particular, Paul Suzuki made the following representations to plaintiffs and the Class Members, which he knew were false or were made with deliberate and conscious recklessness as to their truth or falsity:

- Represented to plaintiffs that their investments would be used solely to purchase MARS;

- The lockbox account was a specialized bank account used for collecting receivables, which required that the face value of the receivables purchased exceeded the actual amount paid to purchase them;

43

- Only companies that passed a rigorous test were eligible to open lockbox accounts;
- A lock box would provide protection even against the bank's insolvency because the assets were guaranteed by the state government;
- Investment in MARS is secure, because of the state guarantee;
- The escrow company makes it impossible for MRI to handle the investors' money;
- MRI maintained contracts with 116 medical providers and 72 pharmacies to purchase claims in 2009;
- That in the event the escrow company becomes insolvent the state of Nevada would use the contingency funds deposited by the escrow company with the state, to reimburse investors; and
- That each state implements a system by which it guarantees payment on MARS, and MRI only purchases MARS valued at less than the maximum state guarantee, and therefore, even if the insurance company becomes insolvent, the MARS is guaranteed by the state.

131.    In particular, Keiko Suzuki made the following representations to plaintiffs and the Class Members, which she knew were false or were made with deliberate and conscious recklessness as to their truth or falsity:

- Represented to plaintiffs that their investments would be used solely to purchase MARS;
- The lockbox account was a specialized bank account used for collecting receivables, which required that the face value of the receivables purchased exceeded the actual amount paid to purchase them;
- Only companies that passed a rigorous test were eligible to open lockbox accounts;
- A lock box would provide protection even against the bank's insolvency because the assets were guaranteed by the state government;
- Investment in MARS is secure, because of the state guarantee;
- The escrow company makes it impossible for MRI to handle the investors' money;

**FIFTH AMENDED COMPLAINT**

- MRI maintained contracts with 116 medical providers and 72 pharmacies to purchase claims in 2009;
- That in the event the escrow company becomes insolvent the state of Nevada would use the contingency funds deposited by the escrow company with the state, to reimburse investors; and
- That each state implements a system by which it guarantees payment on MARS, and MRI only purchases MARS valued at less than the maximum state guarantee, and therefore, even if the insurance company becomes insolvent, the MARS is guaranteed by the state.

132.   Each of MRI, Fujinaga, Junzo Suzuki, Paul Suzuki and Keiko Suzuki knew that the representations they made were false or they were made with deliberate and conscious recklessness as to their truth or falsity.

133.    MRI, Fujinaga, Junzo Suzuki, Paul Suzuki and Keiko Suzuki intended for plaintiffs and the Class Members to rely on those false representations.

134.    MRI, Fujinaga, Junzo Suzuki, Paul Suzuki and Keiko Suzuki represented themselves as professional sellers of securities and assured plaintiffs and the Class Members that MRI's securities were safe and secured by various U.S. state government guarantees.   It was, therefore, justifiable for plaintiffs and the Class Members to rely on the representations made by MRI and the Individual Defendants.

135.    Plaintiffs and the Class did in fact rely on Defendants' false statements, and would not have invested in MRI were it not for the false and misleading statements.

136.    Defendants have enjoyed substantial financial gain, and Plaintiffs and the Class have suffered severe financial loss as a result of their reliance on the false statements of Defendants.

137.    Defendants' conduct described herein was intended by Defendants to cause injury to Plaintiffs or was despicable conduct carried on by Defendants with a willful and conscious disregard of Plaintiffs' rights, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights, and was an intentional misrepresentation, deceit or

45

**FIFTH AMENDED COMPLAINT**

concealment of material facts known to the Defendants with the intent to deprive Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage, constituting malice, oppression, or fraud, thereby entitling Plaintiffs to punitive damages against defendants in an amount appropriate to punish or set an example of Defendants.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

**COUNT VI**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

138.    Plaintiffs incorporate the allegations the paragraphs 1 through 137 as if set forth in full herein.

139.    By entrusting their money to MRI and investing in MRI's illegal Ponzi scheme, Plaintiffs and the Class conferred unearned and unmerited benefits on Defendants.

140.    The Defendants voluntarily accepted and retained the benefits conferred by Plaintiffs and the Class.

141.    The circumstances are such that it would be inequitable for Defendants to retain the benefits without paying the value thereof to Plaintiff's and the Class.

142.    Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

143.    Plaintiffs and the Class are entitled to damages as a result of Defendants' unjust enrichment, including the disgorgement of all the funds unlawfully accepted by Defendants from Plaintiffs and the Class.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST MRI, FUJINAGA, JUNZO SUZUKI, PAUL SUZUKI,**
**KEIKO SUZUKI, AND LVT, INC.)**

144.    Plaintiffs re-allege and incorporate paragraphs 1 through 143 as if fully set forth herein.

145.    Plaintiffs and the Class Members shared a relationship with Defendants, whereby Defendants held themselves out as worthy of the trust and confidence of Plaintiff's and all Class members.  Plaintiffs and the Class Members in fact reposed trust and confidence in Defendants to invest Plaintiffs' and the Class Members' moneys prudently, and to make truthful statements about

46

the investments, and Defendants undertook such trust and assumed a duty to advise and counsel Plaintiffs and the Class Members, and to protect Plaintiffs' and the Class Members' assets.

146. Defendants breached their duties to advise and counsel Plaintiffs and the Class Members, and to protect Plaintiffs' and the Class Members' assets.

147. As a direct and proximate result of defendants' breach of its fiduciary duty to Plaintiffs and the Class Members, Plaintiffs and the Class Members have suffered damages in an amount to be determined at trial.

<u>**COUNT VIII**</u>
<u>**AIDING AND ABETTING FRAUD**</u>
**(AGAINST LVT, INC. dba STERLING ESCROW)**

148. Plaintiffs re-allege and incorporate paragraphs 1 through 148 as if fully set forth herein.

149. Sterling Escrow had knowledge of the fraud and the Ponzi scheme committed by MRI.

150. As described above, Sterling Escrow substantially assisted MRI and its representatives in perpetrating the fraud, by wiring plaintiffs' investment funds to MRI to be used for operation expenses, wiring plaintiffs' funds directly to repay other investors' whose investments had matured, and commingling investors' monies between different investment funds. Sterling Escrow also had knowledge of the fact that, at least since 2011, the funds were not being used to purchase MARS, which it knew was the only appropriate use of the funds invested by plaintiffs.

151. As a direct and proximate result of Sterling Escrow's aiding and abetting, MRI and its representatives, MRI's MARS investment fraud flourished, and all of the plaintiffs suffered damages in an amount to be determined at trial.

152. Plaintiffs have suffered substantial financial injury as a result of Sterling Escrow's conduct alleged herein. The majority of plaintiffs have invested the entirety of their life savings and retirement savings, and thus are now left with substantially nothing. As a consequential and proximate result of their financial injuries, plaintiffs have experienced and continue to experience severe emotional distress in the form of depression, fear anxiety, worry grief, and loss of sleep.

47

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

**COUNT IX**
**BREACH OF CONTRACT**
**(AGAINST MRI INTERNATIONAL, INC.)**

153.    Plaintiffs re-allege and incorporate paragraphs 1 through 152 as if fully set forth herein

154.    Plaintiffs and the Class have each entered into contracts with Defendant MRI, whereby Plaintiffs agreed to and did invest a specified sum for the purpose of purchasing and collecting MARS, in return for MRI's promises to invest the funds pursuant to the terms of the agreement, and upon maturity, to repay the principal and the accrued interests under the agreements.

155.    At all times relevant, Plaintiffs and the Class have each performed their obligations by making payment in the specified sum as agreed to in each investment contract.  Many of Plaintiffs and the Class' contracts have reached maturity, entitling them to repayment of the principal and the accrued interest.

156.    MRI has breached the contract by failing to invest, segregate, and safeguard the funds as promised, and failing to repay the principal and interest in accordance with the contract.

157.    Plaintiffs and the Class have demanded Defendants to repay the principal and interest in accordance with the contract.

158.    Defendants have refused, and continue to fail and refuse to pay Plaintiff and the Class the monies they are owed.

159.    As direct and proximate result of Defendant MRI's breach, Plaintiffs and the Class have suffered damages in an amount according to proof to be presented at trial together with lawful interest.

**COUNT X**
**ACTION FOR ACCOUNTING**
**(AGAINST MRI, FUJINAGA, JUNZO SUZUKI, KEIKO SUZUKI, PAUL SUZUKI AND LVT, INC.)**

160.    Plaintiffs re-allege and incorporate paragraphs 1 through 159 as if fully set forth herein.

48

**FIFTH AMENDED COMPLAINT**

161.     Defendants MRI, Fujinaga, Junzo Suzuki, Keiko Suzuki and LVT, Inc. were fiduciaries to Plaintiffs and the Class, and at all times relevant, responsible for managing the funds invested by Plaintiffs and the Class.  Contrary to their representations, as fully described above, Plaintiffs' and the Class' investments were commingled and used for purposes other than for the purchase and collection of MARS.

162.     Plaintiffs and the Class believe and thereon allege, that Defendants have dissipated the monies invested by Plaintiffs and the Class, are unaware of the extent of the dissipation and the full nature of the disposition of the funds invested, despite demands made to Defendants. Plaintiffs and the Class are entitled to know the nature of those transactions and dispositions, but cannot do so without an accounting from Defendants.

163.     Plaintiffs and the Class have demanded an accounting of Defendants' operations, but Defendants have failed and refused, and continued to fail and refuse to render an accounting to Plaintiffs and the Class.

**COUNT XI**
**CONSTRUCTIVE TRUST**
**(AGAINST ALL DEFENDANTS)**

164.     Plaintiffs re-allege and incorporate paragraphs 1 through 163 as if fully set forth herein.

165.     By virtue of Defendants' fraudulent acts describe more fully above, Defendants hold monies invested by Plaintiffs and the Class as a constructive trustee for the benefit of Plaintiffs and the Class.

166.     Plaintiffs and the Class believe and thereon alleges that Defendants have caused and continue to cause injury to Plaintiffs' and the Class' beneficial interest, and the funds will be further dissipated or wasted unless Defendants' conducts are enjoined.

**COUNT XII**
**FRAUDULENT TRANSFER**
**(AGAINST ALL DEFENDANTS EXCEPT MRI INTERNATIONAL, INC.)**

167.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 166 as if fully set forth herein.

**FIFTH AMENDED COMPLAINT**

168.    Now and at all times throughout the Class Period, MRI stood in debt to the Plaintiffs for repayment of sums measured in the hundreds of millions of dollars in matured obligations owing to the plaintiffs under the MARS investment scheme; as explained at length above, MRI's MARS investment scheme was in fact a fraudulent Ponzi scheme and MRI was accordingly insolvent within the meaning of Nevada's Fraudulent Transfers Act, Nev. Rev. Stat. § 112.140, *et seq*.

169.    On numerous occasions throughout the Class Period, the Suzukis, together with their business entities and affiliates, including Defendants Suzuki Enterprises, Inc., Puuikena Investments LLLP, Junzo Suzuki Irrevocable Trust dated May 10, 2013, Keiko Suzuki Irrevocable Trust dated May 10, 2013, Paul Suzuki Irrevocable Trust dated May 10, 2013, Catherine Mai Suzuki Irrevocable Trust dated May 10, 2013, and the Suzuki Enterprises, Inc. Profit Sharing Plan received cash, commissions, assets and other items of value in the tens of millions of dollars from MRI and its affiliates as recompense for the Suzukis' efforts in the propagation of the MARS investment Ponzi scheme.  All of the commissions and other sums given over to the Suzukis and their affiliates were generated by MRI or its affiliates in connection with their operation of the Ponzi scheme.  As a function of their direction of, participation in, and knowledge of the inner-workings of the fraudulent scheme, The Suzukis and their business entities and affiliates knew or, if they did not know, recklessly disregarded facts by which they should have known, that the commissions and other payments they received were derived from the proceeds of MRI's fraud.

170.    Likewise throughout the Class Period, Sterling Escrow and its owners and operators received cash and other forms of payment from MRI and its affiliates as recompense for their services in the propagation of the MARS investment Ponzi scheme.  All of the cash and other sums given over to Sterling Escrow and its affiliates were generated by MRI or its affiliates in connection with their operation of the Ponzi scheme.  As a function of their direction, participation, and knowledge of the inner-workings of the fraudulent scheme, Sterling Escrow and its owners and operators knew or, if they did not know, recklessly disregarded facts by which they should have known, that the payments they received had derived from the proceeds of MRI's fraud.

50

**FIFTH AMENDED COMPLAINT**

171.    Likewise, ICAG, Inc. and its owners and operators received $48,600,728 in cash and other forms of payment from MRI and its affiliates as recompense for their services in the propagation of the MARS investment Ponzi scheme.  All of the cash and other sums given over to ICAG, Inc., were generated by MRI or its affiliates in connection with their operation of the Ponzi scheme.  As a function of their direction, participation, and knowledge of the inner-workings of the fraudulent scheme, ICAG, Inc., and its owners and operators knew or, if they did not know, recklessly disregarded facts by which they should have known, that the payments they received had derived from the proceeds of MRI's fraud.

172.    Neither the recruitment efforts rendered by the defendants herein nor the services undertaken by them on behalf of MRI amounted to the provision of reasonably equivalent value -- or any value at all -- in exchange for the cash, commissions, and other transfers they received because brokerage and other services made in furtherance of a Ponzi scheme cannot confer any value by operation of law.

173.    Since the cash, commissions, and other transfers to Defendants found their source in the fraudulent investment scheme resulting in the damages to Plaintiffs alleged herein, the Plaintiffs and the Class are, by operation of law, the equitable owners of all such cash, commissions, and transfers.

174.    The transfers described herein were made with the actual intent to hinder, delay, or defraud MRI's creditors, including Plaintiffs because, among other reasons, transfers made from a Ponzi scheme are presumptively made with an intent to defraud.  Because the transfers were accordingly fraudulent under applicable law, they are void and without effect as to the Plaintiffs and properly subject to disgorgement in favor of the plaintiffs to the full extent necessary to satisfy the plaintiffs' claims against MRI and the remaining defendants herein.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury.

## PRAYER

The named plaintiffs and the plaintiff Class request the following relief:

1.    Certification of the Class;

**FIFTH AMENDED COMPLAINT**

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1   2.   A jury trial and judgment against defendants;

2   3.   Damages in the amount of the named Plaintiffs' and the Class' financial loss as a

3       result of Defendants' conduct and for injury to their business and property, all as a

4       result of Defendants' violations of law, as set forth above.

5   4.   Disgorgement of all ill-gotten gains obtained by defendants through their

6       participation in their fraudulent activities;

7   5.   For an order declaring that Defendants hold all of the monies invested by Plaintiffs

8       and the Class in trust for Plaintiffs and the Class;

9   6.   For an accounting of all monies invested by and owing to Plaintiffs and the Class;

10  7.   For an order enjoining Defendants from wasting the property held in constructive

11      trust;

12  8.   Punitive damages;

13  9.   For attorneys' fees;

14  10.  For costs of suit; and

15  11.  For such other and further relief as the Court deems just and proper.

16

17  DATED:  September 29, 2016          **MANNING & KASS**
                                       **ELLROD, RAMIREZ, TRESTER LLP**

18

19                                     By:  _____/s/ James E. Gibbons_____

20                                          James E. Gibbons
                                            Attorneys for Plaintiffs

21

22  DATED:  September 29, 2016          **LAW OFFICES OF ROBERT W. COHEN**
                                       **A Professional Corporation**

23

24

25                                     By:  _____/s/ Robert W. Cohen_____

                                            ROBERT W. COHEN
26                                          MARIKO TAENAKA
                                            Attorneys for Plaintiffs

27

28

**FIFTH AMENDED COMPLAINT**

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2016, a copy of the foregoing document was filed electronically via the Court's CM/ECF system. Pursuant to Local Rule 5.5(h), notice of filing will be served on all parties by operation of the Court's CM/ECF system, and parties may access this filing through the Court's CM/ECF system.

<div align="right">

    /s/ Mariko Taenaka    .
Mariko Taenaka

</div>

**FIFTH AMENDED COMPLAINT**